DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

Sebastian MIRALLES ACUÑA
Av. Paseo de la Reforma 246, Floor 41,
Cuauhtémoc, Mexico City 06600
smiralles@tempestcapital.com
+52 (55) 18776252
November 1st, 2021

United States Courts
Southern District of Texas
FILED

NOV 0 2 2021

Nathan Ochsner, Clerk of Court

# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | |
|---|---|
| SEBASTIAN MIRALLES ACUNA (PRO SE), Plaintiff, | Case No.: 20–34114 |
| | (Jointly Administered) |
| vs. | Adv. Proc. No. 21-03902 |
| VALARIS PLC, ET AL., Defendants | **AMENDED ADVERSARY COMPLAINT FOR PLAN REVOCATION, INJUNCTIVE RELIEF, CIVIL PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF** |

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

## LIST OF DEFENDANTS

### Debtor

- Valaris, PLC

### Debtor's Prepetition Management

- Thomas Peter Burke (CEO)
- Jonathan H. Baksht (CFO)
- Michael T. McGuinty (CLO)

### Debtor's Counsel & Advisors

- Kirkland & Ellis, LLP
  - Ross Kwasteniet
  - Anup Sathy
  - Jeffrey Zeiger
  - Spencer Winters
  - Samantha Good
  - Kelann Stirling
- Lazard, Ltd
  - David Kurtz
  - Doug Fordyce
  - Ari Lefkovits
- Slaughter and May, LLP
  - Christian Boney
  - Ian Johnson
  - Hywel Davies
- Richard J. Grossman (Employed by Skadden Arps)

### Fraudulent Transfer of Valaris Rigs

- Lone Star Mineral Development, LLC
  - Bret Johnsen

### Substantial Shareholders & Related Parties

- Luminus Management, LLC
  - Jonathan Barrett
  - Adam Weitzman
- Proskauer Rose, LLP
  - Robert Leonard
  - Frank Zarb

### Debtor's Pre-petition Board Members

- Paul E. Rowsey, III
- William E. Albrecht
- Frederick Arnold
- Mary Francis CBE
- Suzanne P. Nimocks
- Thierry Pilenko

### Bondholders & Ad Hoc Group

- Aurelius Capital Management, LP
- Brigade Capital Management, LP
- Canyon Capital Advisors, LLC
- GoldenTree Asset Management, LP
- King Street Capital Management, LP
- Lodbrok Capital, LLP
- Oak Hill Advisors, LLP
- Oaktree Capital Management, LP
- Pacific Investment Management Company, LLC
- Taconic Capital Advisors, LP
- Whitebox Advisors, LLC

### Yet to be named

- John Doe's 1-50

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

**INTRODUCTION**

1.   This is an amendment Plaintiff Sebastian Miralles Acuña's ("Plaintiff") Pleading under case Adv. Proc. No. 21-03902. Amendment is made pursuant to Fed. R. Civ. P. 15, and Case Management Order signed October 18, 2021 by the Honorable Marvin Isgur.

2.   Case is against the Defendant Valaris PLC ("Valaris" or "The Company"), Luminus Management LLC ("Luminus"), Listed Defendants, and Does 1-50 (collectively, "Defendants"), to request under 11 U.S. Code § 1144 for equitable relief, or a revocation of the Plan Confirmation pertaining to the Valaris Chapter 11 procedure in order to prevent Unjust Enrichment of Defendants. Or in the alternative to request compensatory damages, treble exemplary damages and equitable relief pursuant the Defendants violation of 11 U.S.C. § 1123(a)(4), 18 U.S.C§ 152 (1)(2)(3)(6)(7)(9), 18 U.S.C. § 1961-1962, as well as other predicate offenses. As well as to alert the Court of the actions here described so it may the act in a Sua Ponte basis as it deems fit.

**JURISDICTION**

3.   The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, as this case involves questions of bankruptcy law. Jurisdiction over this proceeding is proper pursuant to 28 U.S.C. § 1334. Bankruptcy courts have jurisdiction over all cases under title 11, as well as "civil proceedings arising under title 11, or arising in or related to cases under title 11." A matter is "related to" a case under title 11 if the adversary proceeding's outcome may "both (1) alter the rights, obligations, and choices of the action of the debtor, and (2) have an effect on the

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

22   administration of the estate." Trevino v. HSBC Mortgage Services, Inc. (In re Trevino), 535

23   B.R. 110, 125 (Bankr. S.D. Tex. 2015) citing In re Bass, 171 F.3d 1016 (5th Cir. 1999).

24      4.   This Court also has jurisdiction pursuant to 28 U.S.C. § 157, and 11 U.S.C § 1144

25   as the Plaintiff seeks equitable relief and compensation for broad violations of 18 U.S.C. §

26   152(1)(2)(3)(6)(7)(9), 11 U.S.C. § 1123(a)(4), all major matters considered by the Court.

27                                    **VENUE**

28      5.   Venue is proper under 28 U.S.C. § 1408 and 28 U.S.C. § 1409.

29                                   **PARTIES**

30      6.   Defendant Valaris PLC is the world´s largest provider of offshore contract drilling

31   services to the international oil and gas industry. The Company was founded in April 2019

32   after the merger of ENSCO plc ("ENSCO") and Rowan Companies plc ("Rowan"), two of the

33   main offshore drilling companies worldwide. Currently, Valaris counts with a diverse rig fleet

34   consisting of ultra-deepwater drill ships, versatile semisubmersibles, and modern shallow-

35   water jackups capable of meeting a wide spectrum of customers' well program requirements.

36   The company owns 61 rigs in total, making it the world's largest fleet.

37      7.   Defendant Luminus Management LLC is an investment management firm founded

38   in 2002 by Jonathan Barret with offices in New York, NY and Houston, TX. It is a self-declares

39   subsidiary of LS Power, LLC.

40      8.   Defendant Thomas Peter Burke was Valaris President  & Chief Executive Officer

41   from April 2019 to September 2021. Before he was President & Chief Executive Officer of

42   Rowan Companies for seven years. Address unknown

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

9.   Defendant Jonathan H. Baksht was Valaris Executive Vice President & Chief Executive Officer from April 2019 to September 2021.   Additionally, he was a board member of ARO Drilling from April 2019 to August 2021. Address unknown

10. Defendant Michael T. McGuinty was Valaris PLC's Senior Vice President as well as General Counsel and Company Secretary from February 2016 to May 2021. Address unknown

11. Defendant Paul E. Rowsey, III served as Independent Director of Valaris PLC since January 2000 and serves as its Non-Executive Chairman and Lead Independent Director since May 01, 2020. Address unknown

12. Defendant William E. Albrecht was previously employed as an Independent Non-Executive Chairman by Rowan Cos. Ltd., and as a Lead Independent Director by Valaris Plc. Address unknown

13. Defendant Frederick Arnold was appointed in November 2019 to serve in Valaris Board of Directors as well as in the finance committee. Prior to joining Mr. Arnold was a Board Member of FS KKR Capital Corp. (A vehicle of FS Investments and KKR) up until November 2019, and since 2012 serves as Lehman Brothers Holdings Inc. Board Member having worked as SVP in Lehman Brothers from 1980 to 1989. Address unknown

14. Defendant Mary Elizabeth Francis CBE LVO is a non-executive Director of Barclays plc, Valaris plc, and PensionBee Group plc, where she is Senior Independent Director. Address unknown

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

15. Defendant Suzanne P. Nimocks, is a non-executive and independent director of ArcelorMittal and a member of the appointments, remuneration, corporate governance and sustainability committee. She served in Valaris Board of Directors from December 2010 to April 2021. Address unknown

16. Defendant Thierry Pilenko currently serves as a director of Valaris plc and Trident Energy and formerly served on the board of directors of Hercules Offshore, Veritas DGC, CGG and Peugeot S.A. Address unknown

17. Kirkland & Ellis, LLP ("Kirkland & Ellis", or "K&E") is Chicago based law firm employed by Valaris since Fall 2019, and lead counsel in the Chapter 11 process. Enjoined for vicarious liability of its participating Partners under Fed. R. Civ. P. 11 (c)(1).

18. Defendant Ross M. Kwasteniet is a Partner in the Restructuring Group of Kirkland & Ellis LLP. Address unknown

19. Defendant Anup Sathy is a Partner in the Restructuring Group of Kirkland & Ellis LLP. Address unknown

20. Defendant Spencer Winters is a Partner in the Chicago office of Kirkland & Ellis LLP. Address unknown

21. Defendant Samantha Good is a Partner in Kirkland & Ellis LLP. Address unknown

22. Defendant Kelann Stirling is a Partner at Kirkland & Ellis LLP. Address unknown

23. Defendant Jeffrey Zeiger is a Partner in Kirkland & Ellis LLP. Address unknown

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

24. Lazard Ltd is a New York based investment bank employed by Valaris since Fall 2019, and lead advisor in the Chapter 11 process. Enjoined for vicarious liability of its employees

25. Defendant David Kurtz is a Managing Director at Lazard ltd. Mr. Kurtz joined Lazard in 2002 from law firm Skadden, Arps, Slate, Meagher & Flom LLP, where he was a senior partner. He advised on the Dynegy, Inc bankruptcy case. Address unknown

26. Defendant Doug Fordyce is a Managing Director at Lazard. Address unknown

27. Defendant Ari Lefkovits is a Managing Director at Lazard. Address unknown

28. Slaughter and May, LLP ("Slaughter & May") is a London based law firm employed by Valaris as Lead Counsel in the United Kingdom for the Chapter 11 process. Enjoined for vicarious liability under Fed. R. Civ. P. 11 (c)(1).

29. Defendant Christian Boney is a Partner at Slaughter and May, LLP. Address unknown

30. Defendant Ian is a Partner in Slaughter and May, LLP. Address unknown

31. Hywell Davies is a Partner at Slaughter and May, LLP. Address unknown

32. Defendant Richard J. Grossman is a Partner at Skadden, Arps, Slate, Meagher & Flom LLP. Address unknown

33. Defendant Jonathan Barrett is the Founder and CEO of Luminus Management LLC. Mr. Barret was CFO of investment management firm, J. Epstein & Co. and Ossa Properties. Address unknown

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

102    34. Defendant Adam Weitzman was a Managing Director at Luminus Management.

103  He became member of the Valaris Board because of a corporate raid by Luminus. He left both

104  both Luminus and Valaris in 2021. Mr. Weitzman is currently a Portfolio Manager at Surveyor

105  Capital, a subsidiary of Citadel Enterprise Americas, LLC. Address unknown

106    35. Proskauer Rose LLP is a law firm employed by Luminus to negotiate and document

107  the Luminus Settlement. Enjoined for vicarious liability

108    36. Defendant Robert Leonard is a partner in the Hedge Funds Group of Proskauer

109  Rose LLP. Address unknown.

110    37. Defendant Frank Zarb is a partner in Proskauer Rose LLP. Address unknown.

111    38. Defendant Aurelius Capital Management is an American hedge fund with offices

112  in New York, that participated in the Ad Hoc Committee of Valaris, and part of the DIP Capital

113  Providers.

114    39. Defendant Brigade Capital Management, LP, is a hedge fund that participated in

115  the Ad Hoc Committee of Valaris, and part of the DIP Capital Providers.

116    40. Defendant Canyon Capital Advisors, LLC  is a hedge fund that participated in the

117  ad hoc committee of Valaris, and  part of the DIP capital providers.

118    41. Defendant GoldenTree Asset Management, LP is a hedge fund that participated in

119  the Ad Hoc Committee of Valaris, and part of the DIP Capital Providers.

120    42. Defendant King Street Capital Management, LP is a hedge fund that participated in

121  the Ad Hoc Committee of Valaris, and  part of the DIP Capital Providers.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

43. Defendant Lodbrok Capital, LLP is a hedge fund that participated in the Ad Hoc Committee of Valaris, and part of the DIP Capital Providers.

44. Defendant Oak Hill Advisors, LP is a hedge fund that participated in the Ad Hoc Committee of Valaris, and part of the DIP Capital Providers.

45. Defendant Oaktree Capital Management, LP is a hedge fund that participated in the Ad Hoc Committee of Valaris, and part of the DIP Capital Providers.

46. Defendant Pacific Investment Management Company, LLC is a hedge fund that participated in the Ad Hoc Committee of Valaris, and part of the DIP Capital Providers.

47. Defendant Taconic Capital Advisors, LP is a hedge fund that participated in the Ad Hoc Committee of Valaris.

48. Defendant Whitebox Advisors, LLC is a hedge fund participated in the Ad Hoc Committee of Valaris, and part of the DIP Capital Providers.

49. Defendant Lone Star Mineral Development LLC, a purported affiliate of Space Exploration Technologies Corporation ("SpaceX"), is a Delaware domicilied Oil and Gas Exploration limited liability company. Company has OPERATOR NO. 507234 from the Texas Railroad Commission.

50. Defendant Bret Jensen is the CFO of Space X and Principal of Lone Star Mineral Development LLC. Address unknown

51. Plaintiff Sebastian Miralles Acuña, a Mexican national, is the Founder and Managing Partner of Tempest Capital, a private equity investment management firm. Relevant to the case, Mr. Miralles began his career as a forensic finance professional with Kroll, Inc.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

143   Mr. Miralles holds the Chartered Financial Analyst (CFA) designation, as well as the Chartered

144   Alternative Investment Analyst (CAIA) designation.

**Additional Defendants joined under Rule 19(a) & Rule 15(c)**

146   52. Since the original Pleading, Mr. Miralles has determined the identity of some of the

147   John Doe's directly participating in the illicit behavior. All parties relate back to the actions in

148   the original complaint as contemplated under Fed. R. Civ. P. 15(c). Amendment is also filed

149   to meet time restrictions established in Fed. R. Civ. P. 4(m) for serving within 90 days of the

150   original complaint.

151   53. While unusually broad, joinder of Parties is in the interest of justice to grant

152   complete relief as under Fed. R. Civ. P. 19(a), while attempting a highly practical fact-based

153   endeavor. See Pulitzer-Polster v. Pulitzer, 784 F.2d 1305 (5th Cir. 1986), reaffirmed in Schmidt

154   v. Grand Ltd. (In re Black Elk Energy Offshore Operations, LLC), 605 B.R. 138 (Bankr. S.D.

155   Tex. 2019)

156   54. Parties constitute members of the Ad Hoc group who are currently shareholders of

157   restructured Valaris, their attorneys, and senior executives linked directly to Valaris who would

158   reasonably be expected to receive notification of an accusations of Fraud Upon the Court by

159   the Company. This fulfills the requirement to "*infer notice if there is an identity of interest*

160   *between the original defendant and the defendant sought to be added or substituted.*" Jacobsen

161   v. Osborne, 133 F.3d 315 (5th Cir. 1998), "*We hold that relation back under Rule 15(c)(1)(C)*

162   *depends on what the party to be added knew or should have known, not on the amending party's*

163   *knowledge or its timeliness in seeking to amend the pleading*" Krupski v. Costa Crociere S. P.

164   A., 560 U.S. 538, 541 (2010). "*Under Texas law, a newly asserted claim relates back unless it*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

165  *is 'wholly based on a new, distinct, or different transaction or occurrence.'* " Id., citingTex.

166  Civ. Prac. & Rem.Code § 16.068 (2008)" Ultraflo Corp. v. Pelican Tank Parts, Inc., 926 F.

167  Supp. 2d 935, 946 (S.D. Tex. 2013)

## NATURE OF THIS ACTION

169  55. This is an action brought pursuant to flagrant violations of Title 18 U.S. Code § 152

170  (6)(9), 11 U.S.C. § 1123(a)(4) and 11 U.S.C. § 1126(b)(1), among others.

171  56. Plaintiff seeks injunctive relief, or compensatory damages, punitive damages,

172  equitable relief, and his reasonable attorneys' fees and litigation expenses as remedies for

173  Defendants' violations of Federal and Texas statutory laws.

## STANDING

175  57. Plaintiff was an investor for 152,900 shares of Valaris that purchased at a cost basis

176  of US$960,612 which he mostly accumulated during the month of September 2019. Since 2016

177  he was an active investor in the predecessor entities of ENSCO and Atwood Oceanics Inc

178  ("Atwood"). His investment was predicated on the Company's representation that the Fair

179  Market Value of their assets was in excess of $13 billion (after already having gone through

180  fair market value impairment testing, and the company reporting $23.9 Billion in Replacement

181  Value) while having approximately $6.5 billion in financial liabilities. At the same time,

182  Valaris management represented that they had ample liquidity, available for at least 2 years of

183  operation. During this period, the company traded at a pricing band of approximately $1 billion

184  in equity value. The Plaintiff has currently been assigned a pari-passu ownership interest in

185  Warrants for 7% of the value of the restructured entity, Valaris LTD, as determined by the Plan.

186  As outlined below, Mr. Miralles and other Class 13 unsecured Creditors had consequential

187   economic interest vested in Valaris at the time it was plunged into bankruptcy through Fraud

188   upon the Court. He still retains consequential economic interest in the Company, which he

189   seeks to protect through equitable relief under the provisions of 11 U.S. Code § 1144, 11 U.S.

190   Code § 105(a), and 11 U.S. Code § 1142 (b).

191

192   **<u>SUMMARY</u>**

193   58. Long pleadings seldom auger a good beginning. In this case it is necessary to argue

194   with specificity a tangled web of fraud, deceit, and breaches of fiduciary duty. To spare the

195   Court navigating these convoluted events, the Plaintiff has prepared a simplified Timeline of

196   the entire Valaris bankruptcy saga (See Exhibit 1).

197   59. Cutting through the complexity, the Court is being asked to make just one

198   Judgement of Law. Namely, whether the so-called Luminus Settlement Constitutes a Bribe

199   under the meaning of Title 18 U.S. Code § 152(6), and whether withholding knowledge of its

200   existence constituted Concealment under Title 18 U.S. Code § 152(9).

201   60. The existence of the Luminus Settlement is a matter of public record from self-

202   authenticating sources per Fed. R. Evid. 902. Amongst other things, the Agreement allows,

203   Luminus to buy 10% of the senior bond indentures, and thereby acquired the right to participate

204   in the subsequent DIP financing. In exchange, Luminus agreed to join the Restructuring

205   Support Agreement ("RSA"), and to cease all activity, and contact in defense of shareholders.

206   Both parties further agreed not to notify the Court unless required. Mr. Miralles estimates the

207   value of the Bribe at between $136.8 million and $1.7 billion depending on the performance

208   of Valaris.

209    61. If the Court agrees with this interpretation, then an unconscionable Fraud Upon the

210    Court perverting the very functioning of justice was executed with the help of the Debtor-in-

211    Possession, acting as Trustee, and the lawyers acting as Officers of the Court.

212    62. Mr. Miralles believes there is little room for any other interpretation. The intention

213    of the Parties is well documented. The Valaris Board Minutes clearly show how Luminus

214    requested the bribe. The matter was amply debated in the presence of the external advisors;

215    notably Lazard and Kirkland & Ellis. In fact, both Akin Gump Strauss Hauer & Feld LLP (See

216    Exhibit 22) and Kramer Levin Naftalis & Frankel LLP (See Exhibit 32) were sufficiently

217    alarmed to send formal letter voicing their dissent on the matter. Perplexingly, Slaughter and

218    May, LLP had the temerity to send a formal letter to the Ad Hoc Bondholders Group requesting

219    consideration for the Board for amongst other things, having facilitated their negotiations with

220    Luminus (See Exhibit 33). Be as it may, after negotiating with Luminus, the Ad Hoc

221    Bondholders Group chose to grant the bribe. The Ad Hoc Bondholders Group responded

222    generously granting a 10% stock option plan to the CEO, CFO, and CLO. This generosity was

223    worth at least $244.8 million.

224    63. The billing records of Kirkland & Ellis clearly shows how they actively participated

225    in the negotiation of the Bribe, which they had the audacity to bill against the Estate. They

226    labelled it the "Luminus Settlement". In a clear sign of scienter, Richard J. Grossman, a Partner

227    at Skadden, Arps, Slate, Meagher & Flom LLP was brought in as frontman attorney of record

228    for the Agreement. Mr. Grossman billed $17,970.00 for the matter to the Estate labelled as a

229    routine corporate matter (See Exhibit 49 or court docket 647). The Luminus Settlement was

230    never to be mentioned to the Court again.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

64. The other charges stated by the Plaintiff are predicate offenses that both support and color the charge of Fraud Upon the Court. The most important of which is the Fraudulent Transfer of 6 floaters and drill ships originally worth $2.9 billion. This sale, and the corresponding impairments were the proximate cause for the breach debt covenants. Valaris was not hopelessly insolvent. It was a solvent entity with billions of dollars in hard assets in the form of the most modern drillship on the planet, and access to liquidity to operate for 2 years. It was plunged into bankruptcy by a voluntary decision of Management and its Board of Directors, with inducement from the Ad Hoc Bondholders who were eager to get control of Valaris for pennies on the dollar. This certainly casts a new light on the Sub Rosa accusations arising from equitizing the most senior lenders.

65. When viewed through this lens, a well-organized conspiracy between the Parties starts to appear. It is not lightly that Mr. Miralles states his belief that this qualifies as a Racketeering Offense under 18 U.S.C. § 1961-1962. This is a well-oiled machine engaging in bankruptcy fraud. It needs to be stopped, or it will surely strike again to the detriment of Justice, and the Public Good.

66. The case is based entirely on self-authenticating evidence Fed. R. Evid. 902. Even before discovery, the case easily meets the Preponderance of Evidence standard set out in Grogan v. Garner in its core accusation of Fraud Upon the Court.

67. The Court has ample equitable powers to provide relief under 11 U.S. Code § 105(a) and 11 U.S. Code § 1142(b) as a Court of Equity to seek alternative remedies to remedy bad faith, and abuse of process.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

## STATEMENT OF FACTS

### Defendant's Bankruptcy Case

68.  On August 19, 2020, Valaris and certain of its direct and indirect subsidiaries filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. During the bankruptcy process, Lazard, which was originally the investment banker hired by Valaris for the task of raising equity, was hired again for the Bankruptcy process. Lazard performed a valuation based on management guidance. Based on this valuation Valaris claimed an impairment of ~ 90% of the value of its already previously impaired assets, valuing Property Plant & Equipment at a mere $1.2B, within less than 3 months of the last independent fair value opinions provided by the Company's investor presentation (See Exhibit 13). The independent fair value opinions came from by DNB Markets, Morgan Stanley, Scotiabank, SpareBank and Wells Fargo as required by the debt indentures of the Creditors and assigned a replacement cost of such assets at $23.9 billion[1] and $9.9 billion in fully impaired fair market value. Additionally, on the previously mentioned investor presentation Valaris claimed it had 2 years of liquidity available as of February 2020. This 90% impairment, together with the claim of an industrial accident, that was fully insured, were used by Valaris' Management to plunge the company into bankruptcy.

69.  Management's and Lazard's valuation were never updated to reflect oil markets fully recovering, and exploration contracting at significantly higher levels than in December 2020,

---

[1] Valaris, *Investor Presentation*, February 2020, pg. 27, https://s23.q4cdn.com/956522167/files/doc_presentations/2020/01/02032020-Valaris-Investor-Presentation.pdf (last visited Aug. 11, 2021).

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

270   while Lazard lists an Effective Valuation Date of March 30, 2020 (The effective valuation date

271   for the Plan under 26 CFR § 1.430(g)-1).

272   **Luminus Settlement**

273   70.   Valaris offered Luminus Management, the largest equity holder special

274   compensation to agree to not purse its interests as equity holder. This was documented through

275   the Material Definitive Agreement from Valaris SEC 8-K filed on August 28th, 2020 (the

276   "Agreement", or "Luminus Settlement"), labelled as a modification of the existing Cooperation

277   and Support Agreement that existed between Valaris and Luminus (See Exhibit 35). The

278   Agreement was de facto part and parcel of the Restructuring Support Agreement.

279   71.   In exchange for signing the joinder, the Agreement allowed Luminus to purchase

280   10% of the Company's outstanding indebtedness held by the Creditor at the then prevailing price

281   of cents on the dollar. This had the additional benefit of allowing Luminus to participate in the

282   new money DIP financing. Mr. Miralles estimates the value of this option at a minimum $136

283   million up to $1.7 billion. (For more information, please refer to Exhibit 3)

284   72.   In exchange for this consideration, Luminus was enjoined to refrain from exercising

285   any rights as equity holder, and thereby accept the RSA in direct impact to other equity holders.

286   The Parties involved further agreed to withhold said Agreement from the Court, unless

287   specifically mandated. It is notable that this Agreement was negotiated, by Trustee, the Debtor in

288   Possession, and necessarily was known by the Creditors Committee.

289   73.   In the time billing sheet that Kirkland & Ellis submitted to the Court, it is referred

290   to as the "Luminus Settlement" by Spencer A. Winters on August 21, 2020 (See Exhibit 34 or

291   court docket 1303 pg. 103).

292

**Detailed Timeline on Luminus Settlement**

293   74.   **July 27, 2020 -** Minutes from regular Board of Directors meeting of Valaris. (See

294   Exhibit 20 or Court docket 259, pg. 664)[2]

295   75.   Mr. Rowsey (Chairman of the Board and Director) explained that the Board would

296   be facilitating a discussion between Luminus, and the bondholder group. It was noted that the

297   bondholder group had indicated a willingness to have a direct discussion with Luminus. Mr.

298   Rowsey also noted that he would be sending a letter to Jonathan Barrett of Luminus, copying Mr.

299   Weitzman, on behalf of the Board later that day setting out the basis of that discussion and rules

300   of engagement which would confirm what had already been discussed verbally with Luminus

301   over the weekend.

302   76.   Mr. Rowsey proposed that the Board reconvene on Wednesday to discuss the letters

303   and feedback from the discussion between Luminus and the bondholder group.

304   77.   Mr. Pilenko asked the Company's advisers whether the Company should facilitate

305   conversations involving other significant shareholders. A very good question indeed.

306   Unfortunately, the subsequent paragraphs which might show the answer were redacted as

307   PRIVILIGED.

308   78.   Board members present and participating: 1) Paul E. Rowsey, III Chairman of the

309   Board and Director 2) Thomas Burke, Director, Chief Executive Officer and President 3) William

---

[2] Valaris, *Citi Bank Whiteness List and Exhibits, Court Docket 259,* September 2020,
https://cases.stretto.com/public/X088/10396/PLEADINGS/103960930208000000140.pdf (last visited Oct. 22, 2021)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

310    E. Albrecht, Director 4) Frederick Arnold, Director 5) Mary Francis CBE, Director 6) Suzanne

311    P. Nimocks, Director 7) Thierry Pilenko, Director 8) Adam Weitzman, Director

312           79.    Invitees present and participating: 1) Jonathan H. Baksht, Executive Vice President

313    and Chief Financial Officer 2) Michael T. McGuinty, Senior Vice President, General Counsel

314    and Secretary 4) Davor Vukadin, Associate General Counsel — Corporate and Assistant

315    Secretary 5) Darin Gibbins, Vice President and Treasurer 6) Ross Kwasteniet, Kirkland & Ellis

316    LLP 7) Anup Sathy, Kirkland & Ellis LLP 8) David Kurtz, Lazard 9) Ari Lefkovits, Lazard 10)

317    Levi Quaintance, Lazard 11) Christian Boney, Slaughter and May 11) Ian Johnson, Slaughter and

318    May.

319           80.    Minutes were signed and submitted by Michael T. McGuinty (CLO)

320           81.    **July 30, 2020** – James Terry of Akin Gump representing the Ad Hoc Group of

321    Bondholders sent a letter commenting on the Luminus meeting to the lawyer of Valaris Ian

322    Johnson of Slaughter and May: (See Exhibit 22 or Court docket 259, pg. 884)[3]

323                  "A key point in the restructuring negotiations is to what extent

324           the Company´s clearly out of the money shareholders, might receive

325           consideration in the restructuring in return for facilitating a streamlined

326           restructuring implementation process. In an alleged effort to advance discussions

327           on this issue, representatives of the Company's largest shareholder, Luminus

328           Management LLC, presented to the Ad Hoc Group earlier this week.

---

[3] Valaris, *Citi Bank Whiteness List and Exhibits, Court Docket 259,* September 2020,
https://cases.stretto.com/public/X088/10396/PLEADINGS/1039609302080000000140.pdf (last visited Oct. 22, 2021)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

329     *Unfortunately, the approach taken by Luminus was not*

330     *constructive. Luminus didn't seek a higher recovery for shareholders as a*

331     *whole but made representations solely on behalf of itself and its investors to*

332     *ask for value for them alone.* "

333     82.    Copied on the letter were Ross M. Kwasteniet from Kirkland & Ellis, Anup Sathy

334     from Kirkland & Ellis and Stephen Zide from Kramer Levin.

335     83.    **August 10, 2020** - Minutes from regular Board of Directors meeting of Valaris.

336     (See Exhibit 23 or Court docket 259, pg. 403)[4]

337     84.    Mr. Weitzman (On behalf of Luminus and Valaris) asked if the equitization of bank

338     lenders was common. Mr. Kurtz (On behalf of Lazard) noted that this did not happen often and

339     was only possible in this case due to its specific facts including that (i) the Company's RCF debt

340     is unsecured (which is relatively uncommon), and (ii) this would be an involuntary equitization

341     of a senior creditor group which requires there to be sufficient equity value for payment in full.

342     Mr. Kurtz further explained that he had not previously been involved in a deal in which this has

343     been done. It is not uncommon for a US bankruptcy judge to equitize unsecured creditors

344     involuntarily, however, this is not typically done for a creditor at the top of the capital structure

345     as these creditors are typically secured. Mr. Weitzman asked what the pros and cons of siding

346     with a junior creditor over a senior creditor would be. Mr. Kurtz noted that it is typical for a

347     company in bankruptcy to side with a fulcrum creditor which in this case are the bondholders. It

---

[4] Valaris, *Citi Bank Whiteness List and Exhibits, Court Docket 259,* September 2020,
https://cases.stretto.com/public/X088/10396/PLEADINGS/1039609302080000000140.pdf (last visited Oct. 22, 2021)

348  was also not uncommon for a company and its senior creditors to disagree during a bankruptcy;

349  however, this was usually in respect of other parameters such as reinstatement of bank debt or

350  cram-up for secured debt rather than involuntary equitization.

351  *The Directors asked whether there was any other structure which provided the*

352  *advantage of the balance sheet deleveraging while simultaneously avoiding the possible valuation*

353  *litigation risk.*

354  85.  Mr. Weitzman queried how the valuation had been reached **as this figure was**

355  **different to recent valuation figures provided to the Board**. Mr. Fordyce (On behalf of Lazard)

356  explained that the valuation models for the Company had been amended to remove the effect of

357  the new builds as it was unlikely that the Ad Hoc Bondholders would fund these as part of the

358  proceedings. **Mr. Fordyce also explained that the valuation was weighted more towards a**

359  **discounted cash flow (DCF) valuation than the comparable peer valuation methodology** as

360  the valuations of the Company's peers were affected by the stress in the sector.

361  86.  The Board then adjourned to an executive session:

362  87.  Following due and careful deliberation, and on motion duly made and seconded,

363  the Board approved, with all of the Board members except Mr. Weitzman voting in favor, the

364  counter-proposal restructuring term sheet presented to the Board subject to the following

365  amendments:

366  (a) the terms for the MIP shall be addressed in a separate communication from the Board;

367  (b) warrants provided to the existing shareholders **shall represent 15 percent of the**

368  **reorganized equity**.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

369  (c) clarification that backstop fees are in addition to the stapled equity and that there will

370  be no stapled equity in respect of new money PIK payments for backstop parties; and

371  (d)that additional secured debt may be incurred pan passu to the new money.

372  → Signed and Submitted by Michael T. McGuinty (CLO)

373  88.  As seen above, Adam Weitzman (Luminus) didn´t approve shareholders to get only

374  15% in warrants of the reorganized equity. However, due to Luminus getting a settlement they

375  were happy to accept the RSA in which completely out of the money warrants should represent

376  only 7% of the reorganized equity. In direct prejudice to other equity holders, constituting a

377  breach of fiduciary duties.

378  89.  Board members present and participating: 1) Paul E. Rowsey, III Chairman of the

379  Board and Director 2) Thomas Burke, Director, Chief Executive Officer and President 3) William

380  E. Albrecht, Director 4) Frederick Arnold, Director 5) Mary Francis CBE, Director 6) Georges

381  Lambert, Director 7) Suzanne P. Nimocks, Director 7) Thierry Pilenko, Director 8) Adam

382  Weitzman, Director 9) Charles L. Szews, Director.

383  90.  Invitees present and participating: 1) Jonathan H. Baksht, Executive Vice President

384  and Chief Financial Officer 2) Michael T. McGuinty, Senior Vice President, General Counsel

385  and Secretary 4) Davor Vukadin, Associate General Counsel — Corporate and Assistant

386  Secretary 5) Darin Gibbins, Vice President and Treasurer 6) Ross Kwasteniet, Kirkland & Ellis

387  LLP 7) Anup Sathy, Kirkland & Ellis LLP 8) Samantha Good, Kirkland & Ellis LLP 9) Kelann

388  Stirling, Kirkland & Ellis LLP 10) David Kurtz, Lazard 11) Ari Lefkovits, Lazard 12) Levi

389  Quaintance, Lazard 13) Hywel Davies, Slaughter and May 14) Ian Johnson, Slaughter and May

390  15) Ben Tidswell, Ashurst LLP.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

391   91.   **August 19, 2020** – Valaris filed for bankruptcy (Debt traded at 5.5 cents on the

392   dollar) (See Exhibit 29)[5] and presented the Restructuring support agreement (RSA)[6].

393   92.   **August 28th, 2020** - Luminus entered into an amendment to the Cooperation and

394   Support Agreement (Which was reached on January 2020) and in which was offered the

395   opportunity to get 10% of the Company´s outstanding indebtedness, in order to vote in as debt

396   and accept the restructuring support agreement (RSA), in direct impact to other equity holders.

397   All the above, while conspiring to withhold knowledge of said agreement from the Bankruptcy

398   Court (See Exhibit 35)[7].

399   →With a copy (which shall not constitute notice) to: Richard Grossman of Skadden, Arps,

400   Slate, Meagher & Flom LLP and Robert Leonard and Frank Zarb of Proskauer Rose LLP.

401   93.   **September 10, 2020** – Luminus reports joinder to the RSA and declares to hold

402   $4,620,000 in pride bond claims (See Exhibit 37)[8]. No information provided on what happened

403   to the additional 48,379,000 in principal amount of the Issuer's 4.875% Senior Notes due 2022,

404   that it reported to own in November 2019 (See Exhibit 41).

---

[5] Valaris, *The Official Committee of Unsecured Creditors' Joinder to The Debtors' Preliminary Objection to Motion for Appointment of Equity Committee and Amended Motion for Appointment of Equity Committee*, 2020

[6] Valaris, *8-K SEC Filing*, August 2020, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000314808/53c9b5da-eb14-4485-9a51-9e201fb7c470.pdf (last visited Oct. 22, 2021)

[7] Valaris, *Amended Cooperation and Support Agreement*, August 2020, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000314808/0861bf79-e6d4-413e-8fe2-b2ded7066cbb.pdf (last visited Oct. 22, 2021)

[8] Valaris, *Schedule 13G/A containing Joinder to the RSA*, September 2020, https://sec.report/Document/0001193125-20-246328/ (last visited Oct. 22, 2021)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

405 **K&E Time Sheet Showing Negotiation and Drafting of Luminus Settlement**

406 **(See Exhibit 34 or Court docket 1303)[9]**

407 94.   Kirkland and Ellis participated actively in the drafting and negotiation of the Luminus

408 Settlement. This is evidenced by the Time Sheets filed with the Court.

| Date | Individual | Description | Hours |
|---|---|---|---|
| August 20, 2020 | *Spencer A. Winters* | Prepare for and attend telephone conference with customer re chapter 11 filing; review and analyze issues re NOL order, **Luminus settlement** ; correspond and telephone conferences with multiple parties re same. | 4.4 |
| August 22, 2020 | *Ross M. Kwasteniet, P.C.* | **Analyze issues re Luminus cooperation agreement and potential modifications to same**; prepare for and participate in telephone conference with management and P. Rowsey re same; follow-up analysis re same. | 3.2 |
| August 23, 2020 | *Ross M. Kwasteniet, P.C.* | **Follow-up analysis re possible amendment to Luminus agreement.** | 1.6 |
| August 24, 2020 | *Ross M. Kwasteniet, P.C.* | Analysis re potential revisions to Luminus cooperation agreement; attend follow-up telephone conference re same. | 1.5 |
| August 25, 2020 | *Ross M. Kwasteniet, P.C.* | Negotiations re Luminus cooperation agreement. | 1.2 |
| August 26, 2020 | *Ross M. Kwasteniet, P.C.* | Attend telephone conferences and correspond re Luminus agreement. | 1.4 |
| August 27, 2020 | *Ross M. Kwasteniet, P.C.* | Evaluate finalizing revised agreement with Luminus (1.9); review related disclosures. | 2.7 |

---

[9] Valaris, *Notice of Fees K&E, Court Docket 1303*, October 2020,
https://cases.stretto.com/public/X088/10396/PLEADINGS/1039606112180000000012.pdf (last visited Oct. 22, 2021)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

| August 28, 2020 | *Ross M. Kwasteniet, P.C.* | Prepare for and participate in board meeting re approval of Luminus agreement; correspond, monitor re same. **(Corresponds to Missing board minutes)** | 1.5 |
| August 28, 2020 | *Anup Sathy, P.C* | Attend board call re Luminus issues. | 0.5 |

95.     Ross M. Kwasteniet, P.C. billed 13.10 hours at a rate of 1,595.00 for a total of $20,894.50 to review Luminus Cooperation and Support Agreement.

96.     Despite taking a leading role in the negotiation, K&E did not place itself as attorney of record on the Cooperation and Support Agreement. Inexplicably, Richard J. Grossman of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") was brought as attorney of record on behalf of Valaris. Skadden billed for this matter $17,910.00, as a remaining part of a prepetition retainer of $80,210.00 that was not fully paid yet by Valaris plc (See court docket 647).

### Misrepresentation and Perjury to the Court

97.     On December 7, 2020, Valaris files Debtors' Objection to the Motion for Appointment of Equity Committee and Amended Motion for Appointment of Equity Committee (Court docket 754)[10]. In paragraph 3, Defendant states:

*"There also is no need for an equity committee because the equity holders' interests have been and are being adequately represented. Before the Debtors filed for chapter 11, Luminus Management, which was the Debtors' largest shareholder owning*

_____

[10] Valaris, *Debtors' objection to an equity committee,* December 2020,
https://cases.stretto.com/public/X088/10396/PLEADINGS/1039612072080000000112.pdf (last visited Oct. 22, 2021)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

425   *approximately 18% of the Debtors' equity, had a representative on Valaris' Board of*

426   *Directors that strongly advocated for equity holders, including Buxton Helmsley's clients,*

427   *with respect to the restructuring transactions that are set forth in the Plan of*

428   *Reorganization. As a result, current equity holders will receive warrants for seven percent*

429   *of the Reorganized Debtors' equity if they support the restructuring— even though they*

430   *are not entitled to a recovery under the absolute priority rule. During these chapter 11*

431   *cases, the Debtors have continued to maximize the value of the estates for all their*

432   *stakeholders, including the equity holders."* (See Court docket 754 pg. 2)

433   98.   Document was signed by Matthew D. Cavenaugh (TX Bar No. 24062656) of

434   Jackson Walker LLP along with Kristhy M. Peguero (TX Bar No. 24102776) and Genevieve

435   Graham (TX Bar No. 24085340). As well as for Kirkland and Ellis L.L.P - Anup Sathy, P.C. (pro

436   hac vice), along with Ross M. Kwasteniet, P.C. (pro hac vice), Spencer A. Winters (pro hac vice),

437   Jeffrey J. Zeiger, P.C. (pro hac vice), Jason A. Feld (pro hac vice).

438   99.   Both Valaris, and the signatories were fully aware of the Luminus Settlement when

439   the Motion was presented to the Court.

440   100.   On March 2nd, 2021, Valaris filed Debtor's Memorandum of Law in Support of

441   Confirmation of the Debtor's Fourth Amended Joint Chapter 11 Plan of Reorganization and

442   Omnibus Reply to Objections Thereto. The document categorically states that the "Plan Satisfies

443   the Seven Mandatory Plan Requirements of Section 1123(a)". Itexerci elaborates in detail on why

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

444   the Plan provides "Equal treatment", is "Fair and Equitable", and complies with Solicitation

445   requirements (See Exhibit 43 or Court docket 1127 pg. 16,17,36,27,28,35,36,37)[11].

446        101.   In paragraphs 34-38, it declares (emphasis added):

447        *The Plan Satisfies the Seven Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.* The

448   seven applicable requirements of section 1123(a) of the Bankruptcy Code relate to the specification of claims

449   treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan.

450   The Plan satisfies each requirement.

451        Specification of Classes, Impairment, and Treatment. The first three requirements of section 1123(a) are that

452   a plan specify (a) the classification of claims and interests; (b) whether such claims and interests are impaired or

453   unimpaired; and (c) the precise nature of their treatment under the plan. Article III of the Plan satisfies these three

454   requirements by setting forth these specifications in detail. No party has asserted otherwise.

455        Equal Treatment.

456        The fourth requirement of section 1123(a) is that a plan must *"provide the same treatment for each claim or*

457   *interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment.".*

458   *The Plan meets this requirement because Holders of Allowed Claims or Interests in each Class will receive the same*

459   *rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective class, unless a*

460   *Holder of an Allowed Claim agrees to less favorable treatment.*

461        For example, the Rights Offering contemplated by the Plan was open to all eligible Holders of Credit

462   Facility Claims and Senior Notes Claims that hold Claims in Class 3 and Classes 4 through 8, respectively. With

463   respect to the bondholders, participation rights in that notes offering were fairly allocated among bondholders based

464   on the extent and timing of their new-money commitment. Holders of the Senior Notes had an opportunity to

---

[11] Valaris, *Brief,* March 2021, https://cases.stretto.com/public/X088/10396/PLEADINGS/10396030221800000000215.pdf (last visited Oct. 22, 2021)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

465    participate in the backstop portion of the New Secured Notes at the time the Initial RSA was being negotiated, a

466    second opportunity during the joinder period at the outset of these chapter 11 cases, and a third opportunity to

467    participate pursuant to the Rights Offering. This was done in a fair and open manner. No bondholder disputes that

468    allocation. In addition, each Class of Senior Notes Claims will receive its respective portion of reorganized equity

469    under the Plan in accordance with a settlement among bondholders of complex disputes that was reached after

470    extensive diligence. With respect to Class 3, the Plan provides the RCF Lenders with a combination of new equity

471    and cash recovery (and, for certain RCF Lenders that elected to receive Rights Offering Subscription Rights, a smaller

472    cash recovery plus Rights Offering Subscription Rights). Further, as part of the RCF Settlement, the RCF Lenders

473    were afforded a seven-day period within which they could elect to participate in the Rights Offering and the Backstop

474    Commitments and to receive one of the two aforementioned corresponding Plan treatments. No RCF Lender has

475    disputed the fairness of that process nor its treatment under the Plan.

476           Thus, the Plan satisfies section 1123(a)(4). *No party has asserted otherwise.*"

477        102.    In paragraphs 80-82, it declares:

478           A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a

479    plan (or is deemed to reject a plan) if it follows the absolute priority rule. The absolute priority rule provides that a

480    junior stakeholder (e.g., an equity holder) may not receive or retain property under a plan of reorganization "on account

481    of" its junior interests unless all senior classes either (a) are paid in full, or (b) vote in favor of the plan Junior unsecured

482    claims and interests can receive a recovery if senior unsecured claims receive a full recovery.

483           The Plan satisfies the absolute priority rule. As set forth above, all classes entitled to vote have voted

484    to accept the Plan, and many of the Non-Voting Classes are unimpaired. While Holders of General Unsecured Claims

485    will receive payment in full, this does not violate the absolute priority rule because every senior impaired Class voted

486    to accept the Plan. With respect to the reinstatement of Intercompany Interests, such reinstatement is merely an

487    administrative provision to preserve the corporate structure that does not have any economic substance and does not

488    enable any junior creditor or interest holder to retain or recover any value under the Plan.

489           With respect to impaired Classes that are deemed to have rejected, the Plan still satisfies the absolute

490    priority rule. *The Plan satisfies the "fair and equitable" requirement* notwithstanding Class 11 (Intercompany Claims)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

491  and Class 12 (Intercompany Interests) may be deemed to reject the Plan because such Claims and Interests are held

492  by the Debtors and their affiliates, all of which have consented to the Plan. The treatment of Intercompany Claims and

493  Interests is administrative in nature, has no economic substance, and does not prejudice any party in interest.

494          Notwithstanding that Class 14 (Section 510(b) Claims) is deemed to reject the Plan, the Plan does

495  not violate the absolute priority rule as to Class 14 because no more junior Class of Claims or Interests is receiving a

496  recovery under the Plan. Holders in Class 13 (Existing Interests in Valaris) and Class 14 rank in equal priority on

497  account of their Interests and Claims, respectively, against the Debtors. Thus, the Plan satisfies the "fair and equitable"

498  requirement as to Class 14.

499          *Given its adherence to the absolute priority rule described above, the Plan satisfies the "fair*

500  *and equitable" requirement of the Bankruptcy Code.*

501          103.   Document was signed by Matthew D. Cavenaugh (TX Bar No. 24062656) of

502  Jackson Walker L.L.P along with Kristhy M. Peguero (TX Bar No. 24102776) and Genevieve

503  Graham (TX Bar No. 24085340). As well as for Kirkland and Ellis L.L.P, Anup Sathy, P.C.

504  (admitted pro hac vice), Ross M. Kwasteniet, P.C. (admitted pro hac vice) and Spencer A. Winters

505  (admitted pro hac vice).

506          104.   The Parties show a detailed understanding of the Absolute Priority Rule, and

507  Equitable Treatment. Valaris, and the signatories were fully aware of the Luminus Settlement

508  which provides Luminus individually within the Class 13 shareholders to obtain a significant

509  recovery, and in excess of recoveries for junior claims. The Luminus Settlement was also not

510  reported to the Court or included in the Solicitation Material.

511          **Sale of Assets of the Estate Below Fair Market Value**

512          105.   On July 2020, Valaris declared it had sold ENSCO 8500 and ENSCO 8501 to Space

513  Exploration Technologies Corp. ("SpaceX"). The rigs were relatively young by industry

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

514    standards and had cost more than $650 million in 2008/09. They were sold for $3.5 million each;

515    a sum reportedly below the scrap value of the rigs. Bassoe Offshore on December 31, 2019,

516    estimated the value of the rigs ranging from $51 million to $60 million (See Exhibit 45).

517        106.    The sale was reported to have been made directly to SpaceX to transform the rigs

518    into rocket launching platforms[12]. However, the sale was actually to a self-declared affiliate of

519    SpaceX, Lone Star Mineral Development LLC ("Lone Star")[13.] Lone Star is an Oil and Gas

520    Exploration company with permit OPERATOR NO. 507234 from the Texas Railroad

521    Commission[14]. It was incorporated on June 23, 2020; shortly before the transfer by Bret Johnson[15].

522        107.    Lone Star is an active E&P company with a license to explore La Pita Wells 2R &3.

523    La Pita was previously owned by an affiliate of Sanchez Energy Corp. ("Sanchez"). The company

524    went through Chapter 11 and is now Mesquite Energy Inc. ("Mesquite"). Kirkland and Ellis

525    advised Sanchez on the acquisition of Anadarko's Eagle Ford Acreage, alongside Blackstone.[16]

526        108.    As of October 2021, there is no visible evidence of any work being performed on

527    the now renamed Deimos.[17] The rig remains in its original state[18]. There is little evidence to

---

[12] Nermina Kulovic, *Elon Musk's SpaceX buys two Valaris rigs to build rocket launchpads*, January 20, 2021, https://www.bassoe.no/asset-valuations-become-even-more-confusing-as-rig-owners-sacrifice-rigs-to-stay-afloat/news/195/ (last visited, Oct. 23, 2021)

[13] Michael Sheetz, CNBC, *SpaceX bought two former Valaris oil rigs to build floating launchpads for its Starship rocket*, January 2021, https://www.cnbc.com/2021/01/19/spacex-bought-former-valaris-oil-rigs-to-build-starship-launchpads.html (last visited Aug. 11, 2021).[0]

[14] Sergio Chapa, Bloomberg , *Musk Wins SpaceX Starbase Land Dispute in Texas Regulator Vote*, August 2021, https://www.bloomberg.com/news/articles/2021-08-03/musk-wins-spacex-starbase-land-dispute-in-texas-regulator-vote (last visited Aug. 11, 2021).

[15] Open Corporates, https://opencorporates.com/companies/us_tx/0803663368 (last visited Aug. 13, 2021).

[16] K&E Press Release, *Kirkland Counsels Blackstone and Sanchez Energy on Anadarko's Eagle Ford Acreage Deal*, January 2017 https://www.kirkland.com/news/press-release/2017/01/kirkland-counsels-blackstone-and-sanchez-energy-on (last visited Oct. 31, 2021).

[17] Deimos, Seaside View, Port of Brownsville, TX. Saturday October 23, 2021, https://www.youtube.com/watch?v=mwhaflxk9Uo (last visited Oct. 31, 2021).

[18] Deimos, SpaceX Future Starship Spaceport , https://www.youtube.com/watch?v=JdD76C1no0Q (last visited Oct. 31, 2021).

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

528    believe it will be used for anything other than drilling for hydrocarbons, a task it is ideally suited

529    for.

530         109.    It is worth noting that LS Power Development LLC ("LS Power"), the self-declared

531    parent entity of Luminus, owns EVgo Inc. ("EVgo")[19] a major supplier for Tesla Inc. ("Tesla"),

532    which shares clear ownership links to SpaceX, and presumably Lone Star Mineral Development,

533    LLC.

534         110.    Valaris also sold 3 young drill ships for scrap 2010-built Valaris DS-3, 2011-built

535    Valaris DS-5 and 2012-built Valaris DS-6. These had an estimated value of over $100 million

536    each according to Bassoe but were sold for just $6 million each[20]. These drill ships had an initial

537    value of approximately $2.25 billion when acquired from Pride International Inc. ("Pride

538    International")[21]. This represents a discount of about a 99.9% to build value, and an 88% discount

539    over third-party valuation estimates. As of Aug 23rd, 2021, over a year since the sale, Valaris

540    DS-6 still has its EIS transponder active.[22]

541         111.    The sale of ENSCO 8500, ENSCO 8501, DS-3, DS-5 and DS-6 is hugely

542    consequential. The impairment charges generated by their sale, were the direct cause of Valaris

543    breaching the debt covenants in the Revolving Credit Facility. The decision by Management to

---

[19] EvGo, *Press Release,* January 2020 https://www.evgo.com/press-release/ls-power-completes-acquisition-of-evgo/ (last visited Aug. 11, 2021).

[20] Teresa Wilkie, *Asset valuations become even more confusing as rig owners sacrifice rigs to stay afloat,* March 2, 2021, https://www.bassoe.no/asset-valuations-become-even-more-confusing-as-rig-owners-sacrifice-rigs-to-stay-afloat/news/195/ (last visited, Aug 23, 2021)

[21] Jason Jiang, Valaris scraps three young drillships originally ordered for $2.25bn, *https://splash247.com/valaris-scraps-three-young-drillships-originally-ordered-for-2-25bn/* (last visited Oct. 23, 2021)

[22] MarineTraffic,*https://www.marinetraffic.com/en/ais/details/ships/shipid:713294/mmsi:613003625/imo:9535929/vessel:ENSCO_DS_6/_:b0edc a5205294abed72d158197ed5657 (last visited Oct 23, 2021)*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

544 sell these rigs was the proximate cause of the bankruptcy filing. Absent these sales, Valaris would

545 have retained its Revolving Credit Facility with full access to the liquidity it provided. Valaris'

546 insolvency was a <u>voluntary decision</u> taken by Management and its Board of Directors.



547

548 ## Materially Inconsistent valuations of PP&E across different fillings



550      112.   Valaris stated in their SEC filings that it performed quarterly recoverability tests of

551 its entire fleet, based on fair market values, impairing the book value of PP&E for any changes

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

552   in market conditions. That is to say, Valaris was representing to the market that its Book Value

553   was already priced to Fair Market Value.

554       113.   The fair market value of PP&E given by the lender's third party independent

555   appraisers[23], the Company's SEC filings (10-Ks & 10-Qs), and the one presented to court by

556   Lazard[24] for bankruptcy (BK) differ materially within a short period of time. Lazard valuation of

557   PP&E, which was ratified when the bankruptcy plan was confirmed, and the PP&E value of the

558   1Q-21 filing, differ by 8.5x within a 28-day period.

559       114.   ASC 820-10-05 states that the objective of a fair value measurement is to estimate

560   the price at which an orderly transaction to sell or transfer the asset would take place between

561   market participants at the measurement date under current market conditions.

562       115.   Impairment is calculated by reference to fair value. One of the most important

563   considerations to measure the fair value of non-financial assets is the "highest and best use". This

564   is a valuation concept that represents the use of an asset by market participants that would

565   maximize the value of the asset or asset group or maximize its sale. Valaris book value of PP&E

566   presented in the 2020 10K, 1Q21 and 10Q's materially differs from the Fari Market Value

567   presented to court by Lazard. Lazard's valuation presented assumption which did not fairly

568   represent market conditions. Said values differ by a factor of~10x. The Company is in effect

---

[23] Valaris, *Investor Presentation*, February 2020, pg. 27, https://s23.q4cdn.com/956522167/files/doc_presentations/2020/01/02032020-Valaris-Investor-Presentation.pdf (last visited Aug. 11, 2021).

[24] Valaris, *Disclosure Statement*, December 2020, pg. 437, https://cases.stretto.com/public/X088/10396/PLEADINGS/103961216208000000000061.pdf (last visited Aug. 11, 2021).

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

declaring one Fair Market Value to the Court, while at the same time consistently presented different Fair Market Values to the SEC and the broader investment public.

**Inconsistent Impairment Tests**

116.   ENSCO and Rowan were merged on April 14, 2019, as a result, both entities were subject to Valaris extensive valuation exercises, and impairment tests throughout 2019. However, Rowan assets were subject to an impairment of 0.8% for 1Q-20, whereas Ensco assets were subject to an impairment of 23.0% for 1Q-20[25.]

117.   Rowan assets were valued for the first quarter of 2020 at $2,989 million and had an impairment of $26 million. While Ensco assets were valued at $12,137 million and had an impairment of $2,808 million. The above-mentioned represents a 28.7x greater impairment for Rowan PP&E than for Ensco PP&E.



Impairment % of Valaris PP&E 1Q20

_____

[25] Valaris, *1Q20 Report,* March 2020, p.13, https://s23.q4cdn.com/956522167/files/doc_financials/2020/q1/VAL-3.31.2020-10Q-FINAL.pdf (last visited Aug. 11, 2021).

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

585    118.    Impairment valuation testing was not being performed uniformly to substantially

586    the same assets, in direct violation of U.S. GAAP ASC 360-10.

587    119.    It is worth noting that at the time Rowan bondholders had an active dispute with

588    Valaris. This may have created an incentive for presenting a higher valuation. Demonstrating a

589    pattern for willingly modifying the fair market value of assets as convenient for management and

590    the Company.

591    **Conflicted Plan Valuation by Lazard**

592    120.    In its Engagement Letter for the fairness opinion for the Plan, Lazard was held out

593    as independent and free of conflicts, despite having previously provided capital markets services

594    to Valaris shareholders during 2019[26], knowing the Company's financial information and being

595    aware of previous valuations. Lazard's compensation during Valaris bankruptcy was

596    $23,013,402.85 million.

597



Independent Analysts Valuations of PP&E presented in Feb-20 MD&A vs Lazard Valuation *(US$B)*

| | MD&A (Feb-20) | Lazard Net PP&E |
|---|---|---|
| Constuction Cost | 25.5 | 1.2 |
| Replacement Cost | 23.9 | 1.2 |
| Gross Asset Value | 9.4 | 1.2 |

Gross Asset Value Estimates
*(In US$B for Feb-20)*

| | |
|---|---|
| Analyst 1 | 10.1 |
| Analyst 2 | 9.7 |
| Analyst 3 | 9.5 |
| Analyst 4 | 9.1 |
| Analyst 5 | 8.9 |

Avg. provided by analysts of $9.4B
Analyst Gross Asset Value estimates include
**DNB Markets, Morgan Stanley, Scotiabank, SpareBank and Wells Fargo**

---

[26] Valaris ,*Proxy Materials DEFA14A*, December 2019, https://d18m0p25nwr6d.cloudfront.net/CIK-0000314808/7c1caf10-59ed-4472-a7db-4567b29f7c6d.pdf (last visited Aug. 11, 2021).

598

599    121.   The average Gross PP&E estimated by five independent analysts is $9.4B, with a

600    replacement value of $23.9B, as presented in the February 2020 Valaris investor presentation[27]

601    (See Exhibit 13). Third-Party independent appraisers selected by Valaris′ lenders gave a ~8x

602    higher valuation to PP&E than the one presented by Lazard[28] in Bankruptcy.



Contracts Awarded per Fleet Report

603    122.   The conflicted Lazard valuation shows a +$8B discrepancy in valuation of PP&E

604    not congruent with the ones presented in the Company′s filings and with the valuations prepared

605    by the independent appraisers hired under the bond indentures prior to bankruptcy. It is notable

606    that these independent appraisals were endorsed and accepted by the Creditors as of December

607    2019, but these same Creditors claimed these assets to be essentially worthless a few months later.

---

[27] Valaris, *Investor Presentation*, February 2020, pg. 27, https://s23.q4cdn.com/956522167/files/doc_presentations/2020/01/02032020-Valaris-Investor-Presentation.pdf (last visited Aug. 11, 2021).

[28] Valaris, *Disclosure Statement,* December 2020, pg. 437, https://cases.stretto.com/public/X088/10396/PLEADINGS/1039612162080000000061.pdf (last visited Aug. 11, 2021).

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

608    123.    Additionally, the high number of awarded and extended contracts announced in the

609  latest 2 fleet status reports by Valaris[29] demonstrate that the company was quickly recovering.

610  Contracts in this industry take upwards of 6 months to multi-year periods to negotiate.

611  Management guidance did not reflect this in either the valuation, nor in the representations made

612  to the Court. The Lazard valuation opinion letter specifically states that they did not try to

613  challenge Management assumptions, nor did they perform any valuation of the physical assets.

614  This is in violation of the Uniform Standards of Professional Appraisal Practice (USPAP) as

615  commonly used in the United States. The nature of this conflicted relationship is implicitly

616  recognized by the Defendants and Lazard in the strongly worded Indemnification Letter that was

617  requested by Lazard as part of its acceptance of the Engagement.

618    124.    Amongst other surprising choices, the ARO notes were valued at a significant

619  discount despite the counterparty being Saudi Aramco, one of the world's largest companies that

620  enjoys a pristine credit rating of A assigned by Fitch. Hence, Lazard´s valuation was based in

621  flawed management guidance that didn´t fairly represent the going concern value of the company.

622  The $8.2B loss in value is not congruent with market conditions.

623    125.    When using DCF to value assets, FASB ASC Topic 852 paragraph 852-10-05-10

624  mentions that "The reorganization value generally approximates fair value of the entity before

625  considering liabilities and approximates the amount a willing buyer would pay for the assets of

626  the entity immediately after the restructuring". Lazard´s valuation did not meet this standard. The

---

[29] Valaris, *Fleet Status Report*, August 2021, https://s23.q4cdn.com/956522167/files/doc_news/2021/08/8.2.2021-Valaris-Fleet-Status-Report.pdf (last visited Aug. 11, 2021).

627  value did not fairly represent the going concern fair market value of the assets that a willing buyer

628  would pay after restructuring since the UFCFs were not appropriately calculated.

629      126.  The abovementioned, deems invalid the Balance Sheet Test argument that the

630  company was insolvent due to its liabilities exceeding its assets.

### Management's Motives to Profit from A Bankruptcy Process

632      127.  As a result of the reorganization plan, a management incentive plan was put in

633  motion, in which an ESOP of 10% was established for management[30]. In terms of bankruptcy

634  valuation (BK) of equity, ESOP would represent $244.8 million; on a book value valuation, it

635  would represent $437.0 million; and in terms of replacement value of assets, ESOP would

636  represent management profiting $2.3 billion (10% of $23.9 billion of PP&E at replacement value).

637  Replacement value of equity is 9.5x is higher than the BK.



Management ESOP equivalents
*(US$MM)*



Management beneficial ownership
*(ESOP %)*

638

---

[30] Valaris, *Disclosure Statement,* December 2020, pg. 28 https://reorg-research.com/pdf/3266692_join.pdf (last visited Aug. 11, 2021).

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

128. Lazard's valuation was made with management guidance. Under the Plan, Management could gain up to $2.3B of potential personal gains by plunging the Company into bankruptcy.

129. This provides for compelling profit motive to question the independence and fairness of Management's inputs used for the preparation of the Bankruptcy. It is notable that despite this windfall ESOP. CEO Tom Burke, CFO Jonathan Baksht, and General Counsel Michael T. McGuinty have all stepped down.

**Reasonable Questions Regarding Background of Counterparties**

130. Some individuals, and entities involved have in the past been linked to previous highly contested bankruptcy practices, and have been linked to questionable business practices. These raise legitimate questions on their character, good faith, and the continuance of said behavor..

131. Jonathan Barrett is the Founder and CEO of Luminus Management LLC, the largest shareholder of Valaris and which betrayed the interests of shareholders by accepting compensation in order to join the RSA as debt in Valaris' Material Definitive Agreement from August 28th, 2020. Mr. Barret began his career working with NYC based investment management firm, J. Epstein & Co. (From highly questionable investor Jeffrey Epstein) and Ossa Properties (an affiliate Real Estate company) rising to the level of CFO[31].

---

[31] LittleSis, *Data Base* https://littlesis.org/person/172917-Jonathan_Barrett# (last visited Aug. 11, 2021).

657    132.   Moreover, Jonathan Barrett shared the same legal address of 301 E. 66th St. as

658    Epstein[32]. Which according to court filings, that building served to host Epstein´s associates,

659    businesses, employees, and girlfriends. Jonathan Barret´s brother, Anthony, is the current

660    president of Ossa Properties, owned by Jeffrey Epstein´s brother Mark. Ossa properties owns the

661    majority of the units in the mysterious 301 E. 66th St. building[33].

662    133.   Luminus is a declared affiliate of LS Power. Despite these links, Mr. Barrett is now

663    listed as a Managing Director within LS Power. LS power itself has been previously investigated

664    for fraudulent conveyance of assets in the following bankruptcy cases: Dynegy[34], Mirant, GenOn

665    / NRG. LS Power founder Mikhail Segal began his career as a non-descript "Soviet official" and

666    as Managing Director of The Energy Systems Company ("ENESCO")[35.] The first recorded public

667    transaction of ENESCO was alongside Pagnotti Enterprises, a firm linked to the Bufalino crime

668    family via founder mafia boss Louis Pagnotti[36]. Court documents show the transaction included

669    allegations of bankruptcy fraud.

670    134.   Before officially contemplating bankruptcy, a Cooperation agreement was made on

671    January 24th, 2020 between Luminus and Valaris, appointing Torque Point Advisors, LLC

672    ("Torque") , as financial advisor, and naming Richard Katz as key man of the Finance Committee.

---

[32] ICIJ - *Offshore Leaks* https://offshoreleaks.icij.org/nodes/80039116?e=true (last visited Aug. 11, 2021).

[33] Gabrielle Bluestone, Business Insider, *Inside the mysterious Manhattan apartment building on East 66th Street, where underage models, lawyers, and key players in Jeffrey Epstein's sex-trafficking circle all live. Ex-Israeli Prime Minister Ehud Barak is a frequent visitor*, August 2019, https://www.businessinsider.com/the-nyc-building-at-the-center-of-jeffrey-epsteins-web-2019-8?r=MX&IR=T (last visited Aug. 11, 2021).

[34] Dynegy Holdings LLC, *Ch. 11 Case*, March 2012, https://www.sec.gov/Archives/edgar/data/1105055/000110465912018950/a12-6988_1ex99d1.htm (last visited Aug. 11, 2021).

[35] LS Power, *Founder's Biography* https://www.lspower.com/mike-segal/ (last visited Aug. 11, 2021).

[36] Matter of Fa Potts and Co., Inc., 93 B.R. 62 (E.D. Pa. 1988), https://law.justia.com/cases/federal/district-courts/BR/93/62/2005353/

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

673   Mr. Katz was hired as a financial advisor despite there being no record of him holding such a

674   license. Torque Point Advisors, LLC ("Torque"), which specializes in bankruptcies were hired

675   to "improve performance" and represent the interest of equity. However, during August 2020,

676   Mr. Katz was receiving class 9 (General unsecured claims) and class 10 (Newbuild claims)

677   notifications, when in theory he was hired for class 13. These simultaneous representations fall

678   within the well-established precedents of conflict of interest as outlined in Re Rusty Jones.

679   135.   Richard Katz was a partner in Cantor-Katz Collateral Monitor LLC ("Cantor-

680   Katz"), which was involved in the bankruptcy of Puerto Rico. In that situation they were being

681   represented by Schulte Roth & Zabel LLP, the same firm that represented Luminus in the

682   Cooperation Agreement. Aurelius Capital Management LP ("Aurelius") lobbied for the

683   appointment of a new Board which incorporated Cantor-Katz. Aurelius is one of the creditors for

684   Valaris, and was also one of the creditors in the Puerto Rico bankruptcy.

685   136.   A similar situation to Mr. Katz's conflict was also present in the Engagement of

686   Kirkland & Ellis LLP ("Kirkland & Ellis"). In the August 18, 2020 Declaration of Jonahtan

687   Baksht, CFO in support of the Chapter 11 Petitions, it is stated that in late 2019 and early 2020,

688   the Debtors engaged Kirkland & Ellis LLP to provide advice pertaining to out-of-court liability

689   management transactions to reduce leverage and capture discount. By the very nature of the

690   Engagement, this was in the benefit of Shareholders, representing Creditors in the bankruptcy

691   would seem to also fall within the well-established precedents for conflicts of interests as argued

692   in Re Rusty Jones.

693   137.   Further, days before Valaris filed for bankruptcy, Millennium Management LLC

694   ("Millenium") purchased 8,766,778 Class A Ordinary Shares or 4.4% of the Class A Ordinary

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

695    Shares outstanding[37]. Millennium bought just below 8,974,359 shares, the limit for which Valaris

696    requested a stay from the Court. Asking the parties that any transaction above it needed to be

697    filed with the Court. Through its senior management, the SEC has found Millennium, has

698    engaged multiple times in market manipulation[38].

699    **Naked Short Selling and Market Manipulation**



700

701    138.   The presence of Valaris stock in the SEC Fail-to-Deliver list as one of the most

702    highly shorted stocks in the US markets[39], seems to indicate possible naked short selling. Naked

703    Short Selling is illegal unless it is done by market makers on a Bona Fide basis. Naked short

704    selling drastically distorted the price of Valaris and invalidates share price as an argument for

---

[37] Valaris, *SC13 Form*, August 2020, https://sec.report/Document/0001487118-20-000002/ (last visited Aug. 11, 2021).

[38] Secutiries and Exchange Commission, *Press Release*, 2005 https://www.sec.gov/news/press/2005-170.htm (last visited Aug. 11, 2021).

[39] Securities and Exchange Commission, *Fails to Deliver VAL*, https://sec.report/fails.php?tc=VAL (last visited Aug. 11, 2021).

705 bankruptcy. As evidence by the recent GameStop Corp. squeeze, naked short selling is a relevant
706 event in the market, that artificially distorts the value of shares.

707     139.   In 2020, Valaris traded at an average short interest of 28% and 56% adjusting for
708 free float as adjusted by Morningstar. On the other hand, Days to Cover in the first quarter of
709 2020 was above 8. This indicates potential naked short selling distorted the price of the stock.
710 Invalidating it as an argument that was presented by the Creditors to the Courts.

711 **Count 1**

712 **Bribery & Fraud Upon the Court**

713     140.   The Material Definitive Agreement was compulsory for the approval of the
714 Restructuring Support Agreement where valuable Consideration was both offered and received.
715 The Court does not need to debate the value of said Consideration. That this Consideration was
716 both valuable and desirable can be reasonably gleamed by the fact the parties had failed to reach
717 an agreement prior to its offering. Mr. Miralles estimate the value of the Bribe at $136.7 million.

718     141.   Valaris attempts to frame this as a routine matter corporate matter. This simply does
719 not pass muster. Even the fact that this option was negotiated shows its nature of Consideration.

720     *"This just begs the question why the opportunity should be exclusive to the old equity holders. If the price*
721     *to be paid for the equity interest is the best obtainable, old equity does not need the protection of*
722     *exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent*
723     *reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the whole*
724     *transaction is, at least in part, to do old equity a favor. And that, of course, is to say that old equity would*
725     *obtain its opportunity, and the resulting benefit, because of old equity's prior interest within the meaning*
726     *of subsection (b)(2)(B)"*

727     *Bank Am. Nat. Tr. Sav. v. 203 N. Lasalle*, 526 U.S. 434, 456 (1999)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

It is thus reasonable to assume, that prior to the Agreement, Luminus believed by its own criteria there was value in its equity, and that said Agreement provided superior value in the form of 10% interest of the restructured entity. In exchange for signing this joinder, the Agreement allowed Luminus to purchase 10% of the Company's outstanding indebtedness held by Creditor at the then prevailing price of cents on the dollar. Mr. Miralles estimates the value of the Bribe at between $136.8 million and $1.7 billion depending on the performance of Valaris. Luminus in turn was enjoined from exercising any rights as equity holder.

142.   The offering and receiving of Consideration for forbearing to act in a case under Title 11 falls neatly within the definition of the Bribery provision of Bankrupcty Fraud as defined under 18 U.S. Code § 152 (6). Further, that this Consideration was only offered to Luminus within the Class violated 11 U.S.C. § 1123(a)(4) as seen In re Combustion Eng'g, Inc., 391 F. 3d 190, 239 (3d Cir 2004). This also defeats any argument that the Consideration was a normal part of negotiation of an RSA.

143.   Furthermore, the Pre-Petition nature of the act is also indicative of Bad Faith as seen in *Marrama v. Citizens Bank of Mass*. Malicious intent is further evidenced since the Trustee was advised through this entire process by some of the most experienced bankruptcy attorneys practicing within the United States who are well versed on the law, had ample resources at their disposal, and were amply rewarded with fees of $20,412,981.50.

144.   The facts surrounding the Agreement are a matter of public record. There can be no doubt on its basic provisions. Its multiple violations of 18 U.S. Code § 157 are self-evident. By itself, it satisfies the Preponderance of the Evidence standards as for bankruptcy fraud as established in Grogan v. Garner and reaffirmed in Tenn-Fla Partners v. First Union National Bank of Florida. The violations committed were highly pernicious, and involved Officers of the Court,

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

751   and qualify as Fraud Upon the Court as defined by Demjanjuk v. Petrovsky, 10 F.3d 338 (6th Cir.

752   1993).

753          *1. On the part of an officer of the court;*

754          *2. That is directed to the "judicial machinery" itself;*

755          *3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth;*

756          *4. That is a positive averment or is concealment when one is under a duty to disclose;*

757          *5. That deceives the court.*

758

759       145.   Defendants Aurelius Capital Management, LP, Brigade Capital Management, LP,

760   Canyon Capital Advisors, LLC, GoldenTree Asset Management, LP, King Street Capital

761   Management, LP, Lodbrok Capital, LLP, Oak Hill Advisors, LP, Oaktree Capital Management,

762   LP, Pacific Investment Management Company, LLC, Taconic Capital Advisors, LP, Whitebox

763   Advisors, LLC acting together at the  Ad Hoc Group Bondholders Group ("Ad Hoc Group") co-

764   opted the process of Chapter 11 agreeing to provide the Luminus Settlement. Due to the shared

765   legal representation, and joint negotiaton of the RSA the entirety of the Ad Hoc Group knew, or

766   should have known about the Bribe. They are jointly accused of Bankruptcy Fraud in the form of

767   Bribery under 18 U.S. Code § 152 (6) which contemplates *knowingly and fraudulently gives,*

768   *offers, receives, or attempts to obtain any money or property, remuneration, compensation,*

769   *reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11*;

770       146.   Defendants Valaris, Valaris Management (Thomas Peter Burke (CEO), Jonathan H.

771   Baksht (CFO), Michael T. McGuinty (CLO)), and the Valaris Board (Paul E. Rowsey, III, Adam

772   Weitzman, William E. Albrecht, Frederick Arnold, Mary Francis CBE, Suzanne P. Nimocks,

773   Thierry Pilenko) authorized the Luminus Settlement. They are jointly accused of Bankruptcy

774   Fraud in the form of Bribery under 18 U.S. Code § 152 (6) which cotemplates *knowingly and*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

775 *fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration,*

776 *compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case*

777 *under title 11;*

778     147.  At the time of offering the Bribe. Defendants Valaris, Valaris Management

779 (Thomas Peter Burke (CEO), Jonathan H. Baksht (CFO), Michael T. McGuinty (CLO)), and the

780 Valaris Board (Paul E. Rowsey, III, Adam Weitzman, William E. Albrecht, Frederick Arnold,

781 Mary Francis CBE, Suzanne P. Nimocks, Thierry Pilenko) were jointly functioning as Debtor-

782 in-Possession, Trustees of the Estate. They were thus Officers of the Court. York Intern. Building,

783 Inc. v. Chaney, 527 F.2d 1061 (9th Cir. 1976). Their acts were subject to the aggravated

784 circumstances of Fraud Upon de Court.

785     148.  At the time of offering the Bribe. Defendants Valaris, Valaris Management

786 (Thomas Peter Burke (CEO), Jonathan H. Baksht (CFO), Michael T. McGuinty (CLO)), and the

787 Valaris Board (Paul E. Rowsey, III, Adam Weitzman, William E. Albrecht, Frederick Arnold,

788 Mary Francis CBE, Suzanne P. Nimocks, Thierry Pilenko) were jointly functioning as Debtor-

789 in-Possession, Trustees of the Court. They were thus Officers of the Court at the time. York Intern.

790 Building, Inc. v. Chaney, 527 F.2d 1061 (9th Cir. 1976). Their actions creates a further charge

791 under Title 18 USC § 201 (2) of Bribery and Influence of Public Officials.

792     149.  Defendants Kirkland & Ellis, Anup Sathy Ross Kwasteniet, Anup Sathy, Jeffrey

793 Zeiger, Spencer Winters, Samantha Good, Kelann Stirling acting in conjunction, facilitated the

794 negotiations of the Luminus Settlement. Their actions make them guilty as accessories to both

795 Influence of Public Officials & Bribery Title 18 USC § 201 (2) and Bankruptcy Fraud in the form

796 of Bribery under 18 U.S. Code § 152 (6).

150.   Defendants Kirkland & Ellis, Ross Kwasteniet, Anup Sathy, Jeffrey Zeiger, Spencer Winters, Samantha Good, Kelann Stirling acting in conjunction were attorneys for the Estate during and after the negotiation of the Luminus Settlement. York Intern. Building, Inc. v. Chaney, 527 F.2d 1061 (9th Cir. 1976). Their actions make them guilty as accessories to both Influence of Public Officials & Bribery under Title 18 USC § 201 (2) and Bankruptcy Fraud in the form of Bribery under 18 U.S. Code § 152 (6). The charges have an aggravated circumstance of Scienter and Concealment by having Defendant Richard J. Grossman document the transaction and report it to the Court as a routine matter. The actions were further aggravated as Fraud Upon the Court.

151.   Defendant Richard J. Grossman, an experienced bankruptcy attorney, knew, or should have known that Luminus Settlement constituted a bribe. He willfully participated as accessory to Influence of Public Officials & Bribery under Title 18 USC § 201 (2) and Bankruptcy Fraud in the form of Bribery under 18 U.S. Code § 152 (6). The charges have an aggravated circumstance of Scienter and Concealment by billing the matter as a Shareholder Matter.

152.   Defendants Slaughter & May, Christian Boney, Ian Johnson, and Hywel Davies acting in conjunction, were attorneys for the Estate and attorneys of record in the United Kingdom. Their letter in defense of the Luminus Settlement clearly shows they analyzed the matter in detail. They are accused as accessories to both Influence of Public Officials & Bribery under Title 18 USC § 201 (2) and Bankruptcy Fraud in the form of Bribery under 18 U.S. Code § 152 (6).

153.   Defendants Lazard, Ltd, David Kurtz, Doug Fordyce, and Ari Lefkovits acting in conjunction, facilitated the negotiations of the Luminus Settlement, and participated in the Board Meetings where the Bribe was discussed. For their action they are charged as accessories to both

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

820   Influence of Public Officials & Bribery Title 18 USC § 201 (2) and Bankruptcy Fraud in the form

821   of Bribery under 18 U.S. Code § 152 (6).

822        154.   Defendants Luminus, Jonathan Barrett, and Adam Weitzman in conjunction

823   solicited, negotiated, and accepted the Bribe. For their action they are charged with Influence of

824   Public Officials & Bribery Title 18 USC § 201 (2) and Bankruptcy Fraud in the form of Bribery

825   under 18 U.S. Code § 152 (6).

826

827                                    **Count 2**

828                      **Concealment & Fraud Upon the Court**

829        155.   Defendant Luminus, and Valaris conspired to withhold knowledge of the Luminus

830   Settlement from the Bankruptcy Court, tainting the proceedings in a clear violation of Title 18

831   U.S. Code § 152 (1)(2)(8)(9).

832        1.   This became a more serious case of Title 18 U.S. Code § 152 (1)(9). To this regard

833   it is important to remember that Courts have repeatedly determined that willfully withholding

834   relevant information on the state of the affairs is also considered as Concealment, see *Tully.*

835   *United States Court of Appeals, First Circuit. May 4, 1987. 818 F.2d 106 (1st Cir. 1987) & United*

836   *States v. Turner, 725 F.2d 1154.*

837        2.   This Concealment the Courts to, unbeknownst, confirm a Plan that was not

838   Equitable to Class 13 securities, did not follow absolute priority principle, after a solicitation that

839   was tainted through willfully withholding adequate disclosures, in violation of 11 U.S.C. §

840   1123(a)(4) and 11 U.S.C. § 1126(b)(1)(2) respectively.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

841      3.    11 U.S.C. § 1123(a)(4) provides that a for a Plan to be Confirmed must be Equitable

842  and "provide the same treatment for each claim in a particular class, unless the holder of a

843  particular claim…agrees to a less favorable treatment of such particular claim…" This

844  requirement has been interpreted to mean that similarly situated claims must receive the same

845  treatment under a plan. See, e.g., and In re Combustion Eng'g, Inc., 391 F. 3d 190, 239 (3d Cir

846  2004). Clearly Luminus received an economic interest that was not only greater than other Class

847  13 equity holders, but even greater than other class of creditors with higher seniority. Such

848  practices has been subject to judicial denunciation by the Supreme Court for over 120 years. See,

849  Louisville Trust Co. v. Louisville, New Albany & Chicago Railway Co.

850      4.    U.S.C. § 1126(b)(1) provides for the solicitation of a Plan to be deemed accepted,

851  such acceptance is subject to the adequacy of disclosures, a standard that was clearly willfully

852  not met. This was affirmed in Re Tully. United States Court of Appeals, First Circuit. May 4,

853  1987. 818 F.2d 106 (1st Cir. 1987)., Re Michelson, which also specifically address that disclosure

854  outside of the Bankruptcy process as being insufficient. Anything otherwise would violate the

855  Good Faith assumption that underlies the functioning of the Courts, as it would transfer the

856  burden of vigilance to the Creditors, and transform the role of the Court from being a court of

857  Equity to an unworkable corporate game of cat and mouse. This was eloquently summarized in

858  Re Tully.

859          *"debtor cannot, merely by playing ostrich and burying his head deeply*

860          *enough in the sand, disclaim all responsibility for statements which he*

861          *has made under oath"*

862

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

156.   Defendants Aurelius Capital Management, LP, Brigade Capital Management, LP, Canyon Capital Advisors, LLC, GoldenTree Asset Management, LP, King Street Capital Management, LP, Lodbrok Capital, LLP, Oak Hill Advisors, LP, Oaktree Capital Management, LP, Pacific Investment Management Company, LLC, Taconic Capital Advisors, LP, Whitebox Advisors, LLC acting together at the  Ad Hoc Group Bondholders Group ("Ad Hoc Group") co-opted the process of Chapter 11 agreeing to provide the Luminus Settlement. Due to the shared legal representation, and joint negotiaton of the RSA the entirety of the Ad Hoc Group knew, or should have known about the Bribe. They are jointly accused of Bankruptcy Fraud in the form of Concealment under 18 U.S. Code § 152 (8) which contemplates *after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a* debtor; *or and* 18 U.S. Code § 152 (9) which states *after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor.*

157.   Defendants Valaris, Valaris Management (Thomas Peter Burke (CEO), Jonathan H. Baksht (CFO), Michael T. McGuinty (CLO)), and the Valaris Board (Paul E. Rowsey, III, Adam Weitzman, William E. Albrecht, Frederick Arnold, Mary Francis CBE, Suzanne P. Nimocks, Thierry Pilenko) authorized the Luminus Settlement. They are jointly accused of Bankruptcy Fraud in the form of Concealment under 18 U.S. Code § 152 (8) which contemplates *after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books,*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

886  *documents, records, and papers) relating to the property or financial affairs of a* debtor*; or and*

887  18 U.S. Code § 152 (9) which states *after the filing of a case under title 11, knowingly and*

888  *fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United*

889  *States Trustee entitled to its possession, any recorded information (including books, documents,*

890  *records, and papers) relating to the property or financial affairs of a debtor, .*

891      158.   At the time of offering the Bribe. Defendants Valaris, Valaris Management

892  (Thomas Peter Burke (CEO), Jonathan H. Baksht (CFO), Michael T. McGuinty (CLO)), and the

893  Valaris Board (Paul E. Rowsey, III, Adam Weitzman, William E. Albrecht, Frederick Arnold,

894  Mary Francis CBE, Suzanne P. Nimocks, Thierry Pilenko) were jointly functioning as Debtor-

895  in-Possession, Trustees of the Estate. They were thus Officers of the Court. York Intern. Building,

896  Inc. v. Chaney, 527 F.2d 1061 (9th Cir. 1976). Their acts were subject to the aggravated

897  circumstances of Fraud Upon de Court.

898      159.   At the time of offering the Bribe. Defendants Valaris, Valaris Management

899  (Thomas Peter Burke (CEO), Jonathan H. Baksht (CFO), Michael T. McGuinty (CLO)), and the

900  Valaris Board (Paul E. Rowsey, III, Adam Weitzman, William E. Albrecht, Frederick Arnold,

901  Mary Francis CBE, Suzanne P. Nimocks, Thierry Pilenko) were jointly functioning as Debtor-

902  in-Possession, Trustees of the Court. They were thus Officers of the Court at the time. York Intern.

903  Building, Inc. v. Chaney, 527 F.2d 1061 (9th Cir. 1976). Their actions creates a further charge

904  under Title 18 USC § 201 (2) of Bribery and Influence of Public Officials.

905      160.   Defendants Kirkland & Ellis, Anup Sathy Ross Kwasteniet, Anup Sathy, Jeffrey

906  Zeiger, Spencer Winters, Samantha Good, Kelann Stirling acting in conjunction, facilitated the

907  negotiations of the Luminus Settlement. They are jointly accused of Bankruptcy Fraud in the

908  form of Concealment under 18 U.S. Code § 152 (8) which contemplates *after the filing of a case*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

909     *under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys,*

910     *mutilates, falsifies, or makes a false entry in any recorded information (including books,*

911     *documents, records, and papers) relating to the property or financial affairs of a* debtor; *or and*

912     18 U.S. Code § 152 (9) which states *after the filing of a case under title 11, knowingly and*

913     *fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United*

914     *States Trustee entitled to its possession, any recorded information (including books, documents,*

915     *records, and papers) relating to the property or financial affairs of a debtor.*

916        161.   Defendants Kirkland & Ellis, Anup Sathy Ross Kwasteniet, Anup Sathy, Jeffrey

917     Zeiger, Spencer Winters, Samantha Good, Kelann Stirling acting in conjunction were attorneys

918     for the Estate during and after the negotiation of the Luminus Settlement. York Intern. Building,

919     Inc. v. Chaney, 527 F.2d 1061 (9th Cir. 1976). They are jointly accused of accessories to

920     Bankruptcy Fraud in the form of Concealment under 18 U.S. Code § 152 (8) *and* 18 U.S. Code §

921     152 (9).

922        162.   The charges have an aggravated circumstance of Scienter and Concealment by

923     having Defendant Richard J. Grossman document the transaction and report it to the Court as a

924     routine matter. The actions were further aggravated as Fraud Upon the Court.

925        163.   Defendant Richard J. Grossman, an experienced bankruptcy attorney, knew, or

926     should have known that Luminus Settlement constituted a bribe. He willfully participated as

927     accessory Bankruptcy Fraud in the form of Concealment under 18 U.S. Code § 152 (8)(9). The

928     charges have an aggravated circumstance of Scienter and Concealment by billing the matter as a

929     non-descript Shareholder Matter.

930        164.   Defendants Slaughter & May, Christian Boney, Ian Johnson, and Hywel Davies

931     acting in conjunction were attorneys for the Estate were attorneys of record in the United

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

932  Kingdom. Their letter in defense of the Luminus Settlement clearly shows they analyzed the

933  matter in detail. They are jointly accused of accessories to Bankruptcy Fraud in the form of

934  Concealment under 18 U.S. Code § 152 (8) *and* 18 U.S. Code § 152 (9).

935      165.  Defendants Lazard, Ltd, David Kurtz, Doug Fordyce, and Ari Lefkovits acting in

936  conjunction, facilitated the negotiations of the Luminus Settlement, and participated in the Board

937  Meetings where the Bribe was discussed. They are jointly accused of accessories to Bankruptcy

938  Fraud in the form of Concealment under 18 U.S. Code § 152 (8) *and* 18 U.S. Code § 152 (9).

939      166.  Defendants Luminus, Jonathan Barrett, and Adam Weitzman in conjunction

940  solicited, negotiated, and accepted the Bribe. They are jointly accused of Bankruptcy Fraud in

941  the form of Concealment under 18 U.S. Code § 152 (8) *and* 18 U.S. Code § 152 (9).

942

943                                **Count 3**

944                  **Misstatements and Perjury to the Court**

945      167.  In addition to Concealment, the Defendants and their agents made several

946  misleading if not outright perjurious statements, and filings. The Defendants have lost the

947  presumption of Good Faith. It is fair to assume Bad Faith and Intent to deceive as per Guion v.

948  Sims (In re Sims), 479 B.R. 415 (Bankr. S.D. Tex. 2012), Marrama v. Citizens Bank of

949  Massachusetts.

950      168.  In the March 2, 2021 Declaration of Jonathan Baksht in support of confirmation of

951  the Debtors' Fourth Amended Joint Chapter 11 Plan of reorganization pursuant to Chapter 11 of

952  the Bankruptcy Code (See Court docket 1131), Jonathan Baksht (Valaris Chief Financial Officer)

953  declared:

954     **The Debtors Proposed the Plan in Good Faith — § 1129(a)(3)**

955     *"The Plan was proposed in good faith, with the legitimate and honest purposes*

956     *of reorganizing the Debtors' ongoing business, and to enable the Debtors to*

957     *reorganize and achieve a fresh start."*

958     **The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii))**

959     *" I understand that a plan is "fair and equitable" with respect to an impaired*

960     *class of claims or interests that rejects a plan (or is deemed to reject a plan) if it*

961     *follows the "absolute priority" rule. I also understand that the absolute priority*

962     *rule provides that a junior stakeholder may not receive or retain property under*

963     *a plan of reorganization "on account of" its junior claims or interests unless all*

964     *senior classes either (a) are paid in full or (b) vote in favor of the plan."*

965     169.   Mr. Basksht was fully aware of the Luminus Settlement. The above statement is

966     one count of Perjury Generally as per 18 U.S. Code § 1621.

967     170.   On December 7, 2020, Valaris files Debtors' Objection to the Motion for

968     Appointment of Equity Committee and Amended Motion for Appointment of Equity Committee

969     (Court docket 754)[40]. In paragraph 3, Defendant states:

970     *"There also is no need for an equity committee because the equity holders' interests have*

971     *been and are being adequately represented. Before the Debtors filed for chapter 11,*

---

[40] Valaris, *Debtors' objection to an equity committee,* December 2020,
https://cases.stretto.com/public/X088/10396/PLEADINGS/103961207208000000112.pdf (last visited Oct. 22, 2021)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

*Luminus Management, which was the Debtors' largest shareholder owning approximately 18% of the Debtors' equity, had a representative on Valaris' Board of Directors that strongly advocated for equity holders, including Buxton Helmsley's clients, with respect to the restructuring transactions that are set forth in the Plan of Reorganization. As a result, current equity holders will receive warrants for seven percent of the Reorganized Debtors' equity if they support the restructuring— even though they are not entitled to a recovery under the absolute priority rule. During these chapter 11 cases, the Debtors have continued to maximize the value of the estates for all their stakeholders, including the equity holders."* (See Court docket 754 pg. 2)

171.   Document was signed by Kirkland and Ellis LLP - Anup Sathy, P.C., along with Ross M. Kwasteniet, P.C., Spencer A. Winters, Jeffrey J. Zeiger, P.C., and Jason A. Feld (pro hac vice). Additionally, it was signed by local attorneys for Jackson Walker LLP who may not have been aware at the time of the Luminus Setttlement.

172.   Having directly participated in the negotiation of the Luminus Settlment, The K&E attorneys were fully aware that the interest of equity holders had been left unrepresented as the product of their very action. There is no need to infer Intent to Deceive on this statement to the Court; it is self-evident. Defendants Kirkland and Ellis LLP , Anup Sathy, Ross M. Kwasteniet, P.C., Spencer A. Winters, Jeffrey J. Zeiger, P.C., Jason A. Feld are each charged with an additional charge of Perjury Generally as per 18 U.S. Code § 1621.

173.   Jeffrey Zeiger (K&E) on the hearing for an Equity Committee held on December 9, 2020, (See court docket 786 pg. 21) declared:

174.   *There are limited circumstances where the company does take impairments, but the bottom line, Judge, is that GAAP does not attempt to*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

995   *approximate fair market value, which is ultimately what this Court needs to look at*

996   *to determine if there is a likelihood that equity will receive a meaningful recovery*

997   *here."*

998   175.   Mr. Zeiger further enquired whether the representative of Buxton Hemsley was an

999   accountant in order to discredit his statement. However, the Hemsley representative was correct

1000   and Mr. Zeiger purposefully, or through ignorance misrepresented GAAP rules on impairments

1001   to the Court. For a simple explanation we cite the accounting firm EY.

1002   176.   *ASC 360-10, Impairment and Disposal of Long-Lived Assets (ASC 360), provides accounting*

1003   *guidance for impairments of assets that are held for use, held for sale and to be disposed of by other means. In one*

1004   *of its more challenging aspects, ASC 360-10 requires the use of fair value measurements for impairment of assets*

1005   *that are unique and not widely traded.*[41]

1006   177.   Mr. Zeiger also mentioned that Long-Lived Assets go through an annual year-end

1007   impairment test, and that said exercise is also conducted at the time of major corporate events.

1008   Said exercise was conducted both during the merger between Ensco and Rowan, as well as by

1009   KPMG for the year-end financial statements based on "Management Guidance".

1010   178.   Mr. Zeiger is held-out as one of the leading bankruptcy attorneys in the United

1011   States it is difficult to believe that he is unfamiliar with the accounting standards that so directly

1012   affect his specialty. Under the presumption of Intent to Deceive. Defendant Mr. Zeiger is charged

1013   with one count of Perjury Generally as per 18 U.S. Code § 1621.

---

[41] EY - Financial reporting developments A comprehensive guide Impairment or disposal of long-lived assets.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

179.   David Kurtz (Lazard) in the hearing held before the Honorable Judge Isgur on September 24, 2020 (See court docket 287 pg. 89) stated,

*"We recommended to the board, along with the other 15 advisors and the management team, that the company should proceed with the bond DIP because we felt that the bond DIP was in the best interests of the company, and offered the potential for a very attractive solution to the company's restructuring."*

180.   As was later extensively discussed in the DIP Conf, this was in fact not true. The Bond DIP financing was more expensive for the Company. As he later recognize, it was more favorable for the Bondholders who Mr. Kurtz represented. He also neglected to state that the bond DIP was part and parcel of the RSA of which the Luminus Settlement was also an integral part. So integral , that the Bank DIP financing was abandoned on the same week as the Luminus Settlement was formalized. Under the presumption of Bad Faith Defendant David Kurtz is presumed to have committed one count of Defendant Mr. Zeiger is charged with one count of Perjury Generally as per 18 U.S. Code § 1621.

5.   Ross Kwasteniet (K&E) in the hearing held before the Honorable Judge Isgur on September 25, 2020 (See court docket 287 pg. 82), declared:

*" The debtors reached the good-faith conclusion that the bond DIP was better for the company, and the extensive post-petitioning market process and post-petition submission from the bank group  did not change this view."*

181.   As was later extensively discussed in the DIP Conf, this was in fact not true. The Bond DIP financing was more expensive for the Company. As he later recognize, it was more favorable for the Bondholders who Mr. Kurtz represented. He also neglected to state that the bond

1036  DIP was part and parcel of the RSA of which the Luminus Settlement was also an integral part.

1037  So integral , that the Bank DIP financing was abandoned on the same week as the Luminus

1038  Settlement was formalized. Under the presumption of Bad Faith Defendant Mr. Zeiger is charged

1039  with an additional count of Perjury Generally as per 18 U.S. Code § 1621.

1040

1041  **Count 4**

1042  **Fraudulent Conveyance**

1043      182.  The Sale of Ensco 8500 and Ensco 8501 were made under a willful

1044  misrepresentation by Valaris who necessarily knew that the purchasing entity was Lone Star

1045  Mineral Development, LLC.

1046      183.  Not only were these sold for the ludicrous sum of 1% build cost, but even a 90%

1047  discount to the then existing depressed market valuation. This amount is purportedly even below

1048  scrap value of the rigs. Such a discount is hard to understand by any reasonableness standard, and

1049  is a clear breach of fiduciary duty to both Shareholders, and the Estate.

1050      184.  It only compounds matters, that there are documented business links between

1051  Valaris' largest shareholder at the time, and the receiving party of the property, the same

1052  shareholder who was bribed to not present itself at the Confirmation hearing. This is the very

1053  definition of Concealment as per United States v. Turner, 725 F.2d 1154, and would fall under

1054  18 U.S.C. § 152 (1)(7).

1055      185.  There is less information available on the sale of Valaris DS-3, Valaris DS-5, and

1056  Valaris DS-6. Their sale at a discount of about a 99.9% to build value, and an 88% discount over

1057    third-party valuation estimates also raises reasonable questions as to whether Valaris was

1058    fulfilling its fiduciary duty to protect the value to the Estate.

1059        186.   The sales of Ensco 8500, Ensco 8501, Valaris DS-3, Valaris DS-5, and Valaris DS-

1060    6 were executed by Defendants Thomas Peter Burke (CEO), Jonathan H. Baksht (CFO), and

1061    Michael T. McGuinty (CLO). The sales were approved by Defendants Paul E. Rowsey, III,

1062    William E. Albrecht, Frederick Arnold, Mary Francis CBE, Suzanne P. Nimocks, and Thierry

1063    Pilenko acting in their capacity of Board Members of Valaris. These individual parties are jointly

1064    responsible for the violation of Fraudulent Transfer 18 U.S.C. § 152 (1)

1065        187.   *knowingly and fraudulently conceals from a custodian, trustee, marshal, or other*

1066    *officer of the court charged with the control or custody of property, or, in connection with a case*

1067    *under title 11, from creditors or the United States Trustee, any property belonging to the estate*

1068    *of a debtor;*

1069        188.   and 18 U.S.C. § 152 (7)

1070        189.   *in a personal capacity or as an agent or officer of any person or corporation, in*

1071    *contemplation of a case under title 11 by or against the person or any other person or corporation,*

1072    *or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals*

1073    *any of his property or the property of such other person or corporation;*

1074        190.   Defendants Lone Star, and its principal Bret Johnsen, participated in the violation

1075    of 18 U.S.C. § 152 (7) by agreeing to take possession of Ensco 8500, Ensco 8501 from the Estate

1076    at what was evidently a price below market value at a time when Valaris had already publicly

1077    declared its intention to file for Chapter 11. Scienter is evidenced by the incorporation of Lone

1078    Star only a month prior to the transaction for the apparent purpose of executing this transaction.

1079    Scienter was further demonstrated by both Valaris and Lone Star when framing the purchase as

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1080  one made by SpaceX, when in reality it was to a fully licensed E&P oil and gas company. There

1081  are no business scenarios, where it would be justified for Valaris to sell below scrap value a recent

1082  generation rig to an entity that in fact is a potential client. There are no reasonableness standards

1083  where Lone Star could expect to receive such a gift.

1084      191.   While Fraudulent Conveyance in and by itself does not meet the high standards for

1085  Fraud Upon the Court, it should be taken as a predicate offense when evaluating the extent of the

1086  elements of Bankruptcy Fraud present in the case.

1087

1088                              **Count 5**

1089                  **Failure to Declare Conflicts of Interest**

1090      192.   Before officially contemplating bankruptcy, a Cooperation agreement was made on

1091  January 24th, 2020 between Luminus and Valaris, appointing Torque Point Advisors, LLC

1092  ("Torque") , as financial advisor, and naming Richard Katz as key man of the Finance Committee.

1093  Mr. Katz was hired as a financial advisor despite there being no record of him holding such a

1094  license. Torque Point Advisors, LLC ("Torque"), which specializes in bankruptcies was hired to

1095  "improve performance" and represent the interest of Equity. However, by August 2020, Mr. Katz

1096  was receiving class 9 (General unsecured claims) and class 10 (Newbuild claims) notifications,

1097  when in theory he was hired for class 13. These simultaneous representations fall within the well-

1098  established precedents of conflict of interest as outlined in Re Rusty Jones.

1099      193.   Richard Katz was a partner in Cantor-Katz Collateral Monitor LLC ("Cantor-

1100  Katz"), which was involved in the bankruptcy of Puerto Rico. In that situation they were being

1101  represented by Schulte Roth & Zabel LLP, the same firm that represented Luminus in the

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1102    Cooperation Agreement. In the Puerto Rico bankruptcy, Aurelius Capital Management LP

1103    ("Aurelius") lobbied for the appointment of a new Board which incorporated Cantor-Katz.

1104    Aurelius is one of the creditors for Valaris, and was also one of the creditors in Puerto Rico.

1105        194.   A similar situation to Mr. Katz's conflict was also present in the Engagement of

1106    Kirkland & Ellis LLP. In the August 18, 2020 Declaration of Jonahtan Baksht, CFO in support

1107    of the Chapter 11 Petitions, it is stated that in late 2019 and early 2020, the Debtors engaged

1108    Kirkland & Ellis LLP to provide advice pertaining to out-of-court liability management

1109    transactions to reduce leverage and capture discount.

1110        195.   By the very nature of the Engagement, this was in the benefit of Shareholders.

1111    representing Creditors in the bankruptcy would seem to also fall within the well-established

1112    precedents for conflicts of interests as argued in Re Rusty Jones, and in violation of 11 U.S.C. §

1113    327(a) Employment of professional persons.

1114

1115                        **Count 6**

1116                      **Securities fraud**

1117        196.   Defendants Valaris, Valaris Management (Thomas Peter Burke (CEO), Jonathan H.

1118    Baksht (CFO), Michael T. McGuinty (CLO)), and the Valaris Board (Paul E. Rowsey, III, Adam

1119    Weitzman, William E. Albrecht, Frederick Arnold, Mary Francis CBE, Suzanne P. Nimocks,

1120    Thierry Pilenko) supervised and authorized the issuance of Valaris financial statements issued to

1121    the public, and company reports issued to the Company. They are jointly accused of Securities

1122    Fraud under Section 17 A of the Securities Act of 1933 for the numerous financial misstatements

1123   listed in the Complaint. These include variations in asset values in excess of any reasonable basis,

1124   misrepresentation as to liquidity position of the Company, proximate causes of bankruptcy.

1125   ## Count 7

1126   ### Racketeer Influenced and Corrupt Organizations Act (RICO)

1127   1.   When all the previous Counts are contextualized, a long-running, and well-

1128   organized conspiracy between the Parties starts to appear. It is not lightly that Mr. Miralles states

1129   his belief that this qualifies as a Racketeering Offense under 18 U.S.C. § 1961-1962. This is a

1130   well-oiled machine engaging in bankruptcy fraud, manufactured defaults, and securities fraud. It

1131   needs to be stopped, or it will surely strike again to the detriment of Justice, and the Public Good.

1132   2.   Under 18 U.S.C. § 1961(5) a pattern of racketeering activity requires the at least

1133   two acts of activities defined as racketeering in the past 10 years. As outlined in the Pleading,

1134   Valaris and the Defendants have engaged not in two, but in all of the following activities defined

1135   by 18 U.S.C. § 1961 including; Bribery of Officials under Title 18 USC § 201, Fraud Title 18

1136   USC § 1028, Wire Fraud Title 18 USC § 143, and Financial Institution Fraud Title 18 USC §

1137   1344, or any offense involving fraud connected with a case under title 11 (except a case under

1138   section 157 of this title), and fraud in the sale of securities.

1139   3.   These offenses constitute a long-running series of criminal activities with the

1140   participants acting in coordination for over 2 years just in the case of the Valaris bankruptcy.

1141   "related predicate acts in furtherance of a single scheme can constitute a pattern if the acts constitute or present the

1142   threat of long-term continuous criminal activity." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1412 (3d Cir.

1143   1991)

1144   4.   The Defendants have coincided in contested bankrupties, and recurrent business

1145   ties. Luminus, and its affiliate LS Power have been involved in over 3 cases involving accusations

1146  of Fraudulent Transfer. The first accusation against a predecessor entity is the cited case of

1147  Pagnotti Enterprises almost 40 years ago. Their Principal, Jonathan Barrett, was CFO for a Jeffrey

1148  Epstein, a notorious financier, and convicted pedophile. This would appear to amply fulfil the

1149  continuity standard set in H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 241 (1989).

1150       5.     Furthermore, these predicate acts caused a direct injury to the Plaintiff's property.

1151  Ocean Energy II, Inc. v. Alexander & Alexander, Inc., 868 F.2d 740, 744 (5th Cir. 1989), Sedima,

1152  S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985). Under a liberal provision of the Title the threshold

1153  has been met. See United States v. Turkette, 452 U.S. 576 (1981)

## CONSIDERATIONS ON TIMING

1155       1.     The following Adversial Pleading relates back to the original Pleading filed within

1156  the 180 day limit from Plan Confirmation established in 11 U.S.C § 1144. Plaintiff notes

1157  following the Court filings, he did not find out about the Agreement until after the Plan

1158  Confirmation had occurred. At the time, Shareholders had every right to expect that Valaris was

1159  acting in good faith in its supervision and was acting in the benefit of all parties involved.

1160       2.     The Defendants actively thwarted the establishment of an Equity Committee by

1161  stating it would have been both overly costly and damaging to the Estate. Furthermore, they

1162  asserted to the Court that Luminus, the Creditor Committee and Trustee would already task with

1163  safeguarding the best interest of all parties.

1164       3.     The Defendants should not be allowed to benefit from the delays that were caused

1165  by their own act of Concealment, and their willful hindrance of the Court, as per In re Tully,

1166  United States v. Turner, Pepper v. Litton, 308 U.S. 295, 312 (1939) and In re Michelson.

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

4.      Without an Equity Committee, individual small equity holders were left powerless in a complex case for which Kirkland & Ellis charged the Estate $20,412,981.50, without contemplating the previous $18,221,244.62 retainer for prepetition services. Clearly there was a marked asymmetry in the resources and ability to defend rights. An asymmetric result that was actively procured through Perjury.

5.      Equitable Tolling should be granted in the face Excusable Delay, particularly in cases of fraud where the aggrieved party could not have reasonably been able to act in a timely manner due to the actions of the perpetrators. *("Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rig*hts"), In re Watson, Case No: 04-46189 (Bankr. S.D. Tex. Dec. 14, 2007), Flores v. Quarterman, 467 F.3d 484, 487 (5th Cir. 2006), Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924 (5th Cir. 1975).

## CONSIDERATION ON DAMAGES

6.      The Plaintiff was greatly and measurably harmed by the actions of the Defendant that led to his participation being eliminated and exchanged for deeply Out-of-the-Money Warrants. Unfortunately, the Defendants through their inconsistent financial disclosures, conflicted valuations and general wanton disregard for truth have created a situation where it is extremely difficult to fairly determine the value of the Estate, both prior to and after their actions. The Mr. Miralles had his firm, Tempest Capital, SC, prepare an exemplary Valuation Exercise (Exhibit 2). The Valuation of the firm is highly sensitive to inputs pertaining to Day Rates and Utilization. Estimates for Enterprise Value of the Firm range from $6.8 billion to $29.1 billion. A range not inconsistent to where Valaris and component entities traded in the prior decade. This

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1189   is also consistent with the Enterprise Value of a Company whose 2020 10K still reported $10.1

1190   billion in PP&E, and that had purported to have $23.9 billion in Replacement Value of Assets.

1191   The Company currently trades at $28.Act39 per share. However, this uncertainty does not render

1192   the calculation of damages impossible as established under Eastman Co. v. Southern Photo Co.,

1193   273 U.S. 359, 379 (1927)

1194   *"Damages are not rendered uncertain because they cannot be calculated with*

1195   *absolute exactness. It is sufficient if a reasonable basis of computation is afforded,*

1196   *although the result be only approximate." This, we think, was a correct statement*

1197   *of the applicable rules of law. Furthermore, a defendant whose wrongful conduct*

1198   *has rendered difficult the ascertainment of the precise damages suffered by the*

1199   *plaintiff, is not entitled to complain that they cannot be measured with the same*

1200   *exactness and precision as would otherwise be possible."*

1201   7.   The Defendant proposes to use Book Value of Equity as of the 2019 10K with the

1202   Company's financial position as of December 31, 2019. Said document was compiled proximate

1203   to the Rowan & ENSCO merger and reflected extensive valuations and impairment testing.

1204   Furthermore, the estimates of PP&E were stated to be derived from the fair value opinions issued

1205   by five independent appraisers, in addition to the valuation impairment test that the external

1206   auditor, KPMG was obligated to perform under US GAAP. This would seem to provide a

1207   reasonable alternative to cut through the uncertainty and is based on the public affirmations made

1208   by Valaris under which the Defendant invested.

1209   8.   The Book Value as of December 31, 2019 was $9,310.9 million with 197.3 million

1210   shares outstanding. This equates to a Book Value per Share of approximately $47.20 per share.

1211   Mr. Miralles' 152,900 shares would be worth $7,216,295.20. This sum is the best proximate

1212   estimate for the fair market value of the property prior to the fraudulent conduct and would

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1213   constitute adequate Compensatory Damages. This methodology is codified in BVS-III (II)(A)

1214   Asset-Based Approach to Business Valuation of the American Society of Appraisers, and

1215   substantially congruent to the Balance Sheet Test applied by Bankruptcy Courts.

1216          9.   In addition, the current situation merits Exemplary Damages as per the criteria set

1217   in Walker v. Sheldon, 10 N.Y.2d 401 (N.Y. 1961) as a deterrence to fraud when a high degree of

1218   moral turpitude is present and when the conduct in question is aimed at the public generally,

1219   involves a high degree of moral culpability, and rises to a level of "such wanton dishonesty as to

1220   imply a criminal indifference to civil obligations". When considering this BMW of North

1221   America, Inc. v. Gore, 517 U.S. 559 (1996) complements that Exemplary Damages must consider

1222   "the degree of reprehensibility of the defendant's conduct," the "ratio to the actual harm," and the

1223   disparity between "the punitive damages award and the civil or criminal penalties that could be

1224   imposed for comparable misconduct." As argued, the acts committed by the Defendants can be

1225   accurately categorized as Fraud Upon de Court representing an offense directed to the "judicial

1226   machinery itself". Elements of bad-faith and malicious intent, including acts with criminal

1227   penalties, have been amply documented in the Defendant's exposition. That these acts were

1228   executed by well-established bankruptcy investors, and legal practitioners is a further factor to

1229   consider. Should this conduct become prevalent practice, it would significantly hinder the proper

1230   functioning of the Bankruptcy Courts. The acts merit the highest level of condemnation that this

1231   Court can extend.

1232         10.   When considering the ratio to the actual harm, the Supreme Court has largely

1233   argued for a guideline of not more than four times damages, See BMW of North America, Inc. v.

1234   Gore, 517 U.S. 559 (1996), and three times damages in cases of bankruptcy fraud, See Cohen v.

1235   de la Cruz, 523 U.S. 213 (1998). The request of Treble Damages for the Defendant is perfectly

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1236  aligned the unconscionable nature of the acts, as well as with well-established practice of the

1237  Courts.

1238      11.    The resulting treble multiple of said Compensatory and Exemplary Damages is

1239  $21,648,885.60. This amount is not Material to the size of the Estate, would not affect the going

1240  concern of Restructured Valaris, and would not harm the Innocent Parties who may have

1241  purchased shares since the Confirmation of the Plan.

1242

1243                          **CONCLUSION**

1244      12.    Valaris was plunged into bankruptcy by a tangled web of conflicted relationships,

1245  misrepresentations, fraudulent conveyance of assets, and outright Fraud Upon the Court. These

1246  parties colluded to form a Manufactured Default to show the Company was insolvent, when in

1247  fact the last Independent Value Opinions showed it had significant positive equity and would pass

1248  any reasonable Balance Sheet Test. In the worst-case scenario, and only after believing the

1249  representations from Management regarding short-term liquidity constraints, the entity would

1250  have been a Solvent Debtor granting a strong residual interest to Junior Unsecured Creditors and

1251  Shareholders.

1252      13.    Bankruptcy relief is intended for the honest, but unfortunate debtor approaching the

1253  Court with Clean Hands. It is well established that Bankruptcy should not be a conduit for a

1254  fraudulent discharge of Creditors. *("Since the Code limits the opportunity for a completely*

1255  *unencumbered new beginning to the honest but unfortunate debtor by exempting certain debts*

1256  *from discharge, it is unlikely that Congress would have fashioned a proof standard that favored*

1257  *an interest in giving the perpetrators of fraud a fresh start over an interest in protecting the*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1258    *victims of fraud. Requiring the creditor to establish by a preponderance of the evidence that his*

1259    *claim is not dischargeable reflects a fair balance between these conflicting interests.)* Grogan v.

1260    Garner, 498 U.S. 279 (1991)

1261    14.    Even before Discovery, the case easily meets the Preponderance of Evidence

1262    standard set out in Grogan v. Garner. The case is based entirely on self-authenticating evidence,

1263    including, Texas Railroad Commission Fed. R. Evid. 902 (2)(A), Securities and Exchange

1264    Comission Filings Fed. R. Evid. 902 (4)(A), Court Docket Entries Fed. R. Evid. 902 (4)(A),

1265    Board Minutes & Acknowledged Documents Fed. R. Evid. 902 (8) & Fed. R. Evid. 902 (9), and

1266    Newspapers and Periodicals Fed. R. Evid. 902 (6)

1267    15.    The proper remedy contemplated in the Code for this situation is a Revocation of

1268    the Confirmation Order under 11 U.S.C § 1144 with Fraud and Fraud Upon the Court being

1269    amply shown on a Preponderance of Evidence standard as contemplated in Grogan v. Garner.

1270    This would give other Shareholders the right to a proper hearing under a Process managed by an

1271    independent Trustee designated by the US Trustee.

1272    1.    Unfortunately, this remedy, while amply justified under the current circumstances

1273    needs to be carefully considered by the Court, that must evaluate if it is still feasible to

1274    "unscramble the egg" without potential to harm entities having acquired rights in good faith

1275    reliance of the order. The Plaintiff is not blind to this conundrum, and the public good.

1276    2.    This requires the Court to use its broad powers in 11 U.S. Code § 105(a) and 11

1277    U.S. Code § 1142 (b) as a Court of Equity to seek alternative remedies to remedy bad faith, and

1278    abuse of process. Such a position is amply documented in In re Hilal, 534 F.3d 498, 500 (5th Cir.

1279    2008), Marrama v. Citizens Bank of Massachusetts, Re Tully, and by this very Court which stated

1280 "Bankruptcy courts are courts of equity and rely on the good faith of parties to function efficiently"

1281 in re Thomas.

1282    3.    This imperative need to prevent Fraud Upon the Court was well articulated in

1283 Pepper v. Litton, 308 U.S. 295, 312

1284    *"But when there is added the existence of a "planned and fraudulent scheme," as*

1285    *found by the District Court, the necessity of equitable relief against that fraud*

1286    *becomes insistent. No matter how technically legal each step in that scheme may*

1287    *have been, once its basic nature was uncovered it was the duty of the bankruptcy*

1288    *court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary*

1289    *duties of dominant or management stockholders would go for naught;*

1290    *exploitation would become a substitute for justice; and equity would be perverted*

1291    *as an instrument for approving what it was designed to thwart."*

1292    4.    Mr. Miralles is open to alternative equitable remedies as deemed by the Court as

1293 allowed under Fed. R. Civ. P. 8(a)(3), *"demand for the relief sought, which may include relief in*

1294 *the alternative, or different types of relief"*. The Court has the wide authority under 11 U.S. Code

1295 § 105(a), 11 U.S.C. § 510, and 11 U.S. Code § 1142 (b) as a Court of Equity to seek alternative

1296 remedies to correct bad faith, and abuse of process. This includes damages, fines, revocation of

1297 releases recharacterization, disallowance, disgorgement of fees, and equitable subordination of

1298 the offending parties under the wide powers of 11 U.S.C. § 510, Pepper V. Litton, 308 U.S. 295

1299 (1939), In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009), Matter of Multiponics, Inc., 622

1300 F.2d 709 (5th Cir. 1980), Re Trico Marine Services.

1301    5.    The Court is empowered to offer meaningful relief "even though the parties cannot

1302 be returned to the status quo ante". In re Continental Airlines, 91 F.3d 553 (3d Cir. 1996), In re

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1303     Swedeland Development Group, Inc., 16 F.3d 552 (3d Cir. 1994). It is a Maxim that "Equity will

1304     not suffer a wrong without a remedy", and that "Equity delights to do justice and not by halves".

1305     6.     Mr. Miralles expresses a preference that damages be awarded in cash given the

1306     amount sought is not material to the Estate, would not materially affect the premises under which

1307     new investors participated in Good-Faith, nor would it endanger the potential solvency of

1308     Restructured Valaris, Furthermore, these could come from a disgorgement of fees from the

1309     unfaithful Trustees which far exceed the Plaintiff's claims.

1310     7.     Alternatively, the Plaintiff posits that damages could be assigned in the form of

1311     additional units of the Warrants in Restructured Valaris at the current OTC market price. Valaris

1312     has repeatedly represented to the Court and the Investment Public that said Warrants are deep-

1313     out-of-the-money, and worthless. The strike price on said Warrants is set at the price that would

1314     make Secured Creditors whole. Restructured Valaris investors have no factual basis to claim that

1315     said Warrants transfer value that they were represented was theirs, and their assignment would

1316     respect the Absolute Priority of Claims. This would appear to be an equitable settlement in the

1317     case of a Solvent Debtor, and draws from common law precedents prior to the current Code.

1318     Impact on innocent parties may be further minimized through equitable subordination, or

1319     abrogation of claims of the offending Creditors, with a corresponding adjustment of the strike

1320     price of the Warrants,

1321     8.     The Plaintiff is a firm believer that investor trust is paramount to the well-

1322     functioning of financial markets. The emblematic nature of this case deserves to be heard, as it

1323     would help set a precedent for the market and would further the public good.

1324

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

### **PRAYER FOR RELIEF**

9.    WHEREFORE Plaintiff prays for the entry of judgment against Defendant as follows:

1.    Provide Equitable Tolling as necessary for the Court to fully evaluate the evidence provided.

2.    Determine that the Plan was procured by fraud, in a degree of Fraud Upon the Court, which justifies the Revocation criteria set out in 11 U.S.C § 1144,

3.    Determine that the Court determine that the Plan was not Equitable, and did not follow Priority of Claims in contravention of 11 U.S. Code § 1123,

4.    Determine a Constructive Trust to prevent Unjust Enrichment of the Tortfeasors and providing restitution by means of Plan Revocation, offending creditor equitable subordination, and claim abrogation.

5.    In the alternative, enjoin the Court's broad powers under 11 U.S. Code § 105(A) for modification and implementation of the Plan to provide equitable relief for compensatory damages, and treble exemplary damages in the amount of $21,648,885.60 in favor of the Plaintiff,

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

6.  For costs of suit herein incurred; and

7.  For such other actions, and further relief, as this Court deems just and proper acting on a *Sua Ponte* basis.

Finally, I beg the Court's indulgence for any mistakes made in Good Faith that may have arisen from my lack of legal training.

Dated: November 1ˢᵗ, 2021                                    Respectfully submitted,

*Sebastian Miralles*

DocuSigned by:
—4E95B6808C22471...

Sebastian Miralles Acuña, CFA & CAIA

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

## **VERIFICATION OF PLEADING**

The Plaintiff Mr. Sebastian Miralle Acuña has reviewed the complaint. The Plaintiff knows or believes that all allegations that he has personal knowledge of to be true. The Plaintiff believes the allegations that the Plaintiff does not have personal knowledge of, to be true based on specified information, documents, or both.

Dated: November 1st, 2021                                   Respectfully submitted,

DocuSigned by:

Sebastian Miralles

4E95B6808C22471...

_____

Sebastian Miralles Acuña, CFA & CAIA

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

## **Table of Authorities**

### **Statutes**

- 11 U.S.C. § 102(1)(B)(i)(ii)

  *(1)"after notice and a hearing", or a similar phrase—authorizes an act without an actual hearing if such notice is given properly and if—(i) such a hearing is not requested timely by a party in interest; or*

  > *(ii)there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act;*

- 11 U.S.C. § 105(a)

  *The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.*

- 11 U.S.C. § 327 (a)

  *Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1395

- 11 U.S.C. § 1123(a)(4)

  1396

  *Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;*

1401

- 11 U.S.C. § 1142 (b)

  *The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.*

1407

- 11 U.S.C § 1144

  *On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud.*

1412

- 11 U.S.C. § 1123(a)(4)

  *provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.*

1417

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

- 11 U.S.C. § 1126(b)(1)

  *the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation*

- 11 U.S.C. § 1126(b)(2)

  *if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.*

- 11 U.S.C. 1129(b)(2)(B)(ii)

  *The holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.*

- 18 U.S.C. § 152(1)

  *knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

- 18 U.S.C. § 152(2)

  *knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;*

- 18 U.S.C. § 152(3)

  *knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;*

- 18 U.S.C. § 152(6)

  *(knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11;*

- 18 U.S.C. § 152 (7)

  *in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1464     •   18 U.S.C. § 152(9)

1465       *after the filing of a case under title 11, knowingly and fraudulently withholds from a*

1466       *custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled*

1467       *to its possession, any recorded information (including books, documents, records, and*

1468       *papers) relating to the property or financial affairs of a debtor,*

1469

1470     •   18 U.S.C. § 157

1471       *A person who, having devised or intending to devise a scheme or artifice to defraud and*

1472       *for the purpose of executing or concealing such a scheme or artifice or attempting to do*

1473       *so.*

1474

1475       18 U.S. Code § 1621

1476       *(1) having taken an oath before a competent tribunal, officer, or person, in any case in*

1477       *which a law of the United States authorizes an oath to be administered, that he will testify,*

1478       *declare, depose, or certify truly, or that any written testimony, declaration, deposition, or*

1479       *certificate by him subscribed, is true, willfully and contrary to such oath states or*

1480       *subscribes any material matter which he does not believe to be true; or*

1481       *(2) in any declaration, certificate, verification, or statement under penalty of perjury as*

1482       *permitted under section 1746 of title 28, United States Code, willfully subscribes as true*

1483       *any material matter which he does not believe to be true;*

1484       *is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under*

1485       *this title or imprisoned not more than five years, or both. This section is applicable whether*

1486       *the statement or subscription is made within or without the United States.*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

**Regulations**

- 17 C.F.R. § 240.10(b)

  *To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading*

- 17 C.F.R. § 240.10(c)

  *To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.*


**Rules**

- Fed. R. Civ. P. 8 (3)

  *"a demand for the relief sought, which may include relief in the alternative or different types of relief."*


- Fed. R. Civ. P. 11 (1)

  *"In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, <u>a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.</u>"*


- Fed. R. Evid. 902 (4)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1509      *Certified Copies of Public Records. A copy of an official record-or a copy of a document*

1510      *that was recorded or filed in a public office as authorized by law-if the copy is certified as*

1511      *correct by:(A) the custodian or another person authorized to make the certification;*

1512      *or(B) a certificate that complies with Rule 902(1), (2), or (3), a federal statute, or a rule*

1513      *prescribed by the Supreme Court.*

1514

1515      • Fed. R. Evid. 902 (6)

1516      *"Newspapers and Periodicals. Printed material purporting to be a newspaper or*

1517      *periodical."*

1518

1519      • Fed. R. Evid. 902 (8)

1520      *"Acknowledged Documents. A document accompanied by a certificate of acknowledgment*

1521      *that is lawfully executed by a notary public or another officer who is authorized to take*

1522      *acknowledgments."*

1523

1524      • Fed. R. Evid. 902 (9)

1525      *"Commercial Paper and Related Documents. Commercial paper, a signature on it, and*

1526      *related documents, to the extent allowed by general commercial law."*

1527

1528

1529

**Cases**

1530   • Bank of America Nat. Trust and Sav. Assn. v. 203 North LaSalle Street Partnership, 526
1531   U.S. 434 (1999)

1532   *A plan may be found to be fair and equitable if "the holder of any claim ... junior to the*
1533   *claims of such class will not receive or retain under the plan on account of such junior*
1534   *claim ... any property." § 1129(b)(2)(B)(ii). Under this "absolute priority rule," the Bank*
1535   *argued, the plan could not be confirmed as a cramdown because the Debtor's old equity*
1536   *holders would receive property even though the Bank's unsecured deficiency claim would*
1537   *not be paid in full.*

1538

1539   • BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996)

1540   *Holding that a court must consider "the degree of reprehensibility of the*
1541   *defendant's conduct," the "ratio to the actual harm," and the disparity between "the*
1542   *punitive damages award and the civil or criminal penalties that could be imposed for*
1543   *comparable misconduct."*

1544

1545   • Cohen v. de la Cruz, 523 U.S. 213 (1998)

1546   *Holding that "§ 523 prevents the discharge of all liability arising from fraud," stressing*
1547   *that this provision applies to treble damages and to attorney fees and costs.*

1548

1549   • In re Combustion Eng'g, Inc., 391 F. 3d 190, 239 (3d Cir 2004)

1550   *Similarly situated claims must receive the same treatment under a plan.*

1551

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1552    •   In re Continental Airlines, 91 F.3d 553 (3d Cir. 1996)

1553     *the rule is stated that a party against whom a judgment has been rendered may be granted*

1554     *relief on the grounds of fraud provided the fraud practiced upon him prevented him from*

1555     *presenting all of his case to the court, but that a judgment will not be set aside on the*

1556

1557    •   Demjanjuk v. Petrovsky, 10 F.3d 338 (6th Cir. 1993)

1558     *Holding that "only actions that actually subvert the judicial process can be the basis for*

1559     *upsetting otherwise settled decrees" on the basis of fraud on the court.*

1560

1561    •   Eastman Co. v. Southern Photo Co., 273 U.S. 359 (1927)

1562     *Explaining "a defendant whose wrongful conduct has rendered difficult the ascertainment*

1563     *of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot*

1564     *be measured with the same exactness and precision as would otherwise be possible"*

1565

1566    •   Grogan v. Garner, 498 U.S. 279 (1991)

1567     *Courts should apply the "preponderance of the evidence" standard when dealing in*

1568     *bankruptcy cases.*

1569

1570    •   Guion v. Sims (In re Sims), 479 B.R. 415 (Bankr. S.D. Tex. 2012)

1571     *"Intent to deceive "may be inferred from reckless disregard for the truth or falsity of a*

1572     *statement combined with the sheer magnitude of the resultant misrepresentation."*

1573     *grounds of perjured testimony or for any other matter that was presented and considered*

1574     *in the judgment under attack.*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1575

1576   • Louisville Trust Co. v. Louisville, New Albany & Chicago Railway Co., 174 U.S. 674

1577   (1899)

1578   *This is based upon the familiar rule that the stockholder's interest in the property is*

1579   *subordinate to the rights of creditors; first of secured and then of unsecured creditors. And*

1580   *any arrangement of the parties by which the subordinate rights and interests of the*

1581   *stockholders are attempted to be secured at the expense of the prior rights of either class*

1582   *of creditors comes within judicial denunciation.*

1583

1584   • Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365 (2007)

1585   *Describing the broad authority § 105 grants to bankruptcy judges to take any action*

1586   *necessary to prevent an abuse of process Pre-petition bad faith. Established the 7 elements*

1587   *of fraudulent intent.*

1588

1589   • Matter of Multiponics, Inc., 622 F.2d 709 (5th Cir. 1980)

1590   *the Fifth Circuit Court of Appeals "re-articulated" the test for determining equitable*

1591   *subordination in the bankruptcy setting: (1) the claimant must have engaged in some type*

1592   *of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of*

1593   *the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable*

1594   *subordination of the claim must not be inconsistent with the provisions of the Bankruptcy*

1595   *Act.*

1596

1597   • In re Michelson, 141 B.R. 715 (Bankr. E.D. Cal. 1992)

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1598      *Considering the "accuracy of disclosure" as "an issue that must be addressed at the*

1599      *confirmation hearing" in revoking the order confirming a plan of reorganization for fraud*

1600      *on the court.*

1601

1602      • H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989)

1603      *Holding that the continuity prong can be met by showing that related predicate offenses*

1604      *continued over a substantial period of time or posed a threat of continuing activity*

1605

1606      • In re Hilal, 534 F.3d 498, 500 (5th Cir. 2008)

1607      *"Not only is there no potential adverse effect on the plan or third parties from our hearing*

1608      *the appeal, but equity strongly supports appellate review of issues consequential to the*

1609      *integrity and transparency of the Chapter 11 process."*

1610

1611      • In re Rusty Jones, Inc., 134 B.R. 321 (Bankr. N.D. Ill. 1991)

1612      *It is well established that simultaneous representation of both a debtor and a debtor's*

1613      *shareholder may under some circumstances create a conflict of interest under sections 327*

1614      *and 328. Attorneys for a Chapter 11 corporate debtor owe a fiduciary duty to the*

1615      *corporation and not to the employees, officers, directors, or dominant shareholders of the*

1616      *corporation or of a controlling parent company.*

1617

1618      • In re Bass, 171 F.3d 1016 (5th Cir. 1999)

1619      *Discussing that bankruptcy jurisdiction lies in a proceeding over an asset, "because the*

1620      *[resolution of the] dispute over the asset would have an effect on the estate."*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1621

1622    • In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009)

1623      *Concluding that impermissible third-party releases were not shielded from review by*

1624      *equitable mootness.*

1625    • In re Tabor, 583 B.R. 155 (Bankr. N.D. Ill. 2018)

1626      *Holding that bankruptcy courts have authority to oversee and correct for attorney conduct*

1627      *under Chambers v. NASCO, Inc., 501 U.S. 32; bankruptcy courts have, essentially, four*

1628      *types of authority that might be invoked: " the power to regulate behavior before it inherent*

1629      *in all courts; the direct, specific authority of a statute or rule; the ability to regulate the*

1630      *practice of the federal bar, as delegated to the court by the United States District Court for*

1631      *this District; and the authority afforded specifically to the bankruptcy courts under section*

1632      *105 of the Bankruptcy Code."*

1633

1634    • In re Thomas, 223 Fed. Appx. at 313

1635          *Bankruptcy Courts are courts of equity.*

1636

1637    • In re Tully. United States Court of Appeals, First Circuit. May 4, 1987. 818 F.2d 106 (1st

1638    Cir. 1987)

1639      *Holding that the bankruptcy code forbids a debtor from obtaining a discharge if the debtor*

1640      *made inaccurate representations to the court as a result of willfully ignoring relevant*

1641      *information because a "debtor cannot, merely by playing ostrich and burying his head*

1642      *deeply enough in the sand, disclaim all responsibility for statements which he has made*

1643      *under oath"*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

- In re Trico Marine Services, Inc., 337 B.R. 811 (Bankr. S.D.N.Y. 2006)

  *Request for revocation was denied, but was given a stay to present claims of damages instead. Damages were granted. There is precedent for requesting damages for fraud Post-Confirmation.*

- Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406 (3d Cir. 1991)

  *related predicate acts in furtherance of a single scheme can constitute a pattern if the acts constitute or present the threat of long-term continuous criminal activity.*

- Nikoloutsos v. Nikoloutsos (In re Nikoloutsos), 199 F.3d 233, 236

  *A court of equity is enabled to frustrate fraud and work complete justice.*

- Pulitzer-Polster v. Pulitzer, 784 F.2d 1305 (5th Cir. 1986)

  *Noting that the Rule 19 inquiry is "highly practical" and "fact-based"*

- Pepper v. Litton, 308 U.S. 295 (1939)

  *Courts of bankruptcy, in passing upon the validity and priority of claims, exercise equity powers and have not only the power but the duty to disallow or subordinate claims if equity and fairness so require. That power and duty are especially clear where the claim seeking allowance accrues to the benefit of an officer, director or stockholder of the bankrupt.*

  *A dominant and controlling stockholder has a fiduciary duty to creditors in dealing with the corporation and with them, and when his transactions are challenged must prove the*

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1667     *good faith of the transactions and their inherent fairness from the* viewpoint of the

1668     corporation and those interested therein. *This obligation is enforceable by the trustee in*

1669     *bankruptcy of the corporation. P. 306. 5. A dominant or controlling stockholder or group*

1670     *of stockholders are fiduciaries, as are directors. Their powers are powers in trust.*

1671

1672     • Pepper v. Litton, 308 U.S. 295, 312 (1939)

1673     *"But when there is added the existence of a "planned and fraudulent scheme," as found by*

1674     *the District Court, the necessity of equitable relief against that fraud becomes*

1675     *insistent. No matter how technically legal each step in that scheme may have been, once*

1676     *its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its*

1677     *equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management*

1678     *stockholders would go for naught; exploitation would become a substitute for justice; and*

1679     *equity would be perverted as an instrument for approving what it was designed to thwart."*

1680

1681     • Realty Corp. v. O'Connor, 295 U.S. 295 (1935)

1682     *Referees in bankruptcy are public officers (11 U.S.C. § 61, 64), and officers of a court.*

1683     *Like public officers generally, they must show clear warrant of law before compensation*

1684     *will be owing to them for the performance of their public duties.*

1685

1686     • Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924 (5th Cir. 1975)

1687     *The court held that, in circumstances where plaintiff claimed defendant had actively sought*

1688     *to mislead her and that a reasonable person would not have been aware of the claim, "the*

1689     *statute does not begin to run until the facts which would support a cause of action are*

1690    *apparent or should be apparent to a person with a reasonably prudent regard for his*

1691    *rights."*

1692

1693    • Salmon v. Brookshire, 301 S.W.2d 48 (Mo. Ct. App. 1957)

1694    *Where the recipient of fraud or deceit is left with no value whatsoever, the proper measure*

1695    *of damages is "the amount ... paid with interest from the date of payment, plus incidental*

1696    *losses and expenses suffered as a result of the seller's misrepresentations."*

1697

1698    • Schmidt v. Grand Ltd. (In re Black Elk Energy Offshore Operations, LLC), 605 B.R. 138

1699    (Bankr. S.D. Tex. 2019)

1700    *Noting that a determination of whether a party is indispensable is a "highly practical, fact-*

1701    *based endeavor." Pulitzer-Polster v. Pulitzer , 784 F.2d 1305, 1309 (5th Cir. 1986). The*

1702    *burden of establishing that a party is necessary initially rests on the advocate. Hood v. City*

1703    *of Memphis , 570 F.3d 625, 628 (5th Cir. 2009). After "an initial appraisal of the facts*

1704    *indicates that a possibly necessary party is absent, the burden of disputing this initial*

1705    *appraisal falls on the party who opposes joinder."*

1706

1707    • Tenn-Fla Partners v. First Union National Bank of Florida, 229 B.R. 720 (W.D. Tenn.

1708    1999)

1709    *Finding that, when determining whether to revoke confirmation procured due to fraud in*

1710    *a Chapter 11 case pursuant to Section 1144, the proper evidentiary standard was*

1711    *preponderance of the evidence, not clear and convincing evidence*

1712

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1713     •  Trevino v. HSBC Mortgage Services, Inc. (In re Trevino), 535 B.R. 110 (Bankr. S.D. Tex.

1714     2015)

1715

1716     •  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985)

1717     *Holding that private actions under RICO do not require a criminal conviction on the*

1718     *underlying predicate offenses*

1719     •  United States v. Turkette, 452 U.S. 576 (1981)

1720     *Holding that an "enterprise" is "a group of persons associated together for a common*

1721     *purpose of engaging in a course of conduct"*

1722

1723     •  Ultraflo Corp. v. Pelican Tank Parts, Inc., 926 F. Supp. 2d 935 (S.D. Tex. 2013)

1724     *Finding on summary judgment that claim against newly added defendant was not time-*

1725     *barred and that relation back applied, where plaintiff put forth "facts plausibly showing"*

1726     *that new defendant had notice of the filing of the original complaint*

1727

1728     •  United States v. Throckmorton, 98 U.S. 61 (1878)

1729     *In United States v. Throckmorton, 98 U.S. 61, 65-66 (1878), the Supreme Court*

1730     *recognized that res judicata does not apply when the party sought to be barred was*

1731     *prevented by his adversary's fraud or misconduct from presenting an issue at trial.*

1732     *Distinguishing intrinsic and extrinsic fraud for purposes of preclusion, allowing*

1733     *independent actions for extrinsic fraud, but not for intrinsic fraud*

1734

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1735     • United States v. Turkette, 452 U.S. 576 (1981)

1736     *Concluding that an association-in-fact enterprise constitutes a "group of persons*

1737     *associated together for a common purpose of engaging in a course of conduct"*

1738

1739     • United States v. Turner, 725 F.2d 1154

1740     *Finding that withholding knowledge or preventing disclosure or recognition is included*

1741     *in the definition of concealment.*

1742

1743     • Walker v. Sheldon, 10 N.Y.2d 401 (N.Y. 1961)

1744     *Holding that only gross and wanton conduct against the public can support an award of*

1745     *punitive damages.*

1746     *Stating that "those who deliberately and cooly engage in a far-flung scheme,*

1747     *systematically conducted for profit, are very much more likely to pause and consider the*

1748     *consequences if they have to pay more than the actual loss suffered by an individual*

1749     *plaintiff*

1750     • York Intern. Building, Inc. v. Chaney, 527 F.2d 1061 (9th Cir. 1976)

1751     *We start with the well established principle that those performing duties in the*

1752     *administration of a bankrupt's estate are not acting as private persons, but as officers of*

1753     *the court.*

1754

1755

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

**Other Authorities**

- American Society of Appraisers
    - BVS-III (II)(A) Asset-Based Approach to Business Valuation

        *The asset-based approach is a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods based on the value of the assets net of liabilities.*

- ASC 820-10-05

- American Bar Association
    - RULE 3.3 (b): Candor Toward the Tribunal

        *A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.*

**Maxims of Equity**

- He who comes to equity must come with clean hands
- He who seeks equity must do equity
- Equity will not suffer a wrong without a remedy
- Equity delights to do justice and not by halves

1777

## **EXHIBITS**

| No. | Description |
|---|---|
| 1 | Valaris Timeline of Relevant Events |
| 2 | Tempest Valuation of Valaris |
| 3 | Tempest Valuation of Option Given to Luminus |
| 4 | Luminus Letter to The Board from November 7, 2019 |
| 5 | Luminus Investor Presentation from August 20, 2019 |
| 6 | Luminus Declaration of Status as a Substantial Shareholder from Sept. 22, 2020 |
| 7 | Declaration from Valaris CFO Jonathan Baksht in Support of Ch.11 petitions and first day motions from Aug. 19, 2020 |
| 8 | Lazard Indemnification Letter from Nov. 4, 2019 |
| 9 | Lazard Engagement Letter from Aug. 14, 2019 |
| 10 | Valaris Comments on Luminus, Press Release from Dec. 4, 2019. |
| 11 | Valaris Announces Board Refreshment Plan, Press Release from Nov. 12, 2019. |
| 12 | Valaris Cooperation and Support Agreement with Luminus from Jan. 24, 2020 |
| 13 | Valaris Investor Presentation from February 2020 pg. 23-28 with Replacement Value of Assets and Analyst Estimates of Fleet FMV |
| 14 | Valaris 8-K Form pg. 3 Regarding Non-Drilling Incident in Angola from March 7, 2020 |
| 15 | Valaris 1Q-20 Report pg. 56-60 Regarding Posibility of a Restructuring and Liquidity Position from April 27, 2020 |
| 16 | Valaris 8-K Regarding Increased in Compesation for Key Employees Apr. 30, 2020 |
| 17 | Valaris 8-K Regarding Skipped Interst Payments from June 1, 2020 |
| 18 | AzValor Schedule 13G Regarding Block Trade from June 08, 2020 |
| 19 | Valaris Press Release reporting 1Q20 Results and Impairment Losses from Sale of Modern Rigs at Scrap Value from Apr. 29, 2020 |
| 20 | Minutes of a Regular Meeting of the Board of Directors of the Company held telephonically at 14:00 BST on 27 July 2020. Regarding Luminus Meeting with Bondholders. |
| 21 | Board Meeting Minutes from July 29, 2020 |
| 22 | Akin Gump Letter to Valaris Lawyers Slaughter and May from July 30, 2020 |
| 23 | Board Meeting Minutes from August 10, 2020 Regarding Vote in Proposal to Give 15% in Warrants to Equity Holders |
| 24 | Valaris Schedule 13G pg. 11 Regarding Millenium Ownership |

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

| 25 | Valaris Oil and Utilization Forecast from April 15, 2020 (Court docket 258 pg. 47) |
|---|---|
| 26 | Citi Bank Enterprise Valuation from May 2020 (Court docket 258 pg. 84-102) |
| 27 | PWP Enterprise Valuation from June 2020 (Court docket 258 pg.187-204) |
| 28 | Lazard Net Asset Valuation from July 2020 (Court docket 259 pg. 853-868) |
| 29 | Objection to Motion for an Equity Committee - Regarding Notes Trading Value (Court docket 742 pg. 7) |
| 30 | Valaris Warrant and Recovery Analysis from April 15, 2020 |
| 31 | Valaris Notes Trading Price at August 18, 2020 (Court docket 759 pg. 8) |
| 32 | Ad Hoc Group Letter to Lazard Regarding Luminus Meeting (Court Docket 259 pg. 881-883) |
| 33 | Slaughter and May response to Ad Hoc Group Regarding Luminus Meeting with Bond Holders (Court docket 259 pg. 886,887) |
| 34 | Fee Application of KK&E regarding Involvement in Luminus Settlement (Court docket 1303 pg. 103,104,139,140,215) |
| 35 | Luminus Amended Cooperation and Support Agreement SEC 8-K from August 28, 2020 |
| 36 | Valaris Asks Court to Limit Trading in August 24, 2020 (Court docket 29, pg. 1-8) |
| 37 | Luminus RSA Joinder Agreement from September 10, 2020 |
| 38 | Lazard Financial Projections and Valuation Analysis Presented in Valaris Disclosure Statement (Court docket 879 pg. 438-450) |
| 39 | Main Bondholders and Amounts (Court Docket 254, pg. 5-8) |
| 40 | Valaris RCF Commitment Schedule |
| 41 | Luminus SEC Schedule 13D from Nov. 13, 2019 pg. 6,7 |
| 42 | Valaris Management Incentive Plan (Court docket 259, pg. 267,268) |
| 43 | Valaris Claims the Plan Provides Equal Treatment and that is Fair and Equitable (Court docket 1127 pg. 16,17,36,27,28,35,36,37) |
| 44 | Elon Musk Tweet Regarding Sale of Valaris Rigs |
| 45 | Bassoe Valuation of Rigs |
| 46 | ENSCO plc SEC 8-K from April 9, 2020 pg. 2 |
| 47 | ENSCO plc Press Release April 11, 2019 |
| 48 | Manufactured Deafault Explanation |
| 49 | Declaration Skadden Arps |

1778

1779

DocuSign Envelope ID: 8419F5AC-8DCC-497A-9F74-7984B47815B3

1780

## **CERTIFICATE OF SERVICE**

1781

1782    I certify that on November 1, 2021, I caused a copy of the foregoing document to be

1783    served by the Electronic Case Filing System for the United States Bankruptcy Court for the

1784    Southern District of Texas.

DocuSigned by:

*Sebastian Miralles*

4E95B6808C22471...

1785

1786    */s/ Sebastian Miralles Acuña*

1787    Sebastián Miralles Acuña, CFA

1788
1789