# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | |
|---|---|
| SEBASTIAN MIRALLES ACUNA (PRO SE), Plaintiff, | Case No.: 20-34114 |
| | (Jointly Administered) |
| vs. | Adv. Proc. No. 21-03902 |
| VALARIS PLC, ET AL., Defendants | **[PROPOSED] SUPPLEMENTAL ADVERSARY COMPLAINT** |

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing. Represented parties should act through their attorney.**

## LIST OF DEFENDANTS

Debtor

- Valaris, PLC

Debtor's Prepetition Management

- Thomas Peter Burke (CEO)
- Jonathan H. Baksht (CFO)
- Michael T. McGuinty (CLO)

Debtor's Counsel & Advisors

- Kirkland & Ellis, LLP
  - Ross Kwasteniet
  - Anup Sathy
  - Jeffrey Zeiger
  - Spencer Winters
  - Samantha Good
  - Kelann Stirling
- Lazard, Ltd
  - David Kurtz
  - Doug Fordyce
  - Ari Lefkovits
- Slaughter and May, LLP
  - Christian Boney
  - Ian Johnson
  - Hywel Davies
- Richard J. Grossman (Employed by Skadden Arps)

Fraudulent Transfer of Valaris Rigs

- Lone Star Mineral Development, LLC
  - Bret Johnsen

Substantial Shareholders & Related Parties

- Luminus Management, LLC
  - Jonathan Barrett
  - Adam Weitzman
- Proskauer Rose, LLP
  - Robert Leonard
  - Frank Zarb

Debtor's Pre-petition Board Members

- Paul E. Rowsey, III
- William E. Albrecht
- Frederick Arnold
- Mary Francis CBE
- Suzanne P. Nimocks
- Thierry Pilenko

Bondholders & Ad Hoc Group

- Aurelius Capital Management, LP
- Brigade Capital Management, LP
- Canyon Capital Advisors, LLC
- GoldenTree Asset Management, LP
- King Street Capital Management, LP
- Lodbrok Capital, LLP
- Oak Hill Advisors, LP
- Oaktree Capital Management, LP
- Pacific Investment Management Company, LLC
- Taconic Capital Advisors, LP
- Whitebox Advisors, LLC

Yet to be named

- John Doe's 1-50

DocuSign Envelope ID: 42F42618-1267-46F9-9EBF-5D36A6E853A4

## **INTRODUCTION**

1. This is a supplementary adversary complaint filed with the intent to update the Court on new material events, and findings relating back to the main cause of action that the Plaintiff has become aware of since the last filing on November 20, 2021. Filing was not submitted earlier in attention to the Court's Order issued on October 18, 2021, barring new motions.

2. This is not to distract from Plaintiff's main cause of action of Fraud Upon the Court as through the Luminus sweetheart deal, a.k.a. "Luminus Settlement" as referred to in the Kirkland and Ellis ("K&E") billing sheet.

3. Valaris PLC ("Valaris" or the "Company") violated U.S. Department of the Treasury ("USDT") sanctions 31 CFR Part 589 as part of OFAC Directive 4 under Executive Order 13662 (See Exhibit 1), and in the process once again actively sought to deceive the Court.

4. The violation stems from the sale of the jack-up rig Ensco 101 (a.k.a. "Nevskaya" or "Valaris JU101"), a harsh weather jack-up, specifically used for artic drilling, to Arktikmorneftegazrazvedka AO ("AMNGR AO" or "AMNGR")[1]. AMNGR is a fully owned joint stock company of the Government of the Russian Federation and lists on its website that its corporate purpose is "performing work on the search, exploration and development of oil

---

[1] The company website has been delisted. But its reference can be seen in the Internet Archive.
(1) https://www.zarubezhneft.ru/en/operations/services/
(2) https://web.archive.org/web/20220202064952/http://www.amngr.ru/
(3) http://www.energyboardroom.com/oilandgasdirectory/arktikmorneftegazrazvedka/

18    and gas fields on the shelf of the Arctic seas of Russia" (See Exhibit 2). The name of

19    Arktikmornefteegazrazvedka AO roughly translates to *Artic Sea Oil and Gas Exploration Joint*

20    *Stock Company* (See Exhibit 3).

21         5.   This sale contravened USDT sanction 31 CFR Part 589 that clearly forbids *"The*

22    *provision, exportation, or reexportation, directly or indirectly, of goods, services (except for*

23    *financial services), or technology in support of exploration or production for **deepwater, Arctic***

24    ***offshore, or shale projects.*** *(See Exhibit 1).*

25         6.   The transaction was presented by Valaris and the Counsel for the Debtor for

26    approval by the Court after claiming to have rigorously vetted it. This demonstrates the

27    Defendants brazen and wonton disregard for the truth, laws, regulations, and to an extent U.S.

28    national security.

29

30                          **STATEMENT OF FACTS**

31                    **Valaris violates US sanctions regime**

32         7.   The request for approval of the sale of Ensco 101 to AMGNR was presented in a

33    filing to the US Bankruptcy Court of the Southern District of Texas on December 28, 2020 and

34    listed as Memorandum of Agreement ("MOA") (See Exhibit 4 / Court Docket 874). The MOA

35    was signed by Derek Sangster, President of ENSCO International, a division of Valaris in the

36    UK, and by Mikhail Popov ("Mr. Popov"), CEO of AMGR. The filing was submitted to the

37    Court by Matthew D. Cavenaugh from Jackson Walker, and Anup Sathy, P.C. from K&E, both

38    attorneys for the Debtors in Possession & Trustees of the Estate. Presumably, the sale of such

39  a valuable piece of equipment would have required oversight and approval from Tom Burke,
40  CEO and by Jonathan Baksht, CFO.

41      8.   AMNGR has its headquarters in Murmansk, Russia. It was founded in 1977
42  specifically to engage in "gray-schemes" for avoiding then sanctions against the Soviet
43  Union's oil sector (See Exhibit 5). The parent entity of AMNGR is Zarubezhneft Joint Stock
44  Company ("Zarubezhneft")[2]. Zarubezhneft is an industrial holding conglomerate, fully owned
45  by the Government of the Russian Federation. The Chairman of the Board of Zarubezhneft is
46  Gen. Evgeniy A. Murov ("Mr. Murov"). Mr. Murov is an active Director of the FSB (See
47  Exhibit 6). He was also the head of the Federal Protective Service of the Russian Federation
48  ("FSO"). The FSO is the agency in charge of protecting Vladimir Putin, amongst other senior
49  officials in Russia. It is roughly the equivalent of the US Secret Service. Mr. Murov has been
50  characterized in the media as Mr. Putin's "personal bodyguard", and a close confidant (See
51  Exhibit 7). Mr. Murov has been on the OFAC sanctions list since 2014 (See Exhibit 8).

52      9.   After the sale, Ensco 101 was renamed the Nevskaya (See Exhibit 9). It's last
53  known position, as per its naval tracking beacon, showed it anchored within Kronstadt Naval
54  Military base in St. Petersburg, Russia (Exhibit 10). Kronstadt is the headquarters of the Russian
55  Baltic Fleet. Its arrival was registered by local ship aficionados who posted online a photograph
56  showing the Nevskaya maneuvering into harbor at Kmolz Shipyard on Sept 7, 2021 (Exhibit 11).
57  Located within Kronstadt Naval Base, Kmolz Shipyard (aka. Kronstadt Marine Plant Joint Stock

---

[2] Zarubezneft, Website , https://www.zarubezhneft.ru/en/ (Last visited August 8, 2022)

DocuSign Envelope ID: A2F42618-1267-46F9-9EBF-5D36A6E853A4

Company), is a Russian Federation military enterprise that is also a Specially Designated Entity by the Treasury Department (Exhibit 12).

10.     The MOA specifically states in section 4.2.2 that the jack-up may only be used within the continental waters of Russia, or to be used by Lukoil OAO ("Lukoil"), and by Zarubezhneft. Lukoil is a designated entity in the Sectoral Sanctions Identification List of OFAC and has secondary sanctions (See Exhibit 13).

11.     As per the Supplementary Declaration made by Brad Ringleb, The KPMG International Russia affiliate advised AMGR on the purchase (See Exhibit 14 /Court Docket 666), This despite that KPMG LLP was retained by the Estate. There is no indication that KPMG International felt the need to report any potential violation of USDT sanctions.

12.     Mr. Miralles reported this incident in good faith to Valaris on April 27, 2022. This report was made through an email to Chief Compliance Officer, Elizabeth Darby ("Ms. Darby") and through the Valaris EthicsPoint website[3] (Administered by Navex) (See Exhibit 15 and Exhibit 16). Mr. Miralles was never contacted by Valaris requesting any additional information. Valaris declared the case closed just one day after the Court issued the latest administrative case order scheduling the August 17, 2022 hearing. In a follow-up email on August 4, 2022 by Mr. Miralles, Ms. Darby alleged that Valaris had concluded an internal inquiry whose results are confidential. Valaris failed to make any public disclosure, or statement on the matter after four months to investigate.

---

[3] Valaris, *Ethics Point Website - NAVEX*,
https://secure.ethicspoint.com/domain/media/en/gui/55407/issues.html?clientid=55407&locationid=30149260&companylocation=Thailand&override=yes&agreement=no&companyname=Valaris&country1=Trinidad&country2=Thailand (las visited Aug. 5, 2022)

DocuSign Envelope ID: 42F42618-1267-46F9-9EBF-5D36A6E853A4

13.    The sale of Ensco 101 is not a standalone issue. As recently as August 16, 2021, Valaris had been leasing the semisubmersible rig *"Valaris 8505"* to Lukoil OAO (a U.S. specially designated entity) to drill in the Gulf of Mexico (See Exhibit 17).

14.    These actions are also violations of the laws of the United Kingdom under which Valaris PLC was subject. Specifically, these are the Russia (Sanctions) (EU Exit) Regulations 2019 (2019 No. 855) as established in the Sanctions and Anti-Money Laundering Act 2018 (2018c.13), prohibiting commerce in equipment and services for the oil industry destined to the Russian Federation (See Exhibit 18). These Regulations also specifically signal out Artic Drilling, and offshore oil drilling.

**Valaris and K&E engage in an egregious exercise of Willful Blindness**

15.    The existence of Russia Oil and Gas related sanctions is a well-known fact within the industry. In fact, the sanctions regime is quoted in the MOA on sections 20.1(b)(iv)(vi) and 20.2(ii) on page 18 and 19, respectively. In said sections, both parties make affirmative representation where they "warrant and undertake to the other" to be in compliance. The Defendants seem to be content with these affirmative representations, in lieu of actual due diligence.

16.    K&E billed over 30 hours to the Estate (at approximately $1,000 an hour) for the matter of drafting and reviewing the MOA (See Exhibit 19). There would be a reasonable expectation that experienced Oil & Gas attorneys, who quoted the appropriate sanctions regulations, would have enquired about the legality of selling artic drilling equipment to the *Artic Sea Oil and Gas Exploration Joint Stock Company* of Russia. One would have also expected

99   them to enquire about the legality of a sale that specifically refers to the use of the equipment by

100  Lukoil Development in section 4.2.2, page 9 of the MOA. Lukoil OAO is a secondary sanctioned

101  entity and listed on OFAC's publicly available website (Exhibit 13). A cursory Google web

102  search would have yielded these answers. Inexplicably this did not happen. This is a casebook

103  example of Willful Blindness.

104        17.    The Defendants then proceeded to abuse the confidence of the Court by

105  representing they had diligently reviewed the sales documents stating, *"The Agreement and the*

106  *proposed Sale are the product of good faith, arm's-length negotiations between sophisticated,*

107  *well-represented parties, and the $25,000,000 sale price for the Rig is a fair, reasonable price"*

108  *(See Exhibit 3 / Court Docket 874 pg. 7).* While K&E is recorded as the firm that documented the

109  MOA, Co-Counsel Jackson Walker, LLP, in a possible sign of negligence, also put their name to

110  this verified filing.

111

112                      **Valaris again engages in Fraudulent Transfer**

113        18.    The sale price of Ensco 101 in the MOA is listed as $25 million. In what is now a

114  pattern for the Defendants, this would be a ~47% discount to its market value of $48 million for

115  December 2019. This in reference to the Esgian database reference values (See Exhibit 20). This

116  was done at a time when Valaris already had secured DIP financing and had no pressing need to

117  make a forced sale of equipment.

118        19.    Why Valaris felt the pressing need to gift an artic drilling rig to the Government of

119  the Russian Federation, in flagrant contravention of sanctions, is a mystery that can only be

120  resolved through discovery, or through the naming of a Trustee as per 11 U.S.C. § 1104(e).

121

**Representation to the market that Plaintiff's claim would not be material**

20.    Recently, in the 10-Q market filing for the second quarter of 2022, Valaris announced that it was increasing its potential reserves for litigation by $25.0 million for potential contingent litigation, legal and regulatory liabilities. The Company represented that it did "not expect these matters to have a material adverse effect on our financial position, operating results and cash flows" (See Exhibit 21).

21.    By Valaris own admission, Mr. Miralles claim for damages would not have any material adverse effect on existing shareholders and could be deducted from this existing reserve. This demonstrates that innocent investors in the restructured entity would not suffer any material impact; even assuming all the damages were directly waged against Valaris, and not held out joint and severally amongst the Defendants. Clearly the benefits of justice would prevail.

**Misrepresentations to the Court and the market continue**

22.    In the Valaris investor presentation for the second quarter of 2022, the Company once again makes representations of the build cost value of its fleet, as indications of firm market value. The Valaris stacked fleet of 11 rigs is represented as having a build cost value of approx. US$ 4 billion (See Exhibit 22 / Valaris Investor Presentation 2Q22 pg. 24), with each stacked floater having a build cost value of ~US$600K while each jack-up ~US$150 million. If one were to extrapolate to these numbers to the value of the full fleet, the value of the 49 rigs—16 floaters and 33 jack up, would be ~US$15 billion.

23.    A few slides later in the same presentation, Valaris makes reference to an implied value of $270 million per drillship according to market transactions (See Exhibit 22 / Valaris Investor Presentation 2Q22 pg. 29). The refer to this as "steel value". This is a made-up term for

DocuSign Envelope ID: 42E42618-1267-46F9-9EBF-5D36A6E853A4

144   what they previously properly referred to as the fair market value of the fleet. Valaris claims that

145   under Steel Value, it should trade a 2x its current Market Capitalization.

146       24.    It is also worth noting that two of the three transactions referenced by Valaris are

147   for Samsung Drillships. These are not dissimilar to DS-3, DS-5, DS-6 which were reportedly sold

148   for scrap, and sent to the breakers in Aliaga Turkey.[4]

149       25.    This reference to build cost is in direct opposition to what was represented to the

150   Bankruptcy Court in valuation report presented by Lazard Ltd ("Lazard"). This valued the

151   complete Valaris fleet (which used to have +10 more rigs than it has now) at just US$1.2 billion

152   with an impairment of more than 90% over book value (See First Amended Complaint or Court

153   Docket 879).

154       26.    This is also a sharp contrast to the Defendants statement made in the Debtors'

155   objection to the motion for appointment of an equity committee: *"Book Value of Equity under

156   GAAP Does Not Indicate Whether Equity Holders Are Entitled to a Recovery" (See Court docket

157   754)*. They reaffirmed this in their Motion to Dismiss the present Adversarial Proceeding.

158   Valuation, and truth are clearly flexible constructs for Valaris.

159       27.    The logical conclusion is that Valaris either fraudulently misled the Court on the

160   true value of the Estate. or it systematically attempts to misrepresent its value, and defraud

161   investors. Valaris cannot have its cake, and it eat it.

---

[4] As mentioned in the First Amended Complaint. Of these 3 drillships only the DS-6 tracking beacon showed it reaching Aliaga. DS-5, and DS-3 ceased to transmit from within the harbor of Piraeus Greece. This is extremely odd. The International Maritime Organization requires that all ships of more than 300 gross tons have one. It would have been a violation of Maritime Law for them to transit to Aliaga with their transponders off. Indeed, it is still not possible to verify which, if any, of these drillships were actually scrapped

**Update on the payout to co-conspirators as grounds for motive**

28.     Mr. Miralles would like to update the Court on the potential economic windfall received by the Defendants through their fraudulently bankrupting Valaris. The Plaintiff is aware that in normal situation the Court would only look to the recovery of creditors relative to the nominal value of their claims. However, in a fraud case, motivation is an important consideration to establish.

29.     During 2022 the offshore exploration market has rebounded. This was led on a fundamental basis by the accumulated lack of exploration investment from the past years, and directly catalyzed by supply shocks emerging from the military conflict in Ukraine.

30.     Since the start of 2022, Valaris has been awarded new contracts and extensions with associated contract backlog of over $550 million. This includes several new contracts awarded at leading-edge rates for their respective markets. In the announcement for first quarter results of 2022 the Anton Dibowitz, Valaris CEO stated: *"Very recently, we were awarded a contract with a major operator offshore Angola and the Republic of Congo for drillship VALARIS DS-12. The* <u>*operating rate for this contract,*</u> *which is expected to take place during the first quarter 2023, is* <u>*at a level not seen in the past seven years for drillship work*</u> *offshore West Africa, providing further evidence of the improvement in floater day rates across geographies." (See Exhibit 23).* This announcement is only a year and a half after the Company represented to the Court that they were hopelessly insolvent largely on the grounds of challenging industry conditions which they claimed were unfavorable for the foreseeable future. It is important to note that similar levered companies in the industry such as Transocean Ltd did not opt for bankruptcy, and instead took every opportunity to refinance its debt maturities. Today their shares already trade at levels higher

184 than those at pre-pandemic levels. Certainly, not the option that provided the highest payout to

185 Management, but a laudable testament to fiduciary duty to shareholders.

186       31.    The Luminus Sweetheart Deal granted Luminus the right to purchase 10% of the

187 Company's outstanding indebtedness held by the Creditors at the then prevailing price of cents

188 on the dollar (See First Amended Adversary Complaint for methodology). The value of the option

189 as of August 8, 2022 would be US$252 million, and up to US$330 million at the time the relisted

190 stock reached an all-time-high on June 3, 2022.



Value of Option Given To Luminus

At Replacement Value of PP&E (Feb, 2020)             ,590,363
Approx. at Build Cost (Investor presentation 2Q22)   $989,400,147
At Book Value of PP&E (Dec. 31, 2020)   $799,558,479
At ATH (June 3, 2022)   $330,292,376
As of today (August 8, 2022)   $252,777,502
$VAL relisting  $21.99 per share (May 3, 2021)   $136,784,945

191

192       32.    Valaris' Management adopted a Management Incentive Plan ("MIP") post-

193 emergence for award assigning 10% of the restructured entity to directors and employees of

194 Holdco. The current market value of the MIP as of August 8, 2022 would be $426 million, and

195 $554 million on June 3, 2022.



Management Incentive Plan

At ATH (June 3, 2022)   $554,390,652

As of today (August 8, 2022)   $425,627,218

Value at relisting (May 3, 2021)   $197,043,000

196

33.     The potential profit for bondholders is harder to quantify as it depends at the price at which the bondholder purchased the bond. The original Valaris PLC bondholders were mostly traditional fixed income funds that were forced to sell as the credit rating of Valaris declined. These bonds were purchased at steep discounts by distressed debt investors that constitute the core of the Bondholders Group This is the same group that ultimately authorized the Luminus Sweetheart Deal. A Bondholder that purchased bonds at about 5 cents on the dollar, could have a made up to 39.8x their money as of today (See Exhibit 24). This estimate is admittedly theoretical but illustrates the profit potential for the Bondholders Group.

34.     An unknown amount was earned by triggering Credit Default Swaps, or similar debt insurance equivalents on Valaris, as resulting from a Manufactured Default event. This issue was raised by Luminus itself in the letter to the Board titled *"A Word of Warning"*[5] (See First Amended Adversary Complaint - exhibit 48). Given the nature of Credit Default Swaps, the amount could be several multiples more than the value notional principal of the debt. In simplified terms, this would be the equivalent of an arsonist burning down the house, and then cashing in on the policy; with the main difference that the insurance policy can be multiple times the value of the house.

**DOJ has launched a major investigation into naked short selling**

35.     In the First Amended Adversary Complaint, the Plaintiff referred to indications of naked short-selling and the manipulation of the stock price of Valaris. Plaintiff is aware this may

---

[5] Luminus Management LLC, *A Word of Warning*, November 2019,
https://www.sec.gov/Archives/edgar/data/314808/000090266419004424/p19-2198exhibit3.htm (last visited Aug. 5, 2022)

216    have sounded arcane and hard to follow. However, awareness of this type of financial

217    shenanigans is now mainstream. It is the subject of an ongoing investigation by the Major Frauds

218    Section of the Department of Justice (presumably overseen by Assistant United States Attorney,

219    Ms. Ranee A. Katzenstein). The investigation on naked short selling activities is broad and covers

220    over 30 hedge funds (See Exhibit 25). It was prompted by the very public blow-up of Archegos

221    Capital Management. This serves to highlight the public good that underlies Mr. Miralles'

222    Complaint.

223    <div align="center">**<u>Cause of Action 1</u>**</div>

224    <div align="center">**Fraud Upon the Court**</div>

225    36.    K&E acting as Co-Counsel for the Debtor, represented that "*the sale was made on*

226    *an informed basis, in good faith, and in the honest belief that the [transaction] was in the best*

227    *interests of the [debtor] company*".[6] The sale was not in good faith, it was evidently not well

228    informed, and it certainly was not in the best interest of the Company. As described in paragraphs

229    15. 16. 17. these were all false representations made to the Court by a group of experienced

230    attorneys with experience in the Oil and Gas sector, who could not have but credibly known better.

231    The sale did nothing but detract value from the Estate, recklessly exposing it to unnecessary risks,

232    and furthered the aims of enemies of the United States.

---

[6] Jackson Walker, LLP also signed this verified motion as Co-Counsel. They arguably failed in their duty of diligence. Whether they knew more about the full nature of this transaction is uncertain and would require discovery.

233       37.    The affirmative representations inserted into the language of the MOA only

234 evidence intent, and willful blindness, which is certainly not an acceptable defense. Valaris, its

235 executives, and K&E knowingly conspired to defraud the Court to approve the illegal sale of

236 ENSCO 101 to a sanctioned entity of the Government of the Russian Federation.

237       38.    The Defendants, and in particular K&E, acting as an officer of the Court,

238 participated in the negotiation of this illegal transaction, and then defrauded the Court into

239 approving it. This is already well documented with self-authenticated evidence even though

240 formal discovery has been stayed. The evidence already shows acts that fall within the definition

241 of Fraud Upon the Court, to the clear and convincing evidence standard as established in *Rozier*

242 v. Ford Motor Co., 573 F.2d 1332 (5th Cir. 1978).

243       39.    Rozier v. Ford Motor Co., *573 F.2d 1332, 1338 (5th Cir. 1978) ("Generally speaking, only*

244 *the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication*

245 *of evidence by a party in which an attorney is implicated, will constitute a fraud on the court.*

246 *See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed.*

247 *1250 (1944); Root Refin. Co. v. Universal Oil Products, 169 F.2d 514 (3d Cir. 1948) 7 J. Moore,*

248 *Federal Practice, ¶ 60.33 at 510-11. Less egregious misconduct, such as nondisclosure to the court*

249 *of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on*

250 *the court. See* Kupferman v. Consolidated Research Mfg. Co., *459 F.2d 1072 (2d Cir. 1972); see*

251 *also* England v. Doyle, *281 F.2d 304, 310 (9th Cir. 1960).*

252       40.    *Alternately stated, "[in] order to set aside a judgment or order because of fraud upon the*

253 *court under Rule 60(b) . . . it is necessary to show an unconscionable plan or scheme which is*

254 *designed to improperly influence the court in its decision."* England v. Doyle, supra, *281 F.2d at*

255 *309. See also* United States v. Standard Oil Co. of Calif., *73 F.R.D. 612, 615 (N.D.Cal. 1977).")*

256

DocuSign Envelope ID: 42E42618-1267-48F9-9EBF-5D36A6E853A4

41.     Valaris, and its co-conspirators willingly circumvented US sanctions by transferring Artic drilling equipment to Russia and deceived the Court to do so. The egregious nature of the act should be noted and used to frame Scienter of the previous Causes of Action of Fraud Upon the Court presented in the First Amended Adversary Complaint. This should be considered with the aggravated circumstance of trading with an enemy of the United States.

42.     As described in paragraphs 22. 25. 26. 27. Valaris has once again made financial representations to the market that contradict its statements to the Court by the Attorneys to the Debtor acting as Officers of the Court. The repeated nature of the behavior evidences a pattern of Scienter, meeting the criteria of Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir. 1978). Valaris cannot be allowed to continue representing one set of books to the Court based on cashflows projections provided by a conflicted financial advisor, and then turn around and present "another set of books" based on historical purchase price as a valid proxy of valuation to the investing public.

43.     The logical conclusion is that Valaris either fraudulently misled the Court on the true value of the Estate, or that it systematically attempts to misrepresent its value, and defraud investors. Valaris cannot have its cake, and it eat it. The entire Confirmed Plan was based on this misrepresentation; it is built on lies.

## Cause of Action 2

### Fraudulent Transfer

44.     The attorneys for the Debtor as well as Valaris represented that *"The Agreement and the proposed Sale are the product of good faith, arm's-length negotiations between*

DocuSign Envelope ID: 42F42618-1267-46F9-9EBF-5D36A6E853A4

279    *sophisticated, well-represented parties, and the $25,000,000 sale price for the Rig is a fair,*

280    *reasonable price."* However, the sale price of $25 million represented a discount of close to 50%

281    (see Exhibit 3). This meets the definition of Fraudulent Transfer under 11 U.S.C. § 548(B)(i)

282    **"(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and".

283        45.    This amount is well below the 70% of fair market value consideration set as

284    reasonably equivalent value in *Durrett v. Washington Nat. Ins. Co., 621 F.2d 201 (5th Cir. 1980)*

285    and contextualized in *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC,*

286    *Inc.), 914 F.2d 458 (4th Cir. 1990)* to include *"an analysis of all the circumstances surrounding*

287    *the suspect transfer,"* with *"Factors to be considered include the good faith of the transferee, the*

288    *relation differences in the amount paid compared to the fair market value, and the percentage of*

289    *the amount paid is of the fair market value."*

290        46.    Within this context, and as stated in paragraphs 18. 19. the sale took place once the

291    oil industry was well on its way to recovering to Pre-Covid levels and after Valaris had secured

292    the necessary financing to continue its operations; it was not a forced sale, or foreclosure. The

293    sale was not in good faith, and its motivation was likely collusive. This invalidates any

294    presumption of reasonably equivalent value. The Court should add this event to the growing list

295    of documented fraudulent transfers effected by the Defendants as listed in the First Amended

296    Adversary Complaint.

297        47.    Attempting to remedy this damage will be particularly difficult, if not impossible.

298    The Clawback of this asset from the Russian Federation shall be an "interesting task" for the US

299    Trustee.

300

301

DocuSign Envelope ID: 42F42618-1263-46F9-9EBF-5D36A6E853A4

## **Cause of Action 3**

### **USDT - OFAC Sanctions Violations**

48.     Valaris violated U.S. USDT sanctions by selling ENSCO 101 a harsh weather jack-up specifically used for artic drilling to AMNGR. As stated in sanction 31 CFR Part 589 as part of OFAC Directive 4 under Executive Order 13662, the following activities by a U.S. person or within the United States are prohibited:

> *"The provision, exportation, or reexportation, directly or indirectly, of goods, services (except for financial services), or technology in support of exploration or production for deepwater, Arctic offshore, or shale projects:*

>> *(1) that have the potential to produce oil in the Russian Federation, or in maritime area claimed by the Russian Federation and extending from its territory, and that involve any person determined to be subject to this Directive or any earlier version thereof, their property, or their interests in property; or*

>> *(2) that are initiated on or after January 29, 2018, that have the potential to produce oil in any location, and in which any person determined to be subject to this Directive or any earlier version thereof, their property, or their interests in property has (a) a 33 percent or greater ownership interest, or (b) ownership of a majority of the voting interests."*

49.     In addition, a similar sanction regime is also mirrored in the United Kingdom. Valaris contravened United Kingdom sanctions relating to the export of energy-related goods to

Russia, as outlined in Paragraph 32 of Schedule 1 to the Sanctions Act and Regulations 40 and 41 (See Exhibit 16).

50.     The illegal sale of ENSCO 101 serves to further demonstrate Valaris and K&E's recklessness and wanton disregard for both Law and Truth. This should help color, and support the claims of Fraud made by the Plaintiff in the First Amended Adversary Complaint.

## Cause of Action 4

## Racketeering

51.     The fact pattern narrated in paragraph 7. 8. 9. 10. 11. 12. 13. 14. 15. 16. 17. 18. 19. considered in the light of the Causes of Action already presented in the First Amended Adversary Complaint further evidence Racketeering activity as per 18 U.S.C. § 1961. The combined facts show a highly coordinated set of actions of the Defendants, sometimes together, sometimes separately, executed over a prolonged period, and across events. This fits the definition of a Pattern of Racketeering Activity, as well as the definition of Enterprise as per the Racketeering Influenced and Corrupt Organizations (RICO) Statute 18 U.S.C. § 1961

52.     *18 U.S.C. § 1961 ("5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;")*

53.     *18 U.S.C. § 1961 ("(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.*

Page 19 of 25

54.     The act of selling key industrial equipment to enemies of the United States falls under the category of economic espionage, and theft of trade secrets included within the definition of Racketeering Activity per 18 U.S.C. § 1961, similarly the acts surrounding Fraud Upon the Court and Fraudulent Transfer in a Case under Chapter 11 also fall under the activities defined as Racketeering Activity in 18 U.S.C. § 1961.

55.     *18 U.S.C. § 1961 ("(D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title)".. sections 1831 and 1832 (relating to economic espionage and theft of trade secrets), section 1951 (relating to interference with commerce, robbery, or extortion))*

56.     The actions were made with intent and Scienter as evidenced by the well thought actions to hide the activity by documenting and presenting the MOA in the most inconspicuous light.

57.     Mr. Miralles once again assert his rights to civil remedies as per 18 U.S.C. § 1961(c) by charging the Defendants for damages sustained to his property (known as the "private attorney general" provision).

58.     *18 U.S.C. § 1964 ("(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final")*

## Prayer for Relief

370

371   59.   This Supplementary Adversary Complaint was made with the intention of further

372   exposing the pattern of misconduct exhibited by the Defendants which constitute a coordinated

373   attack on the functioning of the Courts of Bankruptcy of the United States. Should their conduct

374   become prevalent, the Courts would cease to function as vehicles of justice. Their actions merit

375   a strong and spirited response from the Court.

376   60.   The Plaintiff prays the Court takes notice of the events listed in the Supplementary

377   Complaint and incorporates them into the main cause.

378   61.   The Plaintiff also prays the Court take notice of Valaris' financial disclosures that

379   support the feasibility of his claim, and the Court's ability to provide relief.

380   62.   I have faith that truth and justice will prevail. Finally, I once again beg the Court's

381   indulgence for any mistakes made in Good Faith that may have arisen from my lack of legal

382   training.

383

384   Dated: August 8th, 2022                                Respectfully submitted,

385



DocuSigned by:
Sebastian Miralles
4E95B6808C22471...

**Sebastian Miralles Acuña, CFA & CAIA**
Av. Paseo de la Reforma 296, Floor 41,
Cuauhtémoc, Mexico City 06600
smiralles@tempestcapital.com
+52 (55) 18776252

386

DocuSign Envelope ID: 42F42618-1267-46F9-9EBF-5D36A6E85344

387

## **VERIFICATION OF PLEADING**

388  The Plaintiff Mr. Sebastian Miralles Acuña has reviewed the complaint. The Plaintiff knows or

389  believes that all allegations that he has personal knowledge of to be true. The Plaintiff believes the

390  allegations that the Plaintiff does not have personal knowledge of, to be true based on specified

391  information, documents, or both.

392

393

394

395        Dated: August 8th, 2022                                          Respectfully submitted,

396

DocuSigned by:

*Sebastian Miralles*

4E95B6808C22471...

**Sebastian Miralles Acuña, CFA & CAIA**
Av. Paseo de la Reforma 296, Floor 41,
Cuauhtémoc, Mexico City 06600
smiralles@tempestcapital.com
+52 (55) 18776252

397

398

DocuSign Envelope ID: 42F42618-1267-46F9-9EBF-5D36A6E853A4

399

## EXHIBITS

| No. | Description |
|-----|-------------|
| 1 | Sanction 31 CFR Part 589  / OFAC 4 |
| 2 | AMGNR Statement (Website and Archive) |
| 3 | Arktikmorneftegazrazvedka Translation |
| 4 | Court Filing for approval of sale of Ensco 101 (Court docket 874) |
| 5 | Mikhail Popov (Awating Sanctions List) |
| 6 | Evgeniy A. Murov Profile |
| 7 | Departure of Putin's bodyguard article |
| 8 | OFAC Specially Designated Nationals List Update (April 28, 2014) see MUROV, Evgeniy Alekseyevich |
| 9 | Port Of Dundee Notice on Ensco 101/Nevskaya voyage (June 22 2021) |
| 10 | Marinetraffic Location Ensco 101 (August 6, 2022) |
| 11 | Photo of Ensco 101 in Kmolz Shipyard |
| 12 | Ukraine-related Designations -U.S. Department of the Treasury - Kmolz Shipyard |
| 13 | Lukoil -  Sanctions List Search |
| 14 | Brad Ringleb Declaration for KPMG (Court Docket 666) |
| 15 | Mr. Miralles email to Elizabeth Darby |
| 16 | Valaris Ethics Point Conclusion & NAVEX |
| 17 | Lukoil Press Release from August 16, 2021 |
| 18 | The Russia (Sanctions) (EU Exit) Regulations 2019 |
| 19 | K&E Billing Sheet presented to the court (Court Docket 1303 pg. 972-973) |
| 20 | Valaris Rig Fleet Value December 2019 report by Esgian in Excel |
| 21 | Valaris 10-Q for the second quarter of 2022 pg. 28 |
| 22 | Valaris Investor Presentation 2Q22 |
| 23 | Valaris Press Release for 1Q22 |
| 24 | Bond Holder Recovery Group |
| 25 | Bloomberg DOJ Short Selling Investigation |

400

DocuSign Envelope ID: 42E42618-1267-46F9-9E8F-5D36A6E85344

# Table of Authorities

## Statutes

- 11 U.S.C. § 1104(e)

  *The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting.*

- 18 U.S.C. § 1961 (4)(5)

  *(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;*

  *(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;*

426     •  31 C.F.R. § 589 app C to Part 589

427     *Executive Order 13662 of March 20, 2014 - Blocking Property of Additional Persons*

428     *Contributing to the Situation in Ukraine*

429

430     •  (SI 2019/855) Russia (Sanctions) (EU Exit) Regulations 2019

431
432
433     •  (2018 c. 13) Sanctions and Anti-Money Laundering Act 2018

434
435
436   **<u>Cases</u>**

437
438     •  Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir. 1978)

439     *Holding that fraud on the court may exist where party, with counsel's collusion,*

440     *fabricates evidence*

441

442     •  Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.), 914

443     F.2d 458 (4th Cir. 1990)

444     *Adopting a totality of the circumstances test for reasonable equivalence*

445

446     •  Durrett v. Washington Nat. Ins. Co., 621 F.2d 201 (5th Cir. 1980)

447     *Holding that a transfer of property at a foreclosure sale for less than 70% of its fair*

448     *market value is a fraudulent conveyance*

# **EXHIBIT 1**

OFFICE OF FOREIGN ASSETS CONTROL

## DIRECTIVE 4 (AS AMENDED ON OCTOBER 31, 2017)[1]
## UNDER EXECUTIVE ORDER 13662

Pursuant to sections 1(a)(i), 1(b), and 8 of Executive Order 13662 of March 20, 2014 "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" (the Order) and 31 C.F.R. § 589.802, taking appropriate account of the Countering Russian Influence in Europe and Eurasia Act of 2017 (Title II of the Countering America's Adversaries Through Sanctions Act of 2017 (CAATSA)), and following the Secretary of the Treasury's determination under section 1(a)(i) of the Order with respect to the energy sector of the Russian Federation economy, the Director of the Office of Foreign Assets Control has determined, in consultation with the Department of State, that the following activities by a U.S. person or within the United States are prohibited, except to the extent provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control:

The provision, exportation, or reexportation, directly or indirectly, of goods, services (except for financial services), or technology in support of exploration or production for deepwater, Arctic offshore, or shale projects:

(1) that have the potential to produce oil in the Russian Federation, or in maritime area claimed by the Russian Federation and extending from its territory, and that involve any person determined to be subject to this Directive or any earlier version thereof, their property, or their interests in property; or

(2) that are initiated on or after January 29, 2018, that have the potential to produce oil in any location, and in which any person determined to be subject to this Directive or any earlier version thereof, their property, or their interests in property has (a) a 33 percent or greater ownership interest, or (b) ownership of a majority of the voting interests.

Except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, the following are also prohibited: (1) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions contained in this Directive; and (2) any conspiracy formed to violate any of the prohibitions in this Directive.

A complete listing of persons determined to be subject to one or more directives under Executive Order 13662 can be found in OFAC's Sectoral Sanctions Identifications (SSI) List on OFAC's Web site (http://www.treasury.gov/ofac) at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/ssi_list.aspx.

October 31, 2017

---

[1] A prior version of this Directive issued on September 12, 2014, which is superseded by this version, prohibited the same activities covered in subsection (1) of this Directive that involved any person determined to be subject to the prior version of this Directive, their property, or their interests in property.

# EXHIBIT 2

The Wayback Machine - https://web.archive.org/web/20220202064952/http://www.amngr.ru/

About company    Activity    Safe production    Press Service    Career    Procurement    Sale of property    Contacts

## JSC ARKTIKMORNEFTEGAZRAZVEDKA

Established in 1979 with the aim of performing work on the search, exploration and development of oil and gas fields on the shelf of the Arctic seas of Russia. The main re company's activities over the past 31-year period is the discovery on the shelf of the Barents and Kara Seas of a new large raw material base of the oil and gas industry commensurate in its potential with the adjacent areas of Western Siberia and the European North.

Drilling operations have opened 15 oil, gas, gas condensate and oil and gas fields with hydrocarbon reserves registered by the state in the amount of 6.8 billion tons in oil equi the first time in the conditions of the Arctic shelf of Russia in 1987, the enterprise began commercial oil production on Kolguev Island.

The discovery of a new large resource base on the Russian shelf of the Arctic has become a generally recognized fact of domestic and world significance and was marked by th 1995 of the State Prize of the Russian Federation in the field of science and technology to a group of specialists who made a great contribution to the scientific substantiation work, the search for deposits, organization and management works. The winners of the State Prize were A.V. Borisov, O.A. Zapivchiy, E.M. Reshetnyak, Yu.F. Fedorovsky, O.O. S

Arktikmorneftegazrazvedka JSC invites all interested companies engaged in the exploration and development of offshore oil and gas fields to consider the possibility of involving Venture drilling vessel (BS) and the Murmanskaya jack-up drilling rig (SPDR) in drilling operations in their projects. The technical data of the drilling rigs do not limit the possibi beneficial cooperation with drilling. BS "Deep Venture" can be used as a storage vessel for supply and drilling at remote offshore fields, with the function of a rescue duty vess as for placing equipment during hydraulic fracturing in offshore wells.

Education at the VET School

Technical data and photos of the Murmanskaya jack-up rig

Technical data and photo BS "Deep Venture"

# VIRTUAL MUSEUM



## COMPANY'S NEWS

12/15/21
An event in memory of colleagues, friends and comrades who tragically died at the Kolskaya jack-

01.12.20
JSC Arktikmorneftegazrazvedka announces the selection and employment of personnel

## CONTACT INFORMATION

Reception of JSC "AMNGR"
t. (8152) 55-20-00, (8152) 55-23-00
fax: (8152) 44-14-91
amngr@amngr.ru

## WEATHER IN MURMANSK

-19°

Mainly cloudy

## EXCHANGE RATES on 02.02.202

| Currency | Course, rub. |
|----------|-------------|
|          | 77.13       |
|          | 86.79       |

## OUR ADDRESS:

183039 Russia, Murmansk, st. Academ Knipovich, house 33 bldg. 3

© AMNGR 2022

Privacy Policy

# **EXHIBIT 3**



≡ Google Translate

🗛 Text    📄 Documents    🌐 Websites

RUSSIAN - DETECTED    RUSSIAN    ENGLISH    SPANISH    ⌄          ⇄    ENGLISH    SPANISH    ARABIC    ⌄

Arktik mor neftegazrazvedka AO          ✕    Arctic sea oil and gas exploration JSC

Арктик мор нефтегазразведка АО

🎤    🔊                                    30 / 5,000    ✏    🔊

🕓          ★          👥
History      Saved      Contribute

# **EXHIBIT 4**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VALARIS PLC, *et al.*,[1] | ) Case No. 20-34114 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF
## AN ORDER (I) APPROVING THE SALE OF CERTAIN OF
## THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
## ENCUMBRANCES, AND INTERESTS AND (II) GRANTING RELATED RELIEF

> **THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an order, substantially in the attached form (the "Order"), (a) approving that certain memorandum of agreement (the "Agreement")[2] by and between Debtor

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.stretto.com/Valaris. The location of Debtor Ensco Incorporated's principal place of business and the Debtors' service address in these chapter 11 cases is 5847 San Felipe Street, Suite 3300, Houston, Texas 77057.

[2]      The Agreement is attached to the Order as Exhibit 1 thereto.

Ensco Offshore International Company ("Ensco" or the "Seller") and JSC "Arktikmorneftegazrazvedka," a company incorporated in and under the laws of Russia (the "Buyer"); (b) authorizing the Debtors' sale of certain of its property free and clear of liens, claims, encumbrances, and interests on the terms set forth in the Agreement; and (c) granting related relief.

2.    In support of this motion, the Debtors submit the *Declaration of Stephen Mooney in Support of the Debtors' Motion of Entry of an Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (II) Granting Related Relief* (the "Mooney Declaration"), attached hereto as **Exhibit A**.

## Jurisdiction and Venue

3.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

4.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    The bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, and 9014 and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

6.    On August 19, 2020 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Jonathan Baksht,*

*Executive Vice President and Chief Financial Officer of Valaris plc, in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[3] incorporated by reference herein.

7.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.    These chapter 11 cases are jointly administered pursuant to Bankruptcy Rule 1015(b).    On September 3, 2020, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 173].    No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

### The Sale

8.     As a result of the current market downturn, in the lead up to these chapter 11 cases, the Debtors implemented various initiatives to cut costs and increase efficiency, including preservation stacking certain uncontracted rigs, and retiring, selling, or scrapping certain other rigs from the fleet entirely.    As part of this initiative, the Debtors decided to preservation stack one of its jack-up rigs, the ENSCO 101 (the "Rig").    The preservation process was completed and the Rig has been preservation stacked since October 2020.    During the process of stacking the Rig, the Debtors were approached by the Buyer with an offer to purchase the Rig.    Following arms'-length negotiations, the Debtors determined that the Buyer's offer of $25,000,000 in cash,[4] on the terms

---

[3]    Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to them in the First Day Declaration.

[4]    The Seller shall pay 1% of the $25,000,000 purchase price to Artic Offshore International AS as commission for the Sale.    Additionally, as security for the fulfilment of the Agreement, Buyer will pay to Seller a deposit equal to $2,500,000 (the "Deposit").    The Buyer has already paid the Seller a portion of the Deposit in the amount of $100,000 (the "Advance Payment"), and the remainder of the Deposit shall be paid by the Buyer to the Seller within five (5) business days of the satisfaction of the final Conditions Precedent as required by the Agreement.

and conditions set forth in the Agreement (the "Sale"), was in the best interests of the Debtors and their stakeholders, as the Sale would maximize the value of the Rig for the Debtors' estates. Ensco and the Buyer have engaged in extensive, arms'-length negotiations on the terms of the Agreement and expect to execute the Agreement in the coming weeks.

9.     The Sale is a sound exercise of the Debtors' business judgment, as it will provide the Debtors with approximately $24,750,000 of incremental liquidity and relieve them of the costs of holding the Rig, which has been preservation stacked since October 2020. The Debtors incur substantial costs in connection with preservation stacking the Rig, and would incur additional costs in connection with reactivating the Rig if the Company were to obtain a drilling contract utilizing the Rig. Given that the Debtors are not currently utilizing the Rig, realizing the value of the Rig now through the Sale is more beneficial to the Debtors' estates than continuing to preservation stack the Rig.

10.     In the Debtors' business judgment, $25,000,000 is a fair, reasonable sale price for the Rig, and the Sale is the best available option to maximize the value of the Rig. The Debtors negotiated and signed the Agreement following weeks of extensive, arm's-length negotiations.

## Basis for Relief

I.     **The Sale Should Be Approved Under Section 363(b) of the Bankruptcy Code as an Exercise of the Debtors' Sound Business Judgment.**

11.     Under section 363(b)(1) of the Bankruptcy Code, a debtor in possession may "use, sell, or lease" estate property "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). It is well-established in this jurisdiction that a debtor may sell estate property outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g., In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re State Park Bldg. Grp., Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

12.     "Great judicial deference is given to the [debtor in possession's] exercise of business judgment" regarding the sale of estate property. *State Park Bldg. Grp.*, 331 B.R. at 254. Once a debtor articulates a good business reason for the sale of estate property outside the ordinary course of business, it is presumed that the debtor's decision to move forward with the sale was made "on an informed basis, in good faith, and in the honest belief that the [transaction] was in the best interests of the [debtor] company." *In re Integrated Res., Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1990); *see Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As long as [the sale of estate property] appears to enhance [the] debtor's estate, court approval of a [debtor in possession's] decision to [sell the property] should only be withheld if the [debtor's] judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (internal quotation marks and citation omitted).

13.     The Sale is a sound exercise of the Debtors' business judgment, as it will provide the Debtors with approximately $24,750,000 of incremental liquidity and relieve them of the costs of holding the Rig. In the Debtors' business judgment, $25,000,000 is a fair, reasonable price for the Rig, and the Sale is the best available option to maximize the value of Rig.

14.     Accordingly, the Sale is a sound exercise of the Debtors' business judgment and should be approved under section 363(b) of the Bankruptcy Code.

## II.     The Sale Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.

15.     Section 363(f) of the Bankruptcy Code permits a debtor in possession to sell estate property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest

is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. 11 U.S.C. § 363(f).

16. Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any one of the requirements specified therein will suffice to warrant the Debtors' sale of the Rig free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances). *See, e.g.*, *In re C-Power Prods., Inc.*, 230 B.R. 800, 803-04 (Bankr. N.D. Tex. 1998).

17. The Debtors submit that any interest that will not be an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to sell the Rig free and clear of all interests, with any such interests to attach to the proceeds of the Sale.

### III. The Buyer is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.

18. Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under [section 363(b) and (c) of the Bankruptcy Code] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith." While the Bankruptcy Code and the Bankruptcy Rules do not define the term "good faith," the Fifth Circuit has held that a "good faith purchaser" protected by this provision is "one who purchases the assets for value, in good faith, and without notice of adverse claims." *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014).[5] By providing good faith purchasers with a final order and removing the risks

---

[5] Good faith will not be found, however, where there has been "fraud, collusion between the purchaser and other bidders or the [debtor in possession,] or an attempt to take grossly unfair advantage of other bidders."

of endless litigation over ownership, section 363(m) of the Bankruptcy Code "allows bidders to offer fair value for estate property" which "greatly benefits both the debtor and its creditors." *In re Energytec, Inc.*, 739 F.3d 215, 219 (5th Cir. 2013) (internal quotations omitted).

19. The Agreement and the proposed Sale are the product of good faith, arm's-length negotiations between sophisticated, well-represented parties, and the $25,000,000 sale price for the Rig is a fair, reasonable price. Accordingly, the Buyer is a "good faith purchaser" of the Rig and is entitled to the full protection of section 363(m) of the Bankruptcy Code in connection with the Sale.

## IV. The Sale Is Appropriate Under Bankruptcy Rule 6004(f).

20. Bankruptcy Rule 6004(f) and Bankruptcy Local Rule 6004-11(b)(iv)(D) authorize a debtor in possession to sell estate property outside of the ordinary course of business by private sale or public auction. Courts generally afford debtors in possession broad discretion to determine the manner in which estate property is sold. *See, e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998); *In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981). Private sales are appropriate where the debtor demonstrates that the proposed sale is permissible under section 363(b) of the Bankruptcy Code; *i.e.*, where the debtor articulates a good business reason for the sale. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) ("[T]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

21. Here, there is a sound business reason for the Sale, and the Sale is the best available option to maximize the value of the Rig.[6] An auction for the Rig at this juncture is impractical and unlikely to yield more value for the Debtors' estates, and the Buyer desires to consummate Sale as

---

[6] *See* Section I above.

soon as practicable upon entry of the Order by the Court.  For these reasons, a private sale of the Rig (*i.e.*, the Sale) is appropriate under Bankruptcy Rule 6004(f).

## Waiver of Bankruptcy Rule 6004(h)

22.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

23.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas;  (b) counsel to the Committee;  (c) the administrative agent under the Debtors' revolving credit facility, and its counsel;  (d) the indenture trustees for each of the Debtors' unsecured notes, and their respective counsel;  (e) the Office of the United States Attorney for the Southern District of Texas;  (f) the state attorneys general for states in which the Debtors conduct business;  (g) the Internal Revenue Service;  (h) the Securities and Exchange Commission;  (i) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business;  (j) the Buyer;  (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).   In light of the nature of the relief requested, no further notice is required.

## Conclusion

The Debtors request that the Court enter the Order, granting the relief requested herein and

granting such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
December 28, 2020

/s/ *Matthew D. Cavenaugh*

| | |
|---|---|
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Kristhy M. Peguero (TX Bar No. 24102776) | Anup Sathy, P.C. (admitted *pro hac vice*) |
| Genevieve Graham (TX Bar No. 24085340) | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| 1401 McKinney Street, Suite 1900 | Spencer A. Winters (admitted *pro hac vice*) |
| Houston, Texas 77010 | 300 North LaSalle Street |
| Telephone:    (713) 752-4200 | Chicago, Illinois 60654 |
| Facsimile:    (713) 752-4221 | Telephone:    (312) 862-2000 |
| Email:    mcavenaugh@jw.com | Facsimile:    (312) 862-2200 |
|     kpeguero@jw.com | Email:    asathy@kirkland.com |
|     ggraham@jw.com |     rkwasteniet@kirkland.com |
| |     spencer.winters@kirkland.com |

*Co-Counsel to the Debtors*                              *Co-Counsel to the Debtors*
*and Debtors in Possession*                              *and Debtors in Possession*

**Certificate of Service**

I certify that on December 28, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VALARIS PLC, *et al.*,[1] | ) | Case No. 20-34114 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. __** |

**DECLARATION OF STEPHEN MOONEY IN
SUPPORT OF DEBTORS' MOTION FOR ENTRY OF
AN ORDER (I) APPROVING THE SALE OF CERTAIN OF
THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS AND (II) GRANTING RELATED RELIEF**

I, Stephen Mooney, hereby declare under penalty of perjury:

1.     I am the Director of Vessel Management and Corporate Development for Valaris plc, a public limited company organized under the laws of England and Wales and one of the above-captioned debtors and debtors in possession. Valaris plc is the parent company of the above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with Valaris plc's direct and indirect non-Debtor subsidiaries, "Valaris" or the "Company"). I submit this Declaration to support the relief requested in the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims,*

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.stretto.com/Valaris. The location of Debtor Ensco Incorporated's principal place of business and the Debtors' service address in these chapter 11 cases is 5847 San Felipe Street, Suite 3300, Houston, Texas 77057.

*Encumbrances, and Interests and (II) Granting Related Relief* filed contemporaneously herewith (the "Motion").[2]

2.      The facts set forth in this Declaration are based upon my personal knowledge, information, and belief, or client matter records kept in the ordinary course of business that were reviewed by me or other employees of Valaris under my supervision and direction.  If called and sworn as a witness, I could and would testify competently to the facts set forth herein.

3.      Unless otherwise indicated, all facts set forth in this declaration are based upon (a) my personal knowledge of the Sale contemplated in the Motion, (b) information learned from my review of relevant documents, or (c) information I received from Valaris.

4.      As described in the Motion, as a result of the current market downturn, in the lead up to these chapter 11 cases, the Debtors implemented various initiatives to cut costs and increase efficiency, including preservation stacking certain uncontracted rigs, and retiring, selling, or scrapping certain other rigs from the fleet entirely.  As part of this initiative, the Debtors decided to preservation stack the Rig.  During the process of stacking the Rig, the Debtors were approached by the Buyer with an offer to purchase the Rig.  Following arms'-length negotiations, the Debtors determined that the Buyer's offer of $25,000,000 in cash, on the terms and conditions set forth in the Agreement, was in the best interests of the Debtors and their stakeholders, as it would maximize the value of the Rig for the Debtors' estates.

5.      The Rig has been preservation stacked since October 2020.  The Debtors incur substantial costs associated with preservation stacking the Rig and would incur additional costs to reactivate the Rig if the Debtors were to obtain a drilling contract utilizing the Rig.  Accordingly,

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the Debtors concluded that pursuing the Sale of the Rig on the terms provided in the Agreement was a sound exercise of the Debtors' business judgment, as it will provide the Debtors with approximately $24,750,000 of incremental liquidity and relieve them of the costs of holding the Rig.

6.      The Debtors, with the assistance of their advisors, engaged in extensive, arm's-length negotiations with the Buyer on the terms of the Agreement and expect to execute the Agreement in the coming weeks.  Given the substantial costs that the Debtors incur in preservation stacking the Rig, I believe that the purchase price of $25,000,000 is a fair, reasonable sale price for the Rig and that realizing the value of the Rig now through the Sale is more beneficial to the Debtors' estates that continuing to preservation stack the Rig.

7.      The Debtors also concluded that consummating the Sale on a private basis is appropriate in light of the facts and circumstances of these chapter 11 cases and is in the best interests of their estates and all parties in interest.  An auction for the Rig at this juncture is impractical and unlikely to yield more value for the Debtors' estates.  The various valuation analyses conducted by the Debtors and their advisors serve as market-based evidence that the purchase price of $25,000,000 maximizes value for the Debtors' estates.  Such valuation analyses included a review of the Debtors' estimates regarding: (a) the length of time the Rig would remain preservation stacked; (b) reactivation costs, (c) future utilization rates for the Rig; and (d) current scrap values for the Rig.  I do not believe that any additional marketing process is likely to realize any incremental benefits for the estates.  I believe the Agreement is the highest or best offer available for the Rig and should be approved.

8.      I believe that the Buyer is a good-faith purchaser entitled to the full protection of section 363(m) of the Bankruptcy Code in connection with the Sale.  The Agreement and the

3

proposed Sale are the product of good faith, arm's-length negotiations between sophisticated and well-represented parties, and the $25,000,000 sale price for the Rig is fair and reasonable. Based on my experience, the Buyer negotiated the terms of the Agreement with the Seller with the expectation of receiving good-faith buyer protections under section 363(m) of the Bankruptcy Code. Without the protections afforded a good-faith buyer, I believe that the Buyer would have likely not pursued the Sale, or otherwise offered less consideration to the Debtors.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true
and correct.

Dated: December 28, 2020              */s/ Stephen Mooney*
                                      Stephen Mooney
                                      Director of Vessel Management and
                                      Corporate Development
                                      Valaris plc

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VALARIS PLC, *et al.*,[1] | ) Case No. 20-34114 |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

## ORDER (I) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) approving the Agreement by and between Ensco and the Buyer; (b) authorizing the Debtors' sale of certain of its property free and clear of liens, claims, encumbrances, and interests on the terms set forth in the Agreement; and (c) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.stretto.com/Valaris. The location of Debtor Ensco Incorporated's principal place of business and the Debtors' service address in these chapter 11 cases is 5847 San Felipe Street, Suite 3300, Houston, Texas 77057.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing") and in the Mooney Declaration; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Agreement attached hereto as **Exhibit 1** is approved in all respects. The Debtors are authorized, but not directed, to take any and all actions necessary, appropriate, or desirable to (a) consummate the Sale in accordance with the terms and conditions set forth in the Agreement; and (b) otherwise implement and effectuate the terms of the Agreement.

2. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, upon the closing of the Sale, all of the Debtors' right, title, and interest in and to, and possession of, the Rig shall be transferred to the Buyer free and clear of any and all liens, claims, encumbrances, and interests, with any such liens, claims, encumbrances, and interests to attach to the proceeds of the Sale in the order of their priority, with the same force, effect, and validity that they had immediately prior to the entry of this Order, subject to any rights, claims, or defenses the Debtors may have with respect thereto. Such transfer shall constitute a legal, valid, binding, and effective transfer of the Rig.

3. This Order shall be effective as a determination that, as of the closing of the Sale, (a) no liens, claims, encumbrances, or interests will be assertable against the Buyer or any of its respective assets, including the Rig; and (b) the Rig shall have been transferred to the Buyer free and clear of all liens, claims, encumbrances, and interests.

4.      This Order is and shall be binding upon all persons and entities that may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or that may be required to report or insure any title or state of title in or to any property; and each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale.

5.      The Buyer is deemed to be a good faith purchaser of the Rig.  Pursuant to section 363(m) of the Bankruptcy Code, if this Order is reversed or modified on appeal, such reversal or modification shall not affect the validity of the Sale.  The consideration provided for the Rig under the Agreement is fair and reasonable, and the Sale is not subject to avoidance under section 363(n) of the Bankruptcy Code or otherwise.

6.      To the extent there are any inconsistencies between this Order and the Agreement, the terms of this Order shall control.

7.      Notwithstanding anything to the contrary contained in the Motion or this Order, any payment to be made or obligation, relief or authorization granted hereunder shall not be inconsistent with, and shall be subject to, the requirements imposed on the Debtors under the terms of any interim or final orders entered by the Court in these chapter 11 cases approving any postpetition financing, and any budget in connection therewith.  To the extent there is any conflict between this Order and any such financing orders or budget, the financing orders or the budget, as applicable, shall govern.

8.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rule and the Bankruptcy Local Rules are satisfied by such notice.

9.    Notwithstanding any Bankruptcy Rule or Bankruptcy Local Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

10.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.  Notwithstanding anything to the contrary contained in the Motion or this Order, any intercompany transfers by the Debtors of the consideration received from the Buyer in connection with the Sale of the Rig shall be subject to the requirements, protections, and recording obligations set forth in the *Final Order Granting Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 251] (the "Cash Management Order").  To the extent that there is any conflict between this Order and the Cash Management Order, the Cash Management Order shall govern.

11.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Agreement**

MEMORANDUM OF AGREEMENT

in respect of the sale and purchase of the jack-up drilling unit Ensco 101

Date:      December   2020

1.      Ensco Offshore International Company, a Cayman Islands limited liability company, having an address of 1 Capital Place, 3rd Floor, P.O. Box 1564, Cayman Islands, KY1-1110 (hereinafter referred to as the "**Seller**"); and

2.      JSC "Arktikmorneftegazrazvedka", a company incorporated in and under the laws of Russia, having its office at 33/3 Akademika Knipovicha Street, Murmansk, 183039, Russia (the "**Buyer**").

Subject to the terms and conditions set forth below the Seller has agreed to sell and the Buyer

has agreed to buy:

**Name: Ensco 101**

**Classification Society: ABS**       **Class Notation: ✠A1,Self Elevating Drilling Unit**

**Year of Build: 2000**              **Builder/Yard: KEPPEL FELS LTD.**

**Flag: The Republic of Liberia**    **Port of Registry: Monrovia**

**Call Sign: ELWV5**                 **GT/NT: 11827 / 3548**

**Official Number: 11107**           **IMO Number: 8764779**

with all equipment as set forth in Clause 6, hereinafter called the "**Vessel**", on the following terms and conditions:

**Definitions:**

In this Agreement, the following words and expressions shall have the following meanings:

"**ABS**" means the American Bureau of Shipping.

"**Affiliate**" means with respect to one of the Parties hereto, any other person, company or legal entity which (i) is owned or controlled by such Party, (ii) owns or controls such Party, or (iii) is under common ownership or control as such Party. As used in the preceding sentence, "control" shall mean the right or ability to control more than fifty percent (50%) of the voting rights of a company or entity.

"**Agreement**" means this Memorandum of Agreement between the Seller and the Buyer.

"**Business Days**" means days on which banks are open in all of the following: New York, the USA, London, the United Kingdom, and Moscow, Russia.

**"Buyer's Location"** means the location where the Buyer mobilizes the Vessel to following delivery.

**"Buyer's Nominated Flag State"** means the Flag State under which Buyer will register the Vessel.

**"Class"** means the Class Notation referred to above.

**"Classification Society"** means the Classification Society referred to above.

**"Conditions Precedent"** has the meaning given in Clause 6 (*Conditions Precedent*).

**"Delivery Date"** shall have the meaning given in Clause 7.

**"Delivery Location"** means Port of Dundee, Dundee, United Kingdom.

**"Delivery Window"** shall have the meaning given in Clause 7.

**"Deposit"** shall have the meaning given in Clause 2 (*Deposit*).

**"Deposit Holder"** has the meaning given in Clause 2 (*Deposit*)

**"Effective Date"** shall have the meaning given in Clause 6.

**"Exclusivity Agreement"** shall mean exclusivity agreement entered into by the Seller and the Buyer on 23 October 2020.

**"Lukoil Development"** shall mean the LUKOIL-KMN Ltd. D33 and D6-yuzhnoye fields in the Baltic Sea offshore Kaliningrad, located on the Russian continental shelf in the south-eastern part of the Baltic Sea in a water depth of 74 meters. The D6-yuzhnoye is within the 12- miles zone of the RF territorial waters. The D33 field is located outside the RF territorial waters in the exclusive economic zone of the Russian Federation

**"Parties"** means the Seller and the Buyer.

**"Permitted Uses"** shall have the meaning given in Clause 4.

**"Prohibited Use"** shall have the meaning given in Clause 4.

**"Seller's Account"** means the following account at Seller's Bank: Ensco Offshore International Company
Account Number: 4945019099
SWIFT: WFBIUS6S
ABA:121000248


**"Seller's Bank"** means: Wells Fargo Bank 420 Montgomery Street
San Francisco, CA 94104

"**In writing**" or "**written**" means a written communication from the Seller to the Buyer or vice versa, prepared and communicated in accordance with the provisions of Clause 28.

"**US Trade Restrictions**" means the restrictive measures taken in the form of a prohibition (restriction) on certain actions, embargoes, moratoriums, including, inter alia, freezing assets, blocking accounts, banning exports, re-export of technologies and equipment, prohibition of transactions with certain persons and / or in certain areas of activity and other restrictions that may be introduced by the Office of Foreign Assets Control of the United States Department of Treasury.

1.  **Purchase Price**

1.1   The consideration to be paid by the Buyer to the Seller for the sale and purchase of the Vessel shall be the amount of USD 25,000,000 (the "**Purchase Price**"), less one per cent commission (1.00%) payable to Arctic Offshore International AS by the Seller as an integral part of the closing procedures.

2.  **Deposit**

2.1   As security for the correct fulfilment of this Agreement, the Buyer will pay a deposit equal to USD 2,500,000 (the "**Deposit**"). Part of the Deposit, being USD 100,000, has already been paid to, and received by, the Seller as the "Advance Payment" under the Exclusivity Agreement.  The remaining part of the Deposit, being USD 2,400,000, shall be paid by the Buyer within five (5) Business Days of the satisfaction or waiver of the final Conditions Precedent as required under Clause 6 and engagement of the Deposit Holder below.  The remaining part of the Deposit shall be placed with Holman Fenwick Willan LLP as escrow agent and deposit holder (the "**Deposit Holder**") to hold the remaining part of the Deposit payable under this Clause 2 and shall be released only in accordance with this Agreement and the deposit agreement to be made between the Buyer, the Seller and the Deposit Holder. Interest on the Deposit, if any, is to be credited to the Buyer. Any fee charged by the Deposit Holder for holding the Deposit shall be borne by the Buyer. The entire amount of the Deposit (together with any interest accrued thereon) will be non-refundable, except as required in the circumstances and pursuant to the provisions of Clause 7, Clause 15 and Clause 16.

3.  **Payment**

3.1   On delivery of the Vessel in accordance with Clause 7.3:

   (a)   Buyer agrees to pay to the Seller's Account the balance of the Purchase Price and all other sums payable on delivery by the Buyer to the Seller under this Agreement, free of bank charges; and

   (b)   Buyer and Seller shall procure that the Deposit Holder release and pay the remaining amount of the Deposit held by it to the Seller's Account.

   Payment of the Purchase Price shall occur in exchange of delivery of the Vessel and documentation referred to in Clause 10.

4.  **Permitted Uses**

4.1   **General**

The Parties agree and acknowledge that this Agreement is entered into by the Buyer with the Buyer's intention of entry into a sale and leaseback (with purchase option) financing transaction for the Vessel with a Russian finance leasing company (where the Buyer will act as lessee and a Russian finance leasing company as lessor). Accordingly, the Buyer shall be entitled to assign this Agreement to its nominated finance leasing company (as set out in Clause 25 below) or otherwise sell or transfer the Vessel to the Russian leasing company and the Russian leasing company shall be entitled to sell or transfer the Vessel to the Buyer or any Affiliate of the Buyer and otherwise pursuant to the terms of that sale and leaseback (with purchase option) financing arrangement, subject always to the use limitations respecting the Vessel as specified and agreed to by the Parties in Clause 4.2.

4.2     **Permitted Uses**

4.2.1   For the purpose of clarity, the Buyer shall ensure that such Russian finance leasing company shall only lease, sell or transfer the Vessel to the Buyer or any Affiliate of the Buyer and subject always to the use limitation respecting the Vessel as specified and agreed to by the Parties in Clause 4.2. (*Permitted uses*).

4.2.2   Subject to Clause 4.1, the Buyer acknowledges that the Seller has agreed to sell the Vessel to the Buyer on the condition that the Vessel will be used by the Buyer for the following purposes:

> **(a)**     the Lukoil Development;
>
> **(b)**     other work or projects in territorial waters and continental shelf of the Russian Federation;
>
> **(c)**     other work or projects in territorial waters and continental shelf of Vietnam where JSC "Zarubezhneft" or its Affiliate has a majority interest or is the operator or where Vietsovpetro is the operator,

(together the **"Permitted Uses"**).

4.3     **Transfer of the Vessel**

4.3.1   Subject to Clauses 4.1 and 4.3.2, the Buyer shall not be permitted to sell the Vessel to any third party except its Affiliate.

4.3.2   Notwithstanding provisions of Clause 4.3.1, the Buyer may at any time in its own discretion: (i) sell the rig to the Seller for the agreed sum of one United States Dollar, or (ii) scrap the Vessel (or sell the Vessel to be scrapped) providing documentary evidence of scrapping (or sale to be scrapped) to the Seller.

5.      **Inspection**

5.1     The Buyer hereby acknowledges that the sale, purchase and delivery of the Vessel, including the equipment specified in <u>Annexure A</u> will be on an "AS IS, WHERE IS" basis.

5.2     The Seller expressly acknowledges that the Buyer or an Affiliate of the Buyer has entered into or proposes to enter into a drilling contract with Buyer's client for the provision of the Vessel and requires to assess the cost and suitability of upgrading the Vessel for the deployment by Buyer.

5.3    Accordingly, the Seller shall make available to Buyer and shall permit Buyer to carry out any number of inspections and surveys of the Vessel, any equipment on the Vessel, copies of the Vessel's classification records (including previous records), all engineering and construction records of the Vessel, replacement and/or overhaul of the equipment and materials comprising the Vessel and such other records the Buyer may reasonably require.

5.4    The Vessel will be made available for inspection and surveys at the Vessel's current lay-up location and the Buyer and its nominees shall be given free and unrestricted access to all parts of the Vessel and shall be entitled to open up and/or test any part of the Vessel its parts and equipment (whether onshore or offshore) and the Vessel's deck and engine log books shall be made available for examination by the Buyer.

5.5    The Seller shall provide such information as the Buyer may reasonably require for the purposes of advancing its technical and commercial assessment of the Vessel in respect of Buyer's proposed transaction with its client under Clause 5.2.

5.6    The Buyer shall be entitled to share data provided by the Seller, or obtained from its inspection and survey, with the Buyer's engineering, legal, tax or other professional advisers, and with the Buyer's client, provided those advisers and the Buyer's client are bound by an undertaking of confidentiality in broadly similar terms to those set out in Clause22.

5.7    The costs of the inspections, testing, surveys and other actions proposed by the Buyer to be conducted under this Clause 5 shall be for the Buyer's account. The cost of arranging the Seller's personnel or the lay-up contractor to attend inspection under this Clause shall be for the Seller's account.

**6.    Effectiveness and Conditions Precedent**

**6.1    Effectiveness**

This Agreement shall be binding and effective upon execution of this Agreement ("**Effective Date**").

**6.2    Conditions Precedent**

The Agreement to sell and purchase the Vessel on the terms of this Agreement is conditional upon satisfaction of the following conditions (the "**Conditions Precedent**"):

6.2.1    a satisfactory act of inspection relating to the Vessel acceptable to both the Buyer and the Buyer's client; and

6.2.2    receipt by the Buyer of all its necessary corporate approvals required to perform the transactions contemplated by this Agreement;

6.2.3    receipt by the Seller of all its necessary corporate approvals required to perform the transactions contemplated by this Agreement; and

6.2.4    receipt by the Buyer of documentary evidence that the administrators and/or creditors of the Seller (or of its [*Valaris plc*]) has duly approved the sale of the Vessel and the entry into, and performance of the terms of, this Agreement by the Seller.

**6.3    Non-satisfaction**

6.3.1   If the Conditions Precedent are not satisfied or waived by the last day of the Delivery Window, then (subject to any prior extension agreed pursuant to Clause 6.3.2) on or after the last day of the Delivery Window either the Seller or the Buyer may, in its sole discretion by Notice to the other Party, terminate this Agreement and in such case the provisions of Clause 16 (*Mutual Termination*) shall apply.

6.3.2   If the Conditions Precedent have not been satisfied or waived by the last day of the Delivery Window, the Delivery Window may be extended to such other date as may be agreed by the Buyer and the Seller in writing.

7.   **Time and Place of Delivery**

7.1   The Vessel will be delivered and taken over by Buyer at a safe and accessible berth at the Delivery Location.

7.2   When the Vessel is physically ready for delivery in accordance with this Agreement, the Seller will give the Buyer a written Notice of Readiness for delivery.

7.3   The Notice of Readiness shall nominate the date of delivery of the Vessel ("**Delivery Date**"), being a Business Day within the period from 25 January 2021 to 29 January 2021 (both inclusive) ("**Delivery Window**") and such Delivery Date being no earlier than ten (10) Business Days after the Buyer's receipt of the Notice of Readiness.  Subject to the terms of this Agreement, the delivery of the Vessel shall take place on the Delivery Date. Delivery of the Vessel shall be effected by the concurrent delivery by each of the Buyer and Seller to each other of a signed Protocol of Delivery and Acceptance in the form set out in Annexure B and such other documents as required under Clause 10.

8.   **Equipment/Spares/Bunkers and other items**

8.1   Subject to Clauses 8.2, 8.3 and 8.4, the Seller will deliver the Vessel to the Buyer with the equipment as specified in Annexure A, whether on board or ashore. The Seller is not required to replace spare parts that are taken out of spares and used as replacement prior to delivery, but to the extent the items are replaced prior to delivery, they will be the property of the Buyer after delivery and closing. The Seller represents and warrants the list of Equipment set out in Annexure A is materially accurate, up to date and complete.

8.2   Notwithstanding anything to the contrary contained herein, the Buyer acknowledges that the equipment, parts, supplies and other items specified in Annexure A-1 and any ITAR/US licensed equipment/UK licensed equipment ("Seller's Licensed Equipment") will under no circumstances be considered as part of the sale of the Vessel and are expressly excluded from the sale.

8.3   In addition to the items referenced in Clause 8.2 above, items on board which are on hire and/or owned by third parties are excluded from the sale of the Vessel, including without limitation, any third party communication equipment, such as RigNet or CapRock, or any similar system and any third party free placement equipment (e.g., cementing unit or ROV) (collectively, "Third Party Equipment").

The Seller will remove at its own cost all items specified in Annexure A-1, the Third Party Equipment and the Seller's Licensed Equipment, if any, prior to the delivery of the Vessel. Seller will indemnify Buyer from any claims in connection with Annexure A-1 items, Third Party Equipment and Seller's Licensed Equipment that are not removed prior to delivery.

Notwithstanding the above, in the event that any Third Party Equipment and/or Seller's Licensed Equipment is left onboard the Vessel at the time of delivery, any such equipment will be removed at Seller's own cost and expense at Vessel's arrival at the Buyer's Location.

Upon removal of any equipment from the Vessel, Seller will restore the Vessel (at its own expense) to the same state it was in on 14 October 2020 (the date the Buyer inspected the Vessel). For the sake of clarification, any reinstatement resulting from the removal of 3rd party equipment will be the sole responsibility and cost of the 3rd party as detailed in the agreement with Seller. If Buyer encounters any issue with 3rd parties on this condition post-delivery of the Vessel, Seller will provide details of said agreements to Buyer.

8.4     In addition to the items referenced in Clauses 8.2 and 8.3 above, the Seller has the right to exclude from the sale without compensation: (a) all crockery, plates, cutlery, linen and other articles bearing the Seller's flag or name, (b) library forms, etc., exclusively for use in the Vessel, (c) Captain's, Officers' and Crew's personal belongings including the slop chest, and (d) all assets onboard the Vessel of a proprietary nature including, without limitation, any assets containing proprietary information such as personal and/or laptop computer(s) and computer software, all of which will remain the property of Seller and will not be included in the sale of the Vessel. Notwithstanding the foregoing, any software necessary for the normal operation of the Vessel will not be excluded from the Sale or removed from the Vessel. The Buyer further acknowledges and agrees that the Buyer shall be responsible for procuring the approvals from any such third party supplier for the transfer, reliance upon and use of any of the Equipment, if required.

8.5     The Buyer will take over the remaining bunkers and unused lubricating oils in storage tanks and unbroached drums at no extra cost.

8.6     Buyer acknowledges and agrees that all costs incurred in connection with preparing the Vessel for transport and the transport of the Vessel to the Buyer's Location shall be for the account of Buyer, including without limitation, costs incurred in connection with reactivation and floatation.

**9.      Closing/Delivery**

Documentary closing shall take place, simultaneously with the delivery of Vessel under Clause 7 at Seller's office in London (located at the following address: Valaris, 110 Cannon Street | London | EC4N 6EU, UK or at such other location, or electronically, as the Parties may agree.

**10.    Documentation**

10.1    *Seller's Delivery Documents.* At the documentary closing, the Seller will deliver to the Buyer the following delivery documents:

(a)     Four (4) executed and notarized Bills of Sale for the Vessel, duly notarially attested to the extent required by the Buyer's Nominated Flag State and Buyer notifies Seller of said requirement within five (5) days after the date of this Agreement (the "**Bill of Sale**"), in substantially the form attached hereto as Annexure D;

(b)     A commercial invoice in three (3) originals for the Purchase Price and signed by a director, officer or other person authorised to represent the Seller;

(c) A certified copy of a Certificate of Incumbency from the Seller (or the equivalent document in the country of incorporation of the Seller) showing a list of the current directors and officers of the Seller, duly notarized and apostilled;

(d) A copy of the Certificate of Ownership and Encumbrances dated no more than ten (10) Business Days prior to the date of delivery/closing reflecting that the Vessel is owned by the Seller and is free from mortgages, liens and other encumbrances recorded on the Vessel, with the original of such document to follow as soon as practicable following the closing;

(e) An original of the most recent Class certificate issued for the Vessel;

(f) An original of the Vessel's Tonnage Certificate;

(g) An original of the most recent Vessel's Mobile Offshore Drilling Unit Safety Certificate;

(h) An original of the Vessel's Certificate of Registry;

(i) Documents for transfer of the Vessel required by the Liberian registry;

(j) Properly adopted corporate resolutions or other approvals of the Seller approving the terms of this Agreement and the transaction contemplated herein, duly notarized and apostilled;

(k) A certificate of good standing of the Seller (or the equivalent document in the country of incorporation of the Seller), duly notarized and apostilled;

(l) Documents, duly notarized and apostilled, authorizing the Seller's appointed representatives to execute all necessary documents and take all necessary actions in order to sell the Vessel to the Buyer;

(m) Certificate of incorporation and the memorandum and articles of association of the Seller, duly notarized and apostilled;

(n) If the Buyer's Nominated Flag State is different from the current flag, a Certificate of Deletion of the Vessel from the Vessel's registry or other official evidence of deletion appropriate to the Vessel's registry, or in the event that the registry does not as a matter of practice issue such documentation immediately, a written undertaking from the Seller to effect deletion from the Vessel's registry forthwith and furnish a certificate or other official evidence of deletion to the Buyer promptly and latest within four (4) weeks after delivery has occurred. If the Buyer maintains the current flag, this certificate will not be required; and

(o) Any such additional documents as may be reasonably required by the competent authorities for the purpose of registering the Vessel in the name of the Buyer or ensuring the Vessel is in compliance with applicable laws, provided that the Buyer notifies the Seller of any such documents as soon as possible after the date of this Agreement, but in any event, for up to sixty (60) days after delivery.

10.2 At the documentary closing the Parties will execute a Protocol of Delivery and Acceptance confirming the date and time of delivery of the Vessel from the Seller to the Buyer in the form attached hereto as _Annexure B_.

10.3   **Buyer's Delivery Documents.** At the documentary closing, simultaneously with the delivery of the Seller's Delivery Documents under Clause 10.1, the Buyer will deliver to the Seller the following documents:

    **(a)**   A debit advice/swift confirmation from the bank of the Buyer evidencing the irrevocable and unconditional transfer of the balance of the Purchase Price to the Seller's Account (provided; for the avoidance of doubt, delivery of the Vessel shall only be deemed to occur once the balance of the Purchase Price has been received into the Seller's Account).

10.4   The Parties will deliver each to the other draft copies of their delivery documentation not later than three (3) Business Days prior to the Delivery Date, failing which the Delivery Date will be postponed by such period as may be required to accommodate a period of two (2) Business Days for each Party to review the other Party's documents and two (2) Business Days to prepare for closing/delivery after receiving notification of their acceptance of such delivery documentation by each Party.

10.5   Notwithstanding anything herein to the contrary, the Seller shall provide all reasonable assistance to Buyer to obtain appropriate licenses or permits necessary to export the Vessel from the United Kingdom and to clear any customs formalities, including any controlled equipment on the Vessel from the United Kingdom, prior to closing. For the sake of clarity, this includes, but is not limited to, obtaining any customs clearance and export permits in respect of the Vessel and removal of any relevant items of equipment controlled by United States, European Union or United Kingdom regulatory frameworks.

## 11.   Post Completion

11.1   The Buyer will, upon delivery of the Vessel, change the name of the Vessel, alter any funnel markings and not employ the names "Valaris," " Ensco", "Pride", "Rowan". "Atwood" or any derivation thereof in its marketing of or reference to or markings on the Vessel unless previously agreed by the Seller. The Buyer will furnish the Seller with written confirmation of the change of markings of the Vessel prior to the Vessel entering any operational activity for the Buyer's intended use, including without limitation, pictures showing the removal of all markings.

11.2   The Buyer will provide the Seller with a copy of the official Certificate of Ownership from the flag state evidencing that the Vessel has been registered in the name of the Buyer within  thirty (30) days of the last date of signature to this Agreement.

## 12.   Authority, Title and Encumbrances

12.1   Seller hereby represents, covenants and warrants to the Buyer the following:

    **(a)**   as at the Effective Date and on Delivery Date, the Seller is the legal and beneficial owner of the Vessel and the Equipment which belongs to her;

    **(b)**   on Delivery Date, the Vessel and the Equipment will be free of any and all maritime liens, mortgages and all other debts whatsoever, and are not subject to port, state or other administrative detentions or liabilities;

    **(c)**   the Vessel and the Equipment will be the property of the Buyer from and after Delivery Date;

(d)    as at the Effective Date and on Delivery Date, the Seller is duly formed and validly existing under the laws of its country of formation and will have full legal right, power and authority to enter into this Agreement and perform their obligations hereunder; and

(e)    as at the Effective Date and on Delivery Date, other than the current administration of the Seller, no steps have been taken or proposed in relation to the winding up, bankruptcy, administration, insolvency, dissolution of the Seller or any of its Affiliates.

The Seller hereby undertakes to indemnify the Buyer against all and any loss or consequences following any breach of the above-mentioned representations, covenants and warranties.

12.2    The Buyer hereby represents, covenants and warrants to the Seller the following:

(a)    the Buyer is duly formed and validly existing under the laws of its country of formation and has full legal right, power and authority to enter into this Agreement and perform its obligations hereunder;

The Buyer hereby undertakes to indemnify the Seller against all and any loss or consequences following any breach of the abovementioned representations, covenants and warranties.

13.    **Taxes, fees and expenses**

Any taxes (including, but not limited to, VAT), fees and expenses incurred by the Buyer in connection with the purchase and registration of the Vessel in the country of sale and/or Buyer's Nominated Flag State will be for the Buyer's account, whereas similar charges in connection with closing of the Seller's registry will be for the Seller's account.

14.    **Risk and Insurance**

14.1    The Vessel, with everything belonging to it as set forth in <u>Annexure A</u>, will be at the Seller's risk and expense until it is delivered to the Buyer. Subject to the terms and conditions of this Agreement, the Vessel will be delivered and taken over in substantially the same condition as it was at the time of inspection, fair wear and tear excepted.

Notwithstanding anything to the contrary contained in this Agreement, the Seller will not be liable for any deficiency in the description, quality or performance of the Vessel and the Parties agree to exclude the application of all statutory or other implied terms and conditions which might otherwise impose such liability.

14.2    Title to the Vessel and the risk of its loss or damage will pass to the Buyer as from the date and time stated on the Protocol of Delivery and Acceptance, at the Delivery Location and Buyer shall release, defend, indemnify and hold Seller harmless from all claims, losses, costs and/or actions respecting the use, ownership or possession of the Vessel which may arise after the Delivery Date and Seller shall release, defend, indemnify and hold Buyer harmless from all claims, losses, costs and/or actions arising in relation to the use, ownership or possession of the Vessel prior to the Delivery Date.

15.    **Default**

15.1    Buyer's Default

Should the Deposit not be paid in accordance with Clause 2, Seller has the right to cancel this Agreement in its sole discretion  and neither Party will have any further obligation to the other Party except for obligations under this Agreement that survive termination.

Provided that the Seller is not in breach of its obligations under this Agreement, if the remaining Purchase Price is not paid in accordance with Clause 3, Seller has the right to cancel this Agreement in its sole discretion upon providing no less than fourteen (14) days' notice to Buyer, and provided the remaining Purchase Price remains unpaid as required after such fourteen (14) day period, this Agreement shall automatically terminate in which case the Buyer will forfeit to Seller both the Deposit and any interest earned thereon and neither Party will have any further obligation to the other Party except for obligations under this Agreement that survive termination.

In the event that a transfer of the Vessel occurs in violation of Clause 4, the Buyer acknowledges that this could result in significant harm to the Seller and, because of the difficulty of ascertaining the amount of damage that will be suffered as a result of such breach, the Buyer agrees that, in addition to such other relief as may be proper, the Seller shall be entitled to all types of equitable relief (including, but not limited to, the issuance of an injunction and/or temporary restraining order) entitled to it under law against any breach or threatened breach of Clause 4.

15.2   Seller's Default

Should Seller fail to give Notice of Readiness in accordance with Clause 7.3 or fail to be ready to complete a legal transfer by the last day of the Delivery Window, the Buyer will have the option of cancelling this Agreement. If after Notice of Readiness has been given, but before the Buyer has taken delivery, the Vessel ceases to be physically ready for delivery and is not made physically ready by the last day of the Delivery Window, the Buyer will retain their option to cancel. In the event the Buyer elects to cancel this Agreement, without prejudice to any other right of the Buyer under this Agreement, at law or otherwise, the Seller shall repay, and procure the release of, the total amount of the Deposit to Buyer within five (5) days after notice of such cancellation is received by Seller.

16.   **Mutual Termination**

The Parties may terminate this Agreement if mutually agreed in writing. Upon termination by mutual agreement, the Seller shall immediately repay, and procure the release of, the total amount of the Deposit (or such part of the Deposit paid by the Buyer as at the date of termination) together with interest earned, if any, to the Buyer.

17.   **Buyer's Representatives**

17.1   *Embarkation.* Upon payment of the Deposit in accordance with Clause 2, the Buyer will have the right to embark representatives on board the Vessel upon prior appointment with Seller during normal business hours at the current location of the Vessel at the Buyer's own cost, risk and liability during the period from satisfaction of the following conditions until delivery or earlier termination of this Agreement:

(a)   Signature by the Buyer of the Seller's letter of indemnity in the form set out in <u>Annexure C</u> to this Agreement; and

**(b)**    Provision of written evidence by the Buyer to the Seller that the Buyer has procured suitable and reasonable insurance (third party Protection & Indemnity cover and Longshore and Harbor Workers, or equivalent thereof) (including, subject to the terms of such insurance, waiver of subrogation in favour of the Seller), adequate to cover the indemnities granted by the letter of indemnity, including without limitation, risk of injury to, illness or death of any of the Buyer and its Affiliates', directors, officers, employees, agents, contractors and representatives.

Buyer's representatives shall be accompanied at all times during the familiarisation process by one or more crew members employed by Seller. Seller's crew members shall be available to identify equipment and components. Notwithstanding anything to the contrary herein, in no event shall Seller's crew members' presence during the familiarisation process, including any actions, inactions and/or statements of or by such Seller's crew members, alter, amend or otherwise affect Buyer's purchase and acceptance of Vessel "AS-IS", as provided in Clause 5.

17.2    ***Disembarkation.*** In the event that delivery does not take place for any reason by the last day of the Delivery Window, the Buyer will immediately remove, at the Buyer's cost and expense, any representative that the Buyer has placed on the Vessel. The Seller will have the right to demand the removal of any of the Buyer's representatives for reasonable cause and the Buyer will have the right to replace such representatives at the Buyer's cost and expense.

17.3    ***Non-Interference.*** The Buyer acknowledges that its representatives are permitted to embark on the Vessel for the sole purpose of familiarization with the Vessel and its equipment and systems. The Buyer undertakes to the Seller that the Buyer's representatives will not interfere with the Seller's operations or those of any other person present on the Vessel by authorization of Seller.

18.    **Choice of Law / Arbitration**

18.1    ***Choice of Law.*** This Agreement (and any non-contractual obligations which may arise out of or in connection with it) will be governed by and construed in accordance with laws of England and Wales, without regard to any rules of conflict of laws that would require the application of laws of a different jurisdiction.

18.2    ***Arbitration.*** Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre ("SIAC") in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The seat of the arbitration shall be Singapore. The Tribunal shall consist of three (3) arbitrators. Each Party shall nominate one (1) arbitrator and those individuals shall nominate the third arbitrator who shall serve as the chairman of the arbitration proceeding. The language of the arbitration shall be English.

19.    **No Liability for Consequential Loss**

Neither Party will have any liability to the other Party for any (i) indirect or consequential loss or damages resulting from or arising out of this Agreement or (ii) to the extent not included in (i), for any loss of income or profits or anticipated profit, loss of use, loss of product or business interruption, whether direct or indirect or consequential, and in each case whether or not foreseeable as of the Effective Date of this Agreement.

20. **Compliance with Laws**

20.1    Each of the Buyer and the Seller warrant and undertake to the other that:

    (a)    while performing its obligations under this Agreement  it will not violate or assist or instigate any other individual or legal entity to violate, any applicable law, including without limitation the United Kingdom Bribery Act 2010 and the United States Foreign Corrupt Practices Act;

    (b)    it has policies and process in place for its respective officers, employees, consultants, representatives, agents, business partners, joint-venturers and Affiliates in respect of their actions in implementing this Agreement to:

        (i)    be knowledgeable regarding the purpose and provisions of all applicable anticorruption, anti-bribery and anti-money-laundering laws;

        (ii)    comply with the terms of this Agreement, applicable anti-bribery and anti-corruption laws;

        (iii)    not take, or will refrain from taking, any action which would cause either the Buyer or the Seller to be in violation of the terms of this Agreement and applicable anti-bribery and anti-corruption laws;

        (iv)    not be the target of, or owned or subject to control by any country, institution, organization, entity, or person that is the target of economic sanctions and trade restrictions imposed by the United States government, the United Kingdom or the European Union;

        (v)    not be debarred or otherwise excluded or declared ineligible to participate in United States government contracts or contracts, grants, or other programs financed in whole or in part by the United States government; **and**

        (vi)    not be listed by the United States Department of Commerce or State or included on any list maintained by any government including the governments referenced above as an entity with which the United States persons may not engage in commercial transactions.

20.2    Without limiting the generality or scope of Clause 20.1, the Buyer and Seller further warrant and undertake to each other that:

    (a)    the execution, delivery, and performance of the transaction contemplated under this Agreement will be in compliance with all applicable Export and Import Laws (as defined below) as applicable to each of them respectively;

    (b)    neither the Buyer nor the Seller is or will be a person, company, or entity:

(i)     engaged in prohibited end uses involving nuclear weapons, biological weapons or chemical weapons, or rocket systems or unmanned aerial vehicles intended for the delivery of such weapons within the meaning of the Export Administration Regulations (15 C.F.R. Sections 744.2, 744.3, 744.4 and 744.5);

(ii)    with whom the Seller and/or Buyer (as applicable) is prohibited from dealing or otherwise engaging in the transaction contemplated under this Agreement by any law related to transactions involving countries against which any government of Russia, the United Kingdom ("UK"), or the United States of America ("US"), the Organisation for Economic Cooperation and Development ("OECD"), the European Union or other international organization maintains economic sanctions or embargoes under statute, executive order or regulations;

(iii)   is subject to U.S. Sectoral Sanctions, is on the U.S. Sectoral Sanctions identifications List (SSI List) or is fifty percent (50%) or more owned by any person or company on the SSI list.  Buyer and Seller agree that neither the Vessel, nor any part thereof, will be operated in water deeper than 450 feet, in territory above the Arctic Circle, or, in shale formations;

(iv)    appearing on any applicable list of prohibited parties maintained by any of the governments referred to above; or acting or purporting to act, directly or indirectly, on behalf of, or an entity owned or controlled by, any party identified in this paragraph 20.2(b).

**(c)**   it will not export or re-export the Vessel, any part thereof and/or any related equipment (including, without limitation, any accompanying technology, software or other technical data) directly or indirectly without authorizations, licenses, permits or approvals as required by applicable Export and Import Laws as applicable to each of them respectively;

**(d)**   it will not scrap, demolish, recycle or dispose of, or procure the scrapping, demolishing, recycling or disposal of the Vessel or any part thereof, directly or indirectly, except in an environmentally sound manner and in accordance with applicable laws and regulations as applicable to each of them respectively.

All laws and regulations that govern the restrictions and prohibitions referenced in paragraphs 20.2(b) and (c) will be referred to as Export and Import Laws for purposes of this section.

20.3   Without limiting the generality or scope of this Clause 20, the Buyer and Seller further undertake to each other that while performing the obligations under this Agreement that the Parties, their Affiliates, officers, employees, consultants, representatives, agents, business partners and joint-venturers shall not:

(a)     pay, offer to pay and permit payment of any monetary funds or valuable items, direct or indirect, to any persons for the purpose of affecting these persons or actions or decisions of these persons to get any illegitimate benefits or other illegitimate purposes;

**(b)**    carry out actions qualified by law applicable to this Agreement as giving or receiving bribe, corrupt payment, and also actions breaching the requirements of applicable law and international acts against legitimization of illegally obtained income (anti-laundering);

**(c)**    stimulate employees of any Party, including monetary funds, gifts, voluntary performance of any works (services) for them and other manners not mentioned in this Clause that make the employee in a way dependent and aimed at ensuring this employee performs any actions for the benefit of the stimulating Party.

20.4    The obligations set out in Clause 20 will survive any satisfaction, expiration, termination or discharge of any obligations under or pursuant to this Agreement.

## 21.   Third Party Rights

No person who is not a party to this Agreement will have any right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

## 22.   Confidentiality

This Agreement and all matters relating to it will be regarded by the Parties as being highly confidential and will not be disclosed to any person who is not a signatory to the Agreement except where such disclosure is required by law or regulation or expressly permitted by Annexure E.

## 23.   Entire Agreement

Each Party acknowledges and agrees that this Agreement constitutes the entire agreement between the Parties and supersedes any prior agreement, understanding, undertaking or arrangement between the Parties relating to the subject matter of this Agreement. Each of the Parties acknowledge that in entering into this Agreement it has not relied on and will have no right or remedy in respect of any statement, representation, assurance or warranty (whether or not made negligently) other than as is expressly set out in this Agreement. Any terms and/or conditions implied into this Agreement by any applicable statute or law are hereby excluded to the extent such exclusion can legally be made.

## 24.   Amendments and Modifications

Any amendment or modification to the terms of this Agreement will be of no force or effect unless the same has been reduced to writing and been signed by the duly authorised signatories of the Parties. Without prejudice to the generality of the foregoing the Parties undertake not to rely on any such amendment or modification unless the same has been made in the manner aforesaid.

## 25.   Transfer and Assignment

Neither Party may transfer, assign or novate any of its rights or obligations under this Agreement, except with the prior written consent of the other Party which consent will not unreasonably be withheld provided always that Buyer shall be entitled to assign this Agreement to its nominated finance leasing company.

## 26.   Counterparts

This Agreement may be executed in any number of counterparts, each of which when executed and delivered will constitute an original, but all of which will together constitute the same instrument.

27.     **Survival**

The Parties will continue to be bound by the provisions of this Agreement that reasonably require some action or forbearance after termination.

28.     **Notices**

28.1    Any notice, demand or other communication to be given by or on behalf of the Parties hereto pursuant to this Agreement will be in writing and sent by first class pre-paid airmail letter post, telefax or email or be delivered by hand (including by courier delivery against receipt) to the address or coordinates specified below:

(a)     in the case of the Seller, to:

Address: Valaris, 110 Cannon Street | London | EC4N 6EU, UK

to the attention of Derek Sangster

E-mail: Derek.Sangster@valaris.com

Tel: +41 41 562 50 51

Fax: [●]

With a copy to:

[Valaris]

(b)     in the case of the Buyer, to:

Address: 33/3 Akademika Knipovicha Street, Murmansk, 183039, Russia

to the attention of Michail Popov;

E-mail: amngr@amngr.ru, popov.m@amngr.ru;

Tel: (8152) 55-20-00;

Fax: (8152) 44-14-91.

28.2    The Parties will promptly notify each other in the manner provided in this Clause 28 of any change in the coordinates set out above 28.1. Any such communication sent as provided above will be deemed to have been received by the Party to whom it is addressed:

(a)     if delivered by hand, on delivery against signed receipt;

(b)     if sent by post, two (2) Business Days following posting;

(c)     if sent by telefax, on completion of dispatch if the sender receives a transmission report on which the result is recorded as "OK" or equivalent;

(d)     if sent by email, when transmission has been effected, the burden of proof of which will at all times and in all circumstances be borne by the sender,

provided that such notice is delivered or sent between the hours of 09:00 and 17:30 local time on a Business Day in the place of receipt, and otherwise will be deemed to be received at the next following hour of 09:00 on a Business Day.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorised signatories.

For the Seller:

Name: _____

Title: _____

For the Buyer:

Name:    Mikhail A. Popov

Title:    General Director

**ANNEXURE A**

1.1      (Seller to attach the Standard Format Equipment List Excel file titled "Valaris 101 Equipment

List.xlsx" sent by Valaris to lyng@arctic.com electronically via email on 29.09.2020

**ANNEXURE A-1**

[Items excluded]

**ANNEXURE B**

(Form of Protocol of Delivery and Acceptance)

Protocol of Delivery and Acceptance

Date:

Time:

Place: [latitude and longitude]

Pursuant to the Memorandum of Agreement dated_____ , (the "MOA") made between **Ensco Offshore International Company**, a Cayman Island limited liability company (the "**Seller**") and **JSC "Arktikmornneftegazrazvedka"**, a company incorporated in and under the laws of Russia (the "**Buyer**") the Seller deliver Ensco 101 (the "Vessel") to the Buyer, and the Buyer accept delivery of the Vessel on the date and at the location referred to in this Protocol.

The Parties have come to the agreement that together with the Vessel the following have been delivered by the Seller and accepted by the Buyer Rig equipment and drilling equipment in accordance with Annexure A of the MOA.

This Protocol of Delivery and Acceptance is governed by and shall be construed in accordance with the laws of England.

The Protocol of Delivery and Acceptance may be executed in two (2) counterparts, each of which shall be an original but which (both) shall together constitute one and the same instrument.


**(Seller)** _____ **(Buyer)**


By: _____     By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date:                                      Date:

**ANNEXURE C**

**(Form Release and Waiver)**

<u>**RELEASE, WAIVER AND INDEMNITY**</u>

This Release, Waiver and Indemnity is made as of the date indicated below by the person whose name and signature appear below ("the Undersigned").

WHEREAS, the Undersigned is an employee or representative of _____, or one of its affiliates, and desires to enter onto a certain rig owned by ENSCO Worldwide GmbH, and/or its affiliates ("Company"), specifically the ENSCO 101 ("the Rig"), for the purpose of inspecting the Rig in connection with potential purchase of such Rig(s) (the "Purpose"); and.

WHEREAS, Company has agreed to allow the Undersigned limited access to the Rig as an accommodation for the Undersigned's benefit and for the limited Purpose stated above;

NOW THEREFORE, in consideration for being allowed to enter onto the Rig, together with other good and valuable consideration, receipt and sufficiency of which the Undersigned hereby acknowledges, the Undersigned executes this Release, Waiver and Indemnity, as follows:

1.    The Undersigned for itself, individually, and for its employer or company represented, collectively, hereby releases, discharges, indemnifies and holds forever harmless (i) Company and all affiliates or subsidiaries, as well as its officers, directors, shareholders, employees, agents, representatives, joint-venturers, partners, and insurers, (ii) the Rig in any *in rem* capacity, and (iii) the owner(s), operator(s), and manager(s) of any premises on or adjacent to which the Rig may be located and which the Undersigned must enter to access the Rig, together with its affiliates, subsidiaries, officers, directors, shareholders, employees, agents, and representatives, from and against any and all injury or death to persons, or loss or damage to property of any kind or nature that may be sustained to the Undersigned's person or property in, around and/or on the Rig, including but not limited to its appurtenances and equipment, and all means of ingress and egress from the Rig, regardless of cause. <u>THIS RELEASE EXPRESSLY INCLUDES AND EXTENDS TO ANY INJURY OR DEATH TO PERSONS AND LOSS OR DAMAGE TO PROPERTY WHICH THE UNDERSIGNED MAY SUSTAIN AS A RESULT OF COMPANY'S, OR COMPANY'S PERSONNEL'S BREACH OF ANY DUTY (WHETHER STATUTORY OR OTHERWISE), STRICT LIABILITY, ANY THEORY OR TORT, REGULATORY OR STATUTORY LIABILITY, PRODUCTS LIABILITY, NEGLIGENCE (WHETHER SOLE, CONCURRENT, CONTRIBUTORY OR GROSS, AND WHETHER ACTIVE OR PASSIVE), OR WILLFUL MISCONDUCT, OR ANY UNSEAWORTHY CONDITION OF A VESSEL OR ANY HAZARDOUS CONDITION ON OR ABOUT THE RIG.</u>

2.    The Undersigned for itself individually and for its employer or company represented further expressly and unconditionally waives any and all rights, duties, or obligations which he or she might otherwise have, or which Company or its personnel might otherwise owe, whether at common law, or by statute, regulation or other law, with respect to

the disclosure, removal, or protection against hazards or dangerous conditions or activities on or about the Rig.

3.      The Undersigned expressly acknowledges, understands, and agrees that conditions may exist or operations may be undertaken on or about the Rig which may pose a risk of serious injury, damage, or death to his or her person or property, and that while on or about the Rig the Undersigned may come into contact with or be exposed to such risks and may sustain harm or loss, including death, as a result. Nevertheless, it is the Undersigned's express intention to release Company from any and all claims, suits, demands, or causes of action that he or she might otherwise have against Company arising therefrom, and to waive any rights, duties, or obligations which might otherwise exist with respect thereto.

4.      The Undersigned expressly acknowledges, understands, and agrees that he or she is merely a licensee on the Rig, and further, that regardless of his or her legal status as "licensee" or otherwise, this Release, Waiver and Indemnity shall extend and apply in lieu of any rights which he or she might otherwise have, and any duties or obligations which Company might otherwise owe, whether by virtue of common law, statute, regulation, or other law.

5.      The Undersigned expressly acknowledges, understands, and agrees that Company makes no representations or warranties, express or implied, regarding the condition of the Rig or the operations conducted thereon, nor with respect to the safety or well-being of the Undersigned while present on the Rig, nor with respect to any dangers or hazards on or about the Rig, or the absence thereof.

6.      The Undersigned expressly warrants and represents that he or she has read and understood this Release, Waiver and Indemnity, and that he or she has executed same voluntarily and without duress, for the consideration and purposes stated; and further, that in executing this Release, Waiver and Indemnity he or she has not relied on any representations or warranties by Company, express, implied, or otherwise, except as expressly set out herein.

7.      This Release, Waiver and Indemnity shall be binding on the Undersigned and the employer or company represented and shall inure to the benefit of Company and its personnel, together with their respective heirs, successors, and assigns.

8.      This Release, Waiver and Indemnity shall be governed by and construed in accordance with the laws of England and Wales, without giving effect to the choice of law rules thereof that would result in the application of the law of another jurisdiction. Each party hereby irrevocably submits to the (i) exclusive jurisdiction of the English courts, for purposes of any suit, action or other proceeding arising out of this Release, Waiver and Indemnity or of the Purpose contemplated hereby, that is brought by or against the other party, and (ii) the venue of such suit, action or proceeding in such courts in England. Each party waives the right to trial by jury.

EXECUTED this _____ day of _____, 2020.

By:

_____

Printed                              Name:

_____

Title: _____

Representing: _____

_____

WITNESS

By: _____
Printed Name: _____

WITNESS

By: _____
Printed Name: _____

**ANNEXURE D**

(Form of Bill of Sale)

**BILL OF SALE**

**KNOWN ALL MEN** by these presents, that:

**Ensco Offshore International Company**, a Cayman Island limited liability company (the "Seller"), being the sole owner of the rig known as Ensco 101 (the "Vessel"), for good and valuable consideration as set forth in the Memorandum of Agreement between the parties dated _____,    and    any    amendments    thereto (collectively the "Agreement"), the receipt and adequacy of which are hereby acknowledged,

does hereby transfer all its rights, title and interest in and to the Vessel unto:

**JSC "Arktikmorneftegazrazvedka"**, a company incorporated in and under the laws of Russia (the "Buyer").

Seller acknowledges that the Vessel is free from all registered mortgages, encumbrances and maritime liens.  Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Agreement.

Name of Vessel:  Ensco 101
Official Number:  11107
IMO:         8764779
Port of Registry:  Monrovia

IN WITNESS WHEREOF, the Seller causes this Bill of Sale to be duly executed as of the _____ day of _____, 20__.

**SELLER**

By: _____

Name: _____

Title: _____


ACKNOWLEDGED:

**BUYER**

By: _____

Name: _____

Title: _____

# ANNEXURE E

# (Confidentiality – Non Disclosure Agreement)

### MUTUAL CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

THIS MUTUAL CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT (the "Agreement"), entered into this 28 day of September, 2020, (the "Effective Date") by and between

(1) **Ensco Offshore International Company**, a Valaris company organized under the laws of the Cayman Islands whose registered office is at ~~ENECAPITAL HQS SAS KYI-1110~~ (hereinafter referred to as "Valaris"); and

(2) **Joint Stock Company Arttkmorneftegazrazvedka**, a AMNGR company, having its office at Murmansk, Russia (the "**Counterparty**").

Valaris and the Counterparty may be referred to individually as a "Party" or collectively as the "Parties" and the owner of any such Confidential Information shall be referred to herein as the "Disclosing Party" and the receiver of the Disclosing Party's Confidential Information shall be referred to herein as the "Receiving Party".

WHEREAS Valaris and the Counterparty desire to share certain Confidential Information for the Permitted Purpose and wish to enter into this Agreement to establish the terms of disclosure, the confidentiality and use obligations and restrictions with respect to such Confidential Information.

NOW, THEREFORE, for in consideration of the mutual covenants and conditions contained herein, the Parties hereby agree as follows:

1.    <u>Definitions</u>. The following defined terms shall apply in this Agreement.

"**Affiliates**" with respect to either Party shall mean any entity, including without limitation, corporation, company, partnership, limited liability company or group, that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Party. For purposes of this definition, the term "control" (including with the correlative meanings, the terms "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by trust, management agreement, contract or otherwise. This definition includes those entities in which Company maintains such control but owns less than fifty percent (50%) interest.

"**Confidential Information**" means (i) the terms and existence of this Agreement; (ii) the fact that discussions are taking place between the Parties in respect of the Permitted Purpose; (iii) the Permitted Purpose; (iv) all information communicated to or to be obtained by the Receiving Party, directly or indirectly from the Disclosing Party (either through itself or its Affiliates and its and their representatives) in connection with the Permitted Purpose whether prior to or after execution of this Agreement and whether in written, electronic or any other form or medium in which such information may be kept, or in the course of any oral or written communications, regarding the business and technology of the Disclosing Party, including without limitation, information regarding equipment, processes, services, working models, drawings, samples, prototypes, research, reports, development, inventions, marketing and business plans, models, analyses, compilations, interpretations, data, studies, reports, contractual and financial information, technical information; and (v) material derived or generated from the inspection or evaluation of any of the above, including notes, summaries, interpolations or synthesis.

"**Permitted Purpose**" means the evaluation of one or more rigs by a Party or its Affiliates.

2.    <u>Obligations of Confidentiality</u>. The Disclosing Party is willing, in accordance with the terms and conditions of this Agreement, to disclose to the Receiving Party Confidential Information for the Permitted Purpose, and the Receiving Party shall:

(i)    keep the Confidential Information confidential and shall not publish or otherwise disclose the Confidential Information to anyone in any manner whatsoever, including by means of photocopy or reproduction or viewing, except with the Disclosing Party's prior written consent or as otherwise specifically provided by this Agreement;

(ii)    not use, directly or indirectly, the Confidential Information for any purpose other than the Permitted Purpose; and

(iii)    not duplicate the Confidential Information, except as reasonably necessary for the Permitted Purpose.

3.    Permitted Disclosures. The Receiving Party may disclose Confidential Information without the prior written consent of the Disclosing Party only to the extent that immediately prior to such disclosure the Confidential Information:

(i)    is already known to the Receiving Party as of the date of disclosure pursuant to this Agreement; or

(ii)    is already in possession of the public or becomes available to the public other than through an act of the Receiving Party; or

(iii)    is available to the Receiving Party or its Affiliates having become so available through any third party which, to the best of the Receiving Party's knowledge, has the right to disclose such information at the time that it is acquired by the Receiving Party or its Affiliate; or

(iv)    is acquired or developed independently by the Receiving Party through unrelated internal efforts; or

(v)    is required to be disclosed by law or any government, statutory, judiciary or regulatory body; provided that the Receiving Party (1) gives prompt written notice to the Disclosing Party so that the Disclosing Party may seek a protective order or other appropriate remedy, (2) only discloses the portion of such Confidential Information that the counsel for the Receiving Parties advises is legally required to be disclosed, and (3) reasonably cooperates to the extent reasonable with the Disclosing Party in any attempt to obtain any protective order or other appropriate remedy.

4.    Disclosure to Representatives. The Receiving Party may disclose the Confidential Information without the Disclosing Party's prior written consent to: (i) any Affiliates, (ii) employees, consultants, agents, directors and officers of the Receiving Party and its Affiliates, (iii) any insurer, insurance broker or professional adviser; but only for the Permitted Purpose and provided that the Receiving Party shall ensure that any such persons are bound to terms of confidentiality no less onerous than those in this Agreement.

5.    Ownership and Storage. The Confidential Information shall remain the property of the Disclosing Party, and the Disclosing Party may demand the return thereof at any time upon giving written notice to the Receiving Party. The Receiving Party shall exercise all due care in ensuring the proper and secure storage of the Confidential Information and shall only make copies of the Confidential Information to the extent necessary for the Permitted Purpose.

6.    No License. Nothing contained herein is intended to confer upon the Receiving Party, either expressly, by implication, by estoppel, or otherwise, any license or right to any Confidential Information whatsoever, including without limitation, intellectual property rights (patents, trademarks, copyrights, trade secrets or any other intellectual property right) owned or controlled by the Disclosing Party.

7.    Return. Within thirty (30) days of receipt of a notice, the Receiving Party shall return all of the original Confidential Information provided hereunder and shall destroy all copies, reproductions or other notes, memorandum or other documents that contain or reflect the Confidential Information in its possession or control. Notwithstanding the return or destruction of the Confidential Information, the Receiving Party shall continue to be bound by the obligations of confidentiality, non-use and non-disclosure in this Agreement.

8.    Termination. This Agreement shall terminate upon either (i) the Parties entering into an agreement with confidentiality provisions covering the Confidential Information, (ii) written agreement of the Parties, or (iii) five (5) years from the Effective Date. Each Party's rights and obligations under this Agreement shall survive any expiration or termination of this Agreement for a period five (5) years from the date of such expiration or termination, even after the return or destruction of Confidential Information by the Receiving Party.

9.    Non-Solicitation. The Receiving Party shall not, and shall cause that none of its Affiliates shall, for a period of twelve (12) months after the date of this Agreement, without the prior written agreement of Disclosing Party, directly or indirectly actively entice, solicit, or offer to employ or enter into a contract for the services of, any individual who was, at any time during the negotiations relating to the Permitted Purpose, an employee of Disclosing Party or its Affiliates interacting with Receiving Party in connection with the Permitted Purpose. The provisions of this Section 9 are considered fair and reasonable by the Parties.

10.   Non-Infringement. The Disclosing Party represents and warrants that it has the right to disclose the Confidential Information as contemplated herein without breaching any obligations of confidentiality to third parties or infringing upon the intellectual property rights of third parties. Disclosing Party agrees to defend, indemnify and hold harmless the Receiving Party from any and all claims arising out of a breach of this representation and warranty. This indemnity obligation shall survive the expiration of this Agreement.

11.   No Representations. The Disclosing Party is providing its information on as "as-is" basis and makes no representations or warranties, express or implied, as to the accuracy, quality or completeness of its information and only specific representations and warranties made in a definitive agreement, when and if same is executed by the Parties, shall have legal effect. The Receiving Party agrees that it shall not rely upon the Disclosing Party's information without satisfying itself as to the accuracy and completeness of such information by making independent verification thereof.

12.   Governing Law and Remedies. This Agreement shall be governed by and interpreted in accordance with the laws of England and Wales, without regard to the choice of law principles that would result in the application of the law of another jurisdiction. The Parties acknowledge that money damages may not be an adequate remedy for any breach of this Agreement due to the irreparable harm that may result from the unauthorized disclosure of Confidential Information. As a result, the Disclosing Party shall be entitled to seek specific performance, an injunction or other equitable relief if a Receiving Party breaches or threatens to breach the confidentiality, non-use or non-disclosure provisions of this Agreement. Except for actions seeking equitable relief, each Party agrees that the courts sitting in England and Wales shall have jurisdiction over any dispute arising out of or relating to this Agreement which cannot be amicably resolved by the Parties, including any question regarding its existence, validity or termination, and each Party hereby irrevocably commits to the jurisdiction of such courts and to the venue of any such action in England and Wales. A dispute shall be deemed to have arisen when either Party notifies the other Party in writing to that effect. No failure or delay by the Disclosing Party in exercising any of its rights or pursuing any remedies available to Disclosing Party hereunder or at law or in equity shall in any way constitute a waiver or prohibition of such rights and remedies in the event of a breach of this Agreement.

13.   No Obligation. Neither this Agreement, nor the disclosure of Confidential Information under this Agreement or ongoing discussions and correspondence between the Parties, shall constitute or imply any commitment or binding obligation between the Parties.

14. **Entire Agreement.** This Agreement comprises the full and complete agreement of the Parties with respect to the Confidential Information and supersedes and replaces all prior communications, understandings and agreements between the Parties, with respect thereto, whether written or oral, expressed or implied. No amendments, changes or modifications to this Agreement shall be valid except if the same are in writing and signed by a duly authorized representative of each of the Parties.

15. **Notices.** All notices given under this Agreement must be in writing and must be delivered in person or by overnight courier with confirmed delivery to the Parties at the addresses given in the preamble to this Agreement, with attention to the signatories to this Agreement.

16. **Successors.** This Agreement shall be binding upon the Parties hereto and their respective successors and permitted assigns.

17. **No Trading.** The Parties acknowledge that federal and state securities laws prohibit trading in a company's securities on the basis of material non-public information and that certain of the Confidential Information may constitute such material non-public information. The Parties agree that each of them shall not and they shall cause their respective Affiliates, employees, consultants, agents, directors, officers and advisors to not engage in any transaction involving a company's securities based on such material non-public information in violation of federal and/or state securities laws.

18. **Assignment.** Neither Party may assign any of its rights hereunder without the prior written consent of the other Party. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning Party of any of its obligations hereunder. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

19. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

IN WITNESS WHEREOF, the duly authorized representatives of the Parties have caused this Agreement to be executed as of the Effective Date.

ENSCO OFFSHORE INTERNATIONAL  
COMPANY:

By: DEREK SANGSTER

Title: PRESIDENT & DIRECTOR

JSC ARTIKMORNEFTEGAZRAZVEDKA  
COUNTERPARTY:

By: Mikhail Popov

Title: General Director

# **EXHIBIT 5**



13.02.2016

# Intelligence Against Sanctions

### No. 1 2016 January/March

## DMITRIY TULUPOV

Lecturer in the Department of International Affairs at St. Petersburg State University.

## RUSSIAN TECHNOLOGICAL DEVELOPMENT AND INDUSTRIAL ESPIONAGE

"There is no black and white, only shades of gray." Oh, yes! There are fifty of them if some people are to be believed... Yet, setting aside irony, the wide palette of "gray schemes" easily comes to mind to describe the perspectives of many strategic Russian industries (oil and gas, shipbuilding, aerospace instrument engineering, and microelectronics) struggling for survival amid Western sanctions.

### Relations Embargo-Style

After the end of World War II the economy was never used as a tool to advance U.S.-Russia relations. On the contrary, the U.S. used the economy and culture as additional methods to exert pressure on the Soviet Union. The Marshall Plan was the first and most graphic example. The Soviet Union regarded that program as an "infringement on the sovereignty of European countries or an encroachment on their economic independence." The conviction that the United States was determined to strangle the Soviet Union economically grew stronger when in the summer of 1947 the Truman administration refused to extend a interest-free $6-billion loan that Josef Stalin and Franklin D. Roosevelt had agreed to at the Tehran Conference. The economic isolation of the Soviet Union took its final shape in 1950 with the emergence of the Coordinating Committee for Multilateral Export Controls (COCOM), which drew up lists of industrial equipment, dual-purpose technologies, and know-how prohibited for export to the Soviet Union.

Despite the vigorous military and political confrontation in the early days of the Cold War, the Soviet leadership was well aware that its national industry would not be able to push

ahead with advanced development amid autarchy, and that it would have to borrow technologies and know-how available to the West. With this in mind, the Soviet Union displayed remarkable resourcefulness in a bid to overcome through diplomatic and intelligence means export control barriers put up by the United States. In 1952, Moscow hosted an international economic conference that heralded the first major attempt by the Soviet Union to bypass COCOM export restrictions. The conference demonstrated the leadership's desire to develop the economy on a more open basis. As it conducted dialogue with Europe's leading industrialized powers (especially Britain), Moscow, in a bid to secure agreement on the import of scarce industrial equipment and machine tools, played on contradictions between the military-political commitments of these countries as NATO member-states, as well as the natural commercial interests of private businesses. Although the Moscow conference produced no tangible results, in the following years the Soviet Union often used the dichotomy of politics and the economy as leverage to overcome the technological embargo.

So-called "gray schemes" were another widely used trick to circumvent high-tech export restrictions. Contracts for dual-purpose equipment were concluded in third countries that maintained normal relations with NATO member-states. Starting in the 1960s such transactions were performed via Finland, which was neutral and boasted a robust shipbuilding industry. In 1979, the Soviet Union's Gas Industry Ministry created a special division called AMNGR, a giant responsible for offshore oil and gas drilling in the Arctic. Its task was to explore for oil and gas off the country's Arctic shore. That required building an entire fleet of special ice-class ships. The Soviet Union concluded a contract with Finland's Rauma Repola shipyard to build three drilling ships and nine ice-class freighters. This $440-million contract was fulfilled in 1982-1983. The Dutch engineering firm GustoMSC designed the drilling ships. Under the project the ships were to be equipped with the then state-of-the-art dynamic positioning system from Norway's manufacturer Kongsberg, a recognized producer of navigation equipment, including instruments for naval ships. Naturally, if the Soviet Union had requested this type equipment, the answer would have been a firm "no."

Another example of how the Soviet Union sidestepped the sanctions is a partnership agreement the Valmet company and Britain's Foster Wheeler Petroleum signed in February 1985. The contract stipulated obtaining a license to manufacture the basic elements of offshore drilling platforms for their subsequent export to the Soviet Union.

The end of the Cold War and the ensuing fundamental reconfiguration of the system of international relations by no means put an end to the strategy of isolating Russia from cutting-edge Western technologies. The old-time approach underwent only slight revision to become more sophisticated.

Firstly, the COCOM restrictions are still in place. Although they were formally canceled in 1994, the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies was signed in 1996. The Arrangement also included other dual-use goods and technologies and was an exact replica of the export restrictions

COCOM had established previously, as well as expanded lists of equipment prohibited for export. As an example, Professor Sergei Grigoryev of Moscow State Technological University points out the 5-axis CNC machines and robot control systems that are vital to aerospace instrument engineering, shipbuilding, electric power engineering, and other key industries.

The very continuity of the tradition of export control indicates that the Cold War never really ended. It is this unpleasant feature of Western-Russian economic relations that President Vladimir Putin mentioned in his speech on Crimea's reunification with Russia: "The notorious policy of Russia's containment that lasted throughout the 18th, 19th and 20th century is going on... Today we are being threatened with sanctions, but we have been living amid restrictions, quite significant ever... our economy, anyway... The so-called COCOM lists... have been canceled pro forma, but in reality many bans are still there." With the conclusion of the Wassenaar Arrangement, Russian economist Vyacheslav Shuysky said "international trade in technology grew increasingly reliant on the principle that any transfer of know-how is impossible as long as the recipient country lacks an effective system to protect and restore intellectual property rights." In the process of Russia's accession to the WTO this problem remained a stumbling block in negotiations with the United States. It was somewhat settled in December 2012 after the adoption of an intellectual property rights protection action plan. However, even after the plan was endorsed, no practical returns followed. No influx of U.S. technologies to the Russian market was in sight: the conflict that erupted in Ukraine messed things up...

Secondly, starting in the early 1990s, the United States stepped up its efforts to worm out technological secrets that new Russian industries had inherited. Special focus was placed on such traditional strengths of the Soviet Union as the production of composite materials, robotics, aerospace instrument engineering, and nuclear power engineering.

Thirdly, the United States took advantage of its exceptional financial, economic, and diplomatic influence on former Russian President Boris Yeltsin and his entourage in order to prevent the export of Russian know-how the military-industrial complex and nuclear power engineering industry had accumulated. Much of this technology offered strong competition to U.S. companies or bolstered the potential of countries independent from the United States. For instance, in 1992 U.S. Secretary of State James Baker forced Russian Foreign Minister Andrei Kozyrev to revise a contract with India for the supply of cryogenic rocket engines for the GSLV Mk.1 rocket worth $200 million. Should its demands be ignored, the United States warned, trade sanctions would follow and programs for U.S.-Russian cooperation in space would be curtailed.

Russian industry and science had to pay dearly for the "reformers"' policy of worshiping the West that lasted throughout the 1990s. The competitive potential of Russian industry and science was largely undermined. This was most vividly seen in the preferential attitude towards foreign technologies and discrimination against national R&D projects and products. Heavy cuts in spending on both fundamental and applied research made things go from bad to worse.

## Russian Industry Still Technologically Dependent

Unfortunately, the Russian industry's dependence on imported know-how and technologies did not decrease in the 2000s, but remained on average at a level of 80 percent.

In 2004, in a newspaper article regarding the cancellation of the mineral resource reproduction fee, Alexander Romanikhin, chairman of the Oil and Gas Equipment Producers Union, coined the rather telling term, "schlumbergerization," which he defined as "the active ousting of Russian oil and gas service companies by Western competitors,... who use Western equipment and exacerbate the technological dependence of the Russian oil and gas complex on imports." A decade late, speaking at a conference devoted to the ways of effective and safe development of the Arctic, Director of the Mining University Vladimir Litvinenko acknowledged that all offshore seismic exploration was done using mostly Schlumberger equipment and, still worse, the original data was dispatched to the United States for interpretation before it was brought to the customer. In other words, the Americans know Russian resources much better than Russians do.

Russian Energy Minister Alexander Novak formulated the general diagnosis for the Russian industry. He told the Presidential Commission for the Fuel and Energy Complex that the share of foreign technologies in the Russian oil field servicing segment ranged from 80 to 90 percent, and that Russia, if and when stripped of access to them, would inevitably have problems with extracting hard-to-recover reserves, operating high-tech wells, and producing shale oil.

Similar indications of Russia's technological dependence can be seen in the aerospace industry. The electronic components used in Russian spacecraft, including military, are 90-percent foreign-made.

The technological incapacity of domestic shipbuilding can be illustrated with the contract for building sixteen ice-class LNG carriers (worth $5.5 billion), which the Novatek company concluded with South Korea's DSME, when it became pretty clear that not a single plant of the United Shipbuilding Company was capable of doing the job.

Thus, the 2014 anti-Russian sanctions simply drew a line under the "affluent years," when a great deal was said about innovation and modernization, but in fact nothing was done to translate them into reality. The Russian industry's lack of technological sovereignty proved a glaring problem.

## Industrial Espionage: a Panacea Or an Illusion?

Harsh sectoral sanctions provoke the temptation to employ more extensively various roundabout ways of gaining access to much-needed technologies and know-how. Former "gray schemes" of importing equipment have surfaced again. Russia's political discourse has come out with the concept of import substitution as an ideological counter-argument

to sanctions and reverse engineering—thorough replication of the original product—has become the most popular trend in counter-sanctions policies. All three approaches have one common denominator—industrial espionage. The greatest breakthroughs in the Soviet Union's technological development were largely a result of intelligence efforts in science and technologies. For instance, the creation of the atomic bomb and mass production of semi-conductors.

However, the feasibility of using industrial espionage in the current conditions requires a thorough analysis, because, despite the sanctions, the Russian economy remains firmly integrated with the world economy.

Industrial espionage is capable of making up—promptly and at a relatively low cost—for the shortage of some components critically important for developing a certain industry. But as soon as the state begins to use industrial espionage systematically, as an extensive means of boosting the economy's technological development, this "remedy" instantly turns into a killer drug.

The abstract concept of industrial espionage has three major organizational and philosophical flaws.

First, industrial espionage is unable to ensure advanced development for a backward industry and is good only for addressing specific and tactical tasks. At best, industrial espionage will make it easier to come closer to the level of foreign competitors, but never catch up with them. Also, the effect will be felt only in the short term, because while the stolen know-how is introduced, the designers will find a new and better solution. Designers who steal or blindly copy technologies are doomed to constantly fall one step behind the leader.

Second, it is possible to steal sketches, diagrams, blueprints, or samples of certain high-tech equipment, but it is impossible to steal skilled services and personnel required for its effective operation.

Third, the risk is high that one who fully relies on foreign experience in some field will be doomed to follow somebody else's ideas in science and engineering. With every new step one instinctively follows the paradigm already tested by foreign counterparts. In that case the industry's leaders will tend to refrain from darting forward for fear of making mistakes and prefer to watch and wait for more experienced players to act.

As the methodological basis for such shady counter-sanctions mechanisms as import substitution, reverse engineering, and gray import schemes, industrial espionage is unlikely to be able to compensate for the Russian industry's hunger for technologies and know-how, which will inevitably emerge if the sanctions last long enough (for eight to ten years). Industrial espionage can be effective only if it is used as part of a comprehensive and effective state policy in science and engineering.

## "Smart Power" vs Sanctions

U.S. political scientist Joseph Nye Jr. defined "smart power" as a flexible combination of "hard" (military-political) and "soft" (humanitarian-political) power employed to attain a country's foreign policy goals. Today Russia needs precisely this approach if it wants to overcome the harmful effects of Western sanctions.

The impressive show of the Russian armed forces' combat readiness in the operation against the Islamic State in Syria and Moscow's high-principled foreign-policy stance on the civil conflict in Ukraine—however critical comments by Western and Russian mass media are on the issue—are a clear sign that Russia is determined to avoid compromising its interests. But if that power resource is to play a constructive role, it has to be coupled with an active ideological and political course in relations with the West. Nye's concept prompts such a tool as "persuasion." In this context, Russia should think up and put to use such prognostic-analytical arguments that would meet absolute and unanimous understanding in Washington and other Western capitals; arguments that would *persuade* them it is crucial to seek a rapprochement. For this, the problem of sanctions should be considered in the widest context possible and in conjunction with modern trends, prospects, and risks inherent in both Russian and international policies. There are versions of such arguments worth discussing here.

The first argument in favor of lifting the sanctions is the expansion of terrorism, which Western countries and Russia should fight together. The idea has been widely discussed by experts and the mass media, so we will not analyze it here in detail.

The second argument looks a little bit more provocative: sanctions pose a far greater threat to the West for the simple reason that they push Russia towards closer relations with China, which in the long run may result in the emergence of a Eurasian military-economic bloc. That bloc would take final shape when India decides to join in (a sort of Eurasian triad similar to the concept developed by Russian diplomat and politician Yevgeny Primakov). In what position will NATO find itself if such an antipode appears in the East? What would this configuration spell for the entire system of international security and international relations?... While this idea is vulnerable to well-founded criticism, it is important above all as a possibility (albeit a remote one). All the more so since there are some politicians and commentators in the West (especially in the United States) who are already voicing such fears and criticizing Washington's anti-Russian policies precisely for that reason.

Lastly, there is a third way of manipulating negative expectations, which, if properly worded and used, may look to the West even more convincing. Let us imagine that lasting sanctions will continue to fuel the internal political and economic crisis in Russia, which in the final count will bring about a radical change of the ruling elites and reformatting of the system of state governance. Power may not go to the liberal opposition, which is the latent aim or at least the long-cherished hope of the Americans and Europeans, but to conservatively-minded quarters with the mentality of law-enforcement agencies and who have the support of the army, security services, and the majority of the population. As a result, Russia's domestic and foreign policies, which remain a product of compromise

among the elites (a mere look at the economic segment of the Cabinet confirms this) will undergo fundamental change when the *siloviki* come to power. In response to the social and political degradation of the past 25 years, a counter-liberal ideology is likely to emerge, especially as the crisis of liberal ideas has lately become the subject of public debate not only in Russia. In this case property may be redistributed in favor of the state. The system of state governance will be streamlined and material and industrial resources will be consolidated. In foreign policy it will be even harder to negotiate with Russia and Russia will use its potential to undermine the positions of the West (nothing like this is happening at the moment). How will the United States and other Western countries feel when they find themselves face to face with a Russia that has undergone such transformations? So, is the current game worth playing at all?

When Russia became involved in the Syrian campaign, the West promptly developed the suspicion that Vladimir Putin was unpredictable and even dangerous. In this connection it would be appropriate to ask: What makes the West so certain a post-Putin figure would be more predictable? As the saying goes, "he who has never tasted something bitter does not know what is sweet." It is important to remember that finding alternatives often requires opening Pandora's box. But would it not be safer to keep it tightly closed?

Putin's economy differs little from the Yeltsin economy (only in formal and insignificant aspects). Essentially, the economy remains loose, lopsided, and dependent on the import of industrial technologies and equipment. In its current shape, the Russian economy remains an ideal "client," who, having no faith in his own strength, repeatedly turns to Western "partners" for assistance. But some day the client might wake up... Putin may be the Russian leader who is most acceptable for the West if real and not far-fetched alternatives are considered. And if so, is it really worth aggravating the current disagreements with sanctions?

**#cold war  #espionage  #gas  #history  #industry  #oil  #postsoviet space #putin  #russia  #russia and usa  #russia's foreign policy  #sanction #space  #syria  #technologies  #terrorism  #ukraine**

# EXHIBIT 6

**ZARUBEZHNEFT**
JOINT STOCK COMPANY

(/)

Web-sites of the group of companies          Search          RU EN
(/RU/ABOUT_COMPANY/KORPORA

ABOUT COMPANY          OPERATIONS          SUSTAINABLE          INFORMATION          PRESS CENTRE
(/en/about-company)   (/en/operations)   DEVELOPMENT          DISCLOSURE          (/en/press_centre/)
                                          (/en/sustainable-          (/en/information_disclosure/)
                                          development/)

CORPORATE GOVERNANCE

MAIN PAGE (/EN/)  >  ABOUT COMPANY (/EN/ABOUT_COMPANY/)  >  CORPORATE GOVERNANCE (/EN/ABOUT_COMPANY/CORPORATE_GOVERNANCE/)  >  EUGENIY A. MUROV

**Mission and Strategy**
(/en/about_company/mission_and_str

**Areas of activity**
(/en/about_company/areas_of_activit

**Corporate Governance**
(/en/about_company/corporate_gover

**Management Board**
(/en/about_company/management_bc

**Structure**
(/en/about_company/structure/)

**History**
(/en/about_company/history/)

**Contacts**
(/en/about_company/contacts/)



## Murov
## Eugeniy A.

Chairman of the Board of Directors

**Education**
Was born in the city of Zvenigorod in the Moscow Region. Graduated from the Leningrad Technological Institute of Paper and Pulp Industry and the USSR Red Banner KGB Institute.

**Since 1971**
Has served in the USSR State Security Committee authorities.

**In 1974**
Was transferred to the USSR KGB First Chief Directorate (foreign intelligence). Was on official assignment in one of the South-East Asia countries for three and a half years.

**From 1992 to 1997**
Occupied a position of the head of several regional divisions of the Ministry of Defense -- Federal Counter-Intelligence Service -- Federal Security Service of the Russian Federation in Saint-Petersburg, in particular, was the head of the Central Regional Department of the FSS (FSB) of Russia.

**Since 1997**
Deputy Head of the FSS (FSB) of Russia Department for Saint-Petersburg and Leningrad region.

**In 1998**
Was transferred to the central office of the FSS (FSB) of Russia, was appointed a Deputy Head of the Economic Security Department of the FSS (FSB) of Russia.

**Since May 18, 2000 till May 26, 2016**
Head of the Federal Protective Service of the Russian Federation (FSO of Russia). In 2004 E.A. Murov was given a rank of the army general by the Order of the President of the Russian Federation. It was the first time in history of the soviet and post-soviet special services when the head of the protective service was given such a high rank.

**November 15, 2010**
Retired from the military service (Decree of the President of the Russian Federation N 1421 dated November 15, 2010) retaining the position of the Director of the Federal Protective Service of Russia.

**Also**
In the young age was into boxing and basketball, has sporting achievements and awards. Murov has been Head of the Guardian Board of the Boxing Federation of Russia for several years. On June 27, 2007 he was elected the

President of the Boxing Federation of Russia. In 2009 he retired from the position of the President of the Boxing Federation of Russia and became head of the High Supervisory Board of the Boxing Federation of Russia. At the same time E.A. Murov is the special representative of the President pf the International Boxing Federation (AIBA) as a vice-president (from 2011 to the present day). Is as well a member of the Guardian Board of the All-Russian Fitness and Sport Society "Dynamo".

Does not posess any shares of Zarubezhneft JSC

# **EXHIBIT 7**



**EUROPEAN
COUNCIL
ON FOREIGN
RELATIONS**
ecfr.eu

● Wider Europe

# Why the departure of Putin's chief bodyguard actually matters

Today's news risks making this system even more dysfunctional, politicised, untethered from reality, consumed by factionalism – and thus more dangerous for both Putin and Europe.



<u>Mark Galeotti</u>
ECFR Alumni · Former Visiting Fellow

Commentary · 26 May 2016 · 4 minute read

That a 70-year-old man who had already toyed with leaving for some years has just retired may not sound like news. However, it matters rather more when that man is General Evgeny Murov, former head of the Federal Guard Service (FSO), the force that guards President Vladimir Putin, the Kremlin, and the very heart of the Russian state.

In the Byzantine court politics of modern Russia, proximity to the body of the president is an all-important political asset, and who has more proximity than the guards, doormen and bullet-catchers who insulate him from the outside world?  This is especially true now that Putin seems not only to be shrinking his personal circle of advisers and confidantes but even physically withdrawing from the rest of the country, travelling less and even minimising his trips to the Kremlin.

## You may also like:



## Putin's hydra: Inside Russia's intelligence services

by <u>Mark Galeotti</u> – 11th May, 2016

Far from being an all-powerful "spookocracy" that controls the Kremlin, Russia's intelligence services are internally divided.

Much like Tsar Ivan IV – the "Terrible", although in fairness this is a misleading translation and "Awe-Inspiring" perhaps conveys the original Russian best – Putin has created for himself an *oprichnina* – an enclosed physical and social state-within-a-state. And like Ivan, whose *oprichniki* were cronies, allies and storm-troopers all at once, and did very well out of it, Putin seems to be turning more to those whom he knows and trusts, those to whose faces he has become accustomed.

We have already seen this "facetime factor" at work, especially in the rise of figures from the Presidential Security Service (SBP), part of the wider FSO. Former chief Viktor Zolotov now <u>heads up his own army, the National Guard</u>. SBP Colonel Alexei Dyumin in the space of a year became a general in the army, a potential head of military intelligence (GRU) and then <u>acting governor of Tula region</u>. Nor are these the only examples: the rise of the FSO and SBP veterans is a distinct trend.

The emergence of any new elite faction always creates disturbances within the wider architectures of the security state, but these were largely smoothed out by the influence of Evgeny Murov. He was not only a calming presence in a political environment otherwise characterised by factional feuds and personal rivalries, but while researching my recent ECFR report Putin's Hydra: inside Russian intelligence services, it became clear how pivotal he had also become as in some ways a de facto national security adviser:

"If anything, FSO head General Evgeniy Murov sometimes seems to have played this role de facto. Given that part of the FSO's remit is to watch the other agencies, he has both the ability and the justification to identify when cases are based on flimsy data or on self-interest. However, this appears to be very much personal to him: as the longest-serving of any of the service chiefs – appointed in 2000, and clearly having no higher ambitions (Source A called him "the last of the old-school duty-and-honour Chekists"). However, he has been trying to retire for two years now, and it is unlikely his successor will have the will, capacity, or gravitas to follow in his footsteps."

It was an open secret that Murov had wanted to leave for some time; the statutory retirement age is 65, and he was kept on by special – and seemingly onerous – presidential dispensation. Now he has gone, and he has been replaced by Dmitri Kochnev, former head of the SBP, who was appointed to that position in December of last year.

This may seem a logical step, but it actually carries with it several grounds for concern. Although it may not seem it to Putin or the sober, black-suited and earpiece-sporting men who cluster around him, the FSO always did far more than just protect the president. Indeed, although it also controls the Kremlin Guard and the men who secure the Duma, the White House and other buildings and VIPs, was it just about physical protection?

The FSO, or rather Murov, was one of the last figures who had the access, the knowledge, and the license sometimes to question the more outrageous claims being presented to Putin from the intelligence community.

The FSO is the mind to the National Guard's fist. If the Natsgvardiya is in part a force to keep the elite in general and the security apparatus in particular in line, then the FSO

(which has its own communications intercept capabilities and network of informants inside the agencies) was there to know when that might be needed, before it was needed.

The FSO, as a result, sometimes helped moderate the tendency within Russia towards "spook wars" between rival agencies.

The FSO participates in the efforts to monitor discontent across the country, not to repress but to defuse situations where a little money or political capital could head off serious unrest.

In short, however perverse it may sound, this most Praetorian and loyalist of agencies actually helped keep Putin grounded and the system stable. But Murov personally was clearly a driving force, not least because he evidently had no thoughts of personal advancement in mind. Is Kochnev able to play the same role? Willing? Even aware of it? That's hard to see, and the 51-year old Kochnev, whose entire life has been spent within the FSO, is less likely to see his future as being heading the FSO for the next nine-plus years. Even if he is content with his new office, will any of his rivals believe it, anyway?

My conclusion for Putin's Hydra was:

"This is the irony. Putin has the intelligence and security community he wanted: a powerful, feral, multi-headed and obedient hydra. But it is Putin himself, and his dreams of Russia as a renewed great power, that is the real victim of this aggressive and badly-managed beast. The agencies reinforce his assumptions and play to his fantasies rather than informing and challenging his worldview, as good intelligence services should."

If anything, today's news risks making this system even more dysfunctional, politicised, untethered from reality, consumed by factionalism – and thus more dangerous for both Putin and Europe.

The European Council on Foreign Relations does not take collective positions. ECFR publications only represent the views of their individual authors.

 © European Council on Foreign Relations 2022

# EXHIBIT 8

# U.S. DEPARTMENT OF THE TREASURY

## RECENT ACTIONS

Enforcement Actions

General Licenses

Misc./Other

Regulations and Guidance

Sanctions List Updates

## Ukraine-related Designations

04/28/2014

## SPECIALLY DESIGNATED NATIONALS LIST UPDATE

## The following individuals have been added to OFAC's SDN List:

BELAVENCEV, Oleg Evgenyevich (a.k.a. BELAVENTSEV, Oleg); DOB 15 Sep 1949; Russian Presidential Envoy to the Crimean District; Member of the Russian Security Council (individual) [UKRAINE2].

CHEMEZOV, Sergei (a.k.a. CHEMEZOV, Sergey Viktorovich); DOB 20 Aug 1952; POB Cheremkhovo, Irkutsk, Russia (individual) [UKRAINE2].

KOZAK, Dmitry; DOB 07 Nov 1958; POB Kirovograd, Ukraine; Deputy Prime Minister of the Russian Federation (individual) [UKRAINE2].

MUROV, Evgeniy Alekseyevich (a.k.a. MUROV, Evgeny; a.k.a. MUROV, Yevgeniy; a.k.a. MUROV, Yevgeny); DOB 18 Nov 1945; POB Zvenigorod, Moscow, Russia; Director of the Federal Protective Service of the Russian Federation; Army General (individual) [UKRAINE2].

PUSHKOV, Aleksei Konstantinovich (a.k.a. PUSHKOV, Alexei); DOB 10 Aug 1954; Chairman of State Duma Committee on International Affairs (individual) [UKRAINE2].

SECHIN, Igor; DOB 07 Sep 1960; POB St. Petersburg, Russia (individual) [UKRAINE2].

VOLODIN, Vyacheslav; DOB 04 Feb 1964; POB Alexeyevka, Khvalynsk district, Saratov, Russia; First Deputy Chief of Staff of the Presidential Executive Office (individual) [UKRAINE2].

## The following entities have been added to OFAC's SDN List:

AQUANIKA (a.k.a. AQUANIKA LLC; a.k.a. LLC RUSSKOYE VREMYA; a.k.a. OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU RUSSKOE VREMYA; a.k.a. RUSSKOE VREMYA OOO; a.k.a. RUSSKOYE VREMYA LLC), 47A, Sevastopolskiy Ave., of. 304, Moscow 117186, Russia; 1/2 Rodnikovaya ul., Savasleika s., Kulebakski raion, Nizhegorodskaya oblast 607007, Russia; Website http://www.aquanika.com; alt. Website http://aquanikacompany.ru; Email Address office@aquanika.com; Registration ID 1075247000036 [UKRAINE2].

AVIA GROUP LLC (a.k.a. AVIA GROUP LTD), Terminal Aeroport Sheremetyevo Khimki, 141400 Moskovskaya obl., Russia; Website http://www.avia-group.su/ [UKRAINE2].

AVIA GROUP NORD LLC, 17 A, Stratoyava St., Saint Petersburg, Russia; Website http://www.ag-nord.ru [UKRAINE2].

CJSC ZEST (a.k.a. ZEST LEASING), pr. Medikov 5, of. 301, St. Petersburg, Russia; 2 Liter a Pl. Rastrelli, St. Petersburg 191124, Russia; Website http://www.zest-leasing.ru; Registration ID 1027809190507; Government Gazette Number 44323193 [UKRAINE2].

INVESTCAPITALBANK (a.k.a. INVESTKAPITALBANK; a.k.a. OJSC INVESTCAPITALBANK; a.k.a. OPEN JOINT STOCK COMPANY INVESTCAPITALBANK), 100/1, Dostoevskogo Street, Ufa, Bashkortostan Republic 450077, Russia; SWIFT/BIC INAKRU41; Website http://www.investcapitalbank.ru; License 2377 [UKRAINE2].

JSB SOBINBANK (a.k.a. SOBINBANK), 15 Korp. 56 D. 4 Etazh ul. Rochdelskaya, Moscow 123022, Russia; 15/56 Rochdelskaya Street, Moscow 123022, Russia; SWIFT/BIC SBBARUMM; Website http://www.sobinbank.ru; Registration ID 1027739051009; Government Gazette Number 09610355 [UKRAINE2].

SAKHATRANS LLC (a.k.a. OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU SAKHA (YAKUTSKAYA) TRANSPORTNAYA KOMPANIYA; a.k.a. SAKHATRANS OOO), 14 ul. Molodezhnaya Rabochi Pos. Vanino, 682860 Vaninski, Raion Khabarovski Krai, Russia [UKRAINE2].

SMP BANK (a.k.a. BANK SEVERNY MORSKOY PUT; a.k.a. SMP BANK OPEN JOINT-STOCK COMPANY), 71/11 Sadovnicheskaya Street, Moscow 115035, Russia; SWIFT/BIC SMBKRUMM; Website www.smpbank.ru; Email Address smpbank@smpbank.ru [UKRAINE2].

STROYGAZMONTAZH (a.k.a. LIMITED LIABILITY COMPANY STROYGAZMONTAZH; a.k.a. STROYGAZMONTAZH CORPORATION; a.k.a. "SGM"), 53 prospekt Vernadskogo, Moscow 119415, Russia; Website www.ooosgm.com; alt. Website www.ooosgm.ru; Email Address info@ooosgm.ru [UKRAINE2].

STROYTRANSGAZ GROUP (a.k.a. STROYTRANSGAZ; a.k.a. "STG GROUP"), 3 Begovaya Street, Building #1, Moscow 125284, Russia; Website www.stroytransgaz.ru [UKRAINE2].

STROYTRANSGAZ HOLDING (a.k.a. STG HOLDING LIMITED; a.k.a. STG HOLDINGS LIMITED; a.k.a. STROYTRANSGAZ HOLDING LIMITED; a.k.a. "STGH"), 33 Stasinou Street, Office 2 2003, Nicosia Strovolos, Cyprus [UKRAINE2].

STROYTRANSGAZ LLC (a.k.a. OOO STROYTRANSGAZ), House 65, Novocheremushkinskaya, Moscow 117418, Russia [UKRAINE2].

STROYTRANSGAZ OJSC (a.k.a. OAO STROYTRANSGAZ), House 58, Novocheremushkinskaya St., Moscow 117418, Russia [UKRAINE2].

STROYTRANSGAZ-M LLC, 26th Meeting of the Communist Party Street, House 2V, Novy Urengoy, Tyumenskaya Oblast, Yamalo-Nenetsky Autonomous Region 629305, Russia [UKRAINE2].

THE LIMITED LIABILITY COMPANY INVESTMENT COMPANY ABROS (a.k.a. LLC IC ABROS), 2 Liter a Pl. Rastrelli, St. Petersburg 191124, Russia; Government Gazette Number 72426791; Telephone: 7812 3358979 [UKRAINE2].

TRANSOIL (a.k.a. LIMITED LIABILITY COMPANY TRANSOIL; f.k.a. OBSHCHESTVO S ORGANICHERNNOI OTVETSTVENNOSTYU TRANSOIL; a.k.a. TRANSOIL LLC; a.k.a. TRANSOYL SNG LTD.), 18A Petrogradskaya nab., St. Petersburg 197046, Russia; Website http://www.transoil-spb.ru; alt. Website http://transoil.com; Email Address info@toil.spb.ru; Registration ID 1037835069986 [UKRAINE2].

VOLGA GROUP (a.k.a. VOLGA GROUP INVESTMENTS; f.k.a. VOLGA RESOURCES; f.k.a. VOLGA RESOURCES GROUP), 3, rue de la Reine L-2418, Luxembourg; Russia [UKRAINE2].

**Press Release Link**
Announcement Of Additional Treasury Sanctions On Russian Government Officials And Entities

26/4/22, 3:12                                    Ukraine-related Designations | U.S. Department of the Treasury

# SEARCH RECENT ACTIONS Start Date

| mm/dd/yyyy |

End date

| mm/dd/yyyy |

# SEARCH BY YEAR                SEARCH

| YYYY |

( SUBSCRIBE TO THE OFAC RSS FEED )

( SIGN UP FOR OFAC RECENT ACTIONS E-MAIL UPDATES )

RSS Feed Validator

# **EXHIBIT 9**

**PORT OF DUNDEE LIMITED**
**Via e-mail**

No. 20 of 2021                                                22nd June 2021

## NOTICE TO MARINERS

### FIRTH OF TAY

### <u>Jack up Rig 'Nevskaya'</u>

Mariners are advised that the Jack up drilling rig 'Nevskaya', previously named Ensco 101, is now secured in a position at the east end of King George V Wharf, in position 56°27.8'N 002°56.7'W.

The rig exhibits red aircraft warning lights at the top of the legs, which extend approximately 150m above the waterline.

Mariners are advised to navigate with due diligence and caution when passing the vicinity of the rig and to observe a 100m exclusion zone around the rig.

This notice will be self-cancelling on departure of the Nevskaya from the Port of Dundee

**Ryan Porteous**
Harbour Master
Port of Dundee

**<u>Port of Dundee</u>**
**Notices in force:**
**45/2019**
**09/2020; 16/2020; 31/2020**
**05/2021; 10/2021; and 16/2021**

# **EXHIBIT 10**



MarineTraffic

Live Map Explore Community Solutions

Search MarineTraffic Register Log i

**ENSCO 101**

Platform IMO: 8764779

(Ship name as reported by AIS: NEVSKAYA)

ADD NOTES ADD TO FLEET CREATE NOTIFICATIONS

- Voyage Information
- My Notes
- Summary
- Latest Position
- Vessel Information
- Vessel Photos
- Recent Port Calls
- Events Timeline
- Companies
- Vessel currently within Areas
- Vessel timeline
- Service Areas
- Vessel Utilisation
- Similar Vessels
- Vessel's Speed vs Wind Profile
- Vessel Coverage
- Quality of AIS-transmitted

Con lo que te ahorras en el envío, pídele sus premios favoritos
*Aplican TyC
POR SOLO $70 AL MES
Cornershop by Uber
Uber One

**Voyage Information**

UNLOCK VOYAGE INFORMATION

GB **DUN** — DUNDEE

RU **KDT** — KRONSHTADT

ATD: 2021-06-28 17:20 LT (UTC +1)

ATA: 2021-07-24 11:41 LT (UTC +3)

PAST TRACK ROUTE FORECAST

Voyage State: ••••••••••

Reported ETA: **2022-07-24 14:41 LT (UTC +3)**

Calculated ETA: ••••••••••

Calculated ETA at: ••••••••••

Predictive ETD: ••••••••••

Reported Destination: **KRONSHTADT**

Distance Travelled: ••••••••••

Distance to Go: ••••••••••

Total Voyage Distance: ••••••••••

**Latest Position**

Position Received: **2022-08-06 00:24 UTC**
**3 minutes ago**

Vessel's Local Time:
**2022-08-06 03:24 LT (UTC +3)**

Area: **BALTIC - Finland Gulf**

Current Port: **KRONSHTADT**

Latitude / Longitude: **59.97869° / 29.7803°**

Status: **Moored**

Speed/Course: **0 kn / -**

AIS Source: **Terrestrial AIS**

NEARBY VESSELS

**Weather**

Wind: **9 knots**

Wind direction: **SE (136°)**

Air Temperature: **16°C**

Hey there! Is your shipment onboard this vessel, or are you managing this vessel?

# EXHIBIT 11

ozy

IESE | Data Viz Project | C... | Time Zone Convert... | Value Sites | Hobbies | Online Courses - H... | Venture & Science | DXM | Oil | SMC | Places to go | Tempest | Trainning

# **NEVSKAYA** - IMO 8764779

Remove Ads



## **Photo** details

Photographer: **Danibykov** [ **View profile** ]

Captured: **Jul 23, 2021**

Title: **Nevskaya**

Location: **Leningrad**, **St Petersburg**, **Russia**

Photo Category: **Drilling Rigs/parts Of Drilling Rigs**

Added: **Sep 7, 2021**

Views: **62**

Description:

**Ex. ESCO 101. Assisted by tugs during entering KMOLZ shipyard harbour in Kronstadt, Saint-Petersburg.**

 0

⧉ **Full Screen**          ✎ **Edit info**          ○ **Add Comment**          ☆ **Add to favorites**          👍 **Like**

et thumbnail code to post in forum, blog or homepage

# U.S. DEPARTMENT OF THE TREASURY

## RECENT ACTIONS

Enforcement Actions

General Licenses

Misc./Other

Regulations and Guidance

Sanctions List Updates

## Russia–related Designations and Designations Updates; Issuance of Russia–related General Licenses

04/07/2022

The Department of the Treasury's Office of Foreign Assets Control (OFAC) has issued Russia-related General License 9C      , General License 10C      , General License 21A      , General License 24      , and General License 25      .

In addition, the following names have been added or updated to OFAC's list of Specially Designated Nationals.

## SPECIALLY DESIGNATED NATIONALS LIST UPDATE

## The following individuals have been added to OFAC's SDN List:

LAVRISHCHEV, Andrey Vasilyevich (Cyrillic: ЛАВРИЩЕВ, Андрей Васильевич) (a.k.a. LAVRISHCHEV, Andrei Vasilyevich; a.k.a. "LAVRISHEV, Andrei V") , Russia; DOB 12 Oct 1959; POB Blagoveshchensk, Amur Region, Russia; nationality Russia; Gender Male (individual) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

MARKELOV, Vitaliy Anatolyevich (Cyrillic: МАРКЕЛОВ, Виталий Анатольевич) (a.k.a.

MARKELOV, Anatolyevich Vitalii; a.k.a. "MARKELOV, Vitaly A"), Russia; DOB 05 Aug 1963; POB Mordovia, Russia; nationality Russia; Gender Male (individual) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

POLTAVCHENKO, Georgiy Sergeyevich (a.k.a. POLTAVCHENKO, Georgii Sergeevich (Cyrillic: ПОЛТАВЧЕНКО, Георгий Сергеевич); a.k.a. POLTAVCHENKO, Georgy S), Russia; DOB 24 Feb 1953; POB Baku, Azerbaijan; nationality Russia; Gender Male (individual) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

POSPELOV, Vladimir Yakovlevich (Cyrillic: ПОСПЕЛОВ, Владимир Яковлевич) (a.k.a. "POSPELOV, Vladimir Y"), Russia; DOB 21 Jul 1954; POB Sverodvinsk, Arkhangelsk Region, Russia; nationality Russia; Gender Male (individual) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

RAKHMANOV, Aleksey Lvovich (Cyrillic: РАХМАНОВ, Алексей Львович) (a.k.a. RAKHMANOV, Aleksei Lvovich; a.k.a. "RAKHMANOV, Alexei L"), Russia; DOB 18 Jul 1964; POB Nizhniy Novgorod, Russia; nationality Russia; Gender Male (individual) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

RYAZANTSEV, Oleg Nikolayevich (Cyrillic: РЯЗАНЦЕВ, Олег Николаевич) (a.k.a. RYAZANTSEV, Oleg Nikolaevich; a.k.a. "RYAZANCEV, Oleg N"), Russia; DOB 16 Apr 1982; POB Zhukovsky, Moscow Region, Russia; nationality Russia; Gender Male (individual) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

SHESTAKOV, Ilya Vasilyevich (Cyrillic: ШЕСТАКОВ, Васильевич Илья) (a.k.a. "SHESTAKOV, Ilya V"), Russia; DOB 15 Jul 1978; POB St. Petersburg, Russia; nationality Russia; Gender Male (individual) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

SHISHKIN, Andrei Nikolaevich (Cyrillic: ШИШКИН, Андрей Николаевич) (a.k.a. SHISHKIN, Andrey Nikolaevich; a.k.a. SHISHKIN, Andrey Nikolayevich; a.k.a. "SHISHKIN, Andrei N"), Russia; DOB 13 Mar 1959; POB Krasnoyarsk, Russia; nationality Russia; Gender Male (individual) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

## The following entities have been added to OFAC's SDN List:

Case 21-03902   Document 21-2   Filed in TXSB on 08/10/22   Page 112 of 157

27/4/22, 17:06        Russia-related Designations and Designations Updates; Issuance of Russia-related General Licenses | U.S. Department of the ...

ALMAZ CENTRAL MARINE DESIGN BUREAU JOINT STOCK COMPANY (a.k.a. ALMAZ CENTRAL MARINE DESIGN BUREAU; a.k.a. ALMAZ DESIGN BUREAU; a.k.a. JOINT STOCK COMPANY CENTRAL MARINE DESIGN BUREAU ALMAZ; a.k.a. JOINT-STOCK COMPANY CENTRAL SEA ENGINEERING OFFICE ALMAZ; a.k.a. JOINT-STOCK COMPANY TSMKB ALMAZ; a.k.a. JSC TSENTRALNOYE MORSKOYE KONSTRUKTORSKOYE BYURO ALMAZ (Cyrillic: АО ЦЕНТРАЛЬНОЕ МОРСКОЕ КОНСТРУКТОРСКОЕ БЮРО АЛМАЗ)), Warshavskaya Street, 50, Saint-Petersburg 196128, Russia; 50 Varshavskaya Str., St. Petersburg 196070, Russia; Website www.almaz-kb.ru; Organization Established Date 18 Nov 2008; Organization Type: Operation of sports facilities; Tax ID No. 7810537558 (Russia) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

BALTIC SHIPYARD JSC (a.k.a. BALTIC PLANT (Cyrillic: БАЛТИЙСКИЙ ЗАВОД); a.k.a. BALTIC SHIPYARD; a.k.a. JSC BALTIC PLANT (Cyrillic: АО БАЛТИЙСКИЙ ЗАВОД)), St. Oblique Line, House 16, St. Petersburg 199106, Russia; Tax ID No. 7801560631 (Russia) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

FEDERAL STATE UNITARY ENTERPRISE KRONSHTADTSKYY MORSKOY FACTORY MINOBORONY ROSSII (a.k.a. FEDERAL STATE UNITARY ENTERPRISE KRONSTADT MARINE PLANT OF THE MINISTRY OF DEFENSE OF THE RUSSIAN FEDERATION; a.k.a. JOINT STOCK COMPANY KRONSTADT MARINE PLANT; a.k.a. KRONSTADT MARINE PLANT), Kronstadt, St. Petrovskaya, 2, Kronstadt District, St. Petersburg 197762, Russia; Website kmolz.ru; Organization Established Date 25 Apr 1997; Tax ID No. 7818001991 (Russia) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

JOINT PUBLIC STOCK COMPANY NEVSKOE DESIGN BUREAU (a.k.a. JOINT STOCK COMPANY NEVSKOYE PROJECT AND DESIGN BUREAU; a.k.a. JSC NEVSKOE PKB (Cyrillic: АО НЕВСКОЕ ПКБ); a.k.a. JSC NEVSKOYE PROYEKTNO-KONSTRUKTORSKOYE BYURO (Cyrillic: АО НЕВСКОЕ ПРОЕКТНО-КОНСТРУКТОРСКОЕ БЮРО); a.k.a. NEVSKOE DESIGN AND CONSTRUCTION OFFICE; a.k.a. NEVSKOE DESIGN BUREAU; a.k.a. NEVSKOE DESIGN BUREAU JPSC), Galerny Proezd 3, Saint-Petersburg 199106, Russia; Organization Established Date 25 Sep 1995; Tax ID No. 7801074335 (Russia) [RUSSIA-EO14024] (Linked To: JOINT STOCK COMPANY UNITED SHIPBUILDING CORPORATION).

JOINT STOCK COMPANY 10 ORDENA TRUDOVOGO KRASNOGO ZNAMENI DOCKYARD (a.k.a. 10 SHIPYARD; a.k.a. AO 10 SRZ; a.k.a. JOINT STOCK COMPANY 10TH AWARDS OF THE LABOR RED BANNER A SHIP REPAIR FACTORY; a.k.a. JOINT-STOCK COMPANY 10 SRZ; a.k.a. JSC 10 ORDENA TRUDOVOGO KRASNOGO ZNAMENI SUDOREMONTNY FACTORY; a.k.a. JSC 10

# **EXHIBIT 13**



**O F A C**
Office of Foreign Assets Control

# Sanctions List Search

This Sanctions List Search application ("Sanctions List Search") is designed to facilitate the use of the Specially Designated Nationals and Blocked Persons list ("SDN List") and other sanctions lists administered by OFAC, including the Foreign Sanctions Evaders List, the Sectoral Sanctions Identifications List, the List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions, the Non-SDN Palestinian Legislative Council List, the Non-SDN Menu-Based Sanctions List, and the Non-SDN Communist Chinese Military Companies List. Given the number of lists that now reside in the Sanctions List Search tool, it is strongly recommended that users pay close attention to the program codes associated with each returned record. These program codes indicate how a true hit on a returned value should be treated. The Sanctions List Search tool uses approximate string matching to identify possible matches between word or character strings as entered into Sanctions List Search, and any name or name component as it appears on the SDN List and/or the various other sanctions lists. To all users of the tool, Sanctions List Search contains a feature entitled "Minimum Name Score" that functions on a sliding scale, allowing for a user to set a threshold (i.e., a fuzziness rating) for the closeness of any potential match returned as a result of a user's search. This feature enables Sanctions List Search to detect certain misspellings or other incorrectly entered text, and will return near, or proximate, matches based on the confidence rating set by the user via the slider-bar. OFAC does not provide recommendations with regard to the appropriateness of any specific confidence rating. Sanctions List Search is one tool offered to assist users in utilizing the SDN List and/or the various other sanctions lists; use of Sanctions List Search is not a substitute for undertaking appropriate due diligence. The use of Sanctions List Search does not limit any criminal or civil liability for any act undertaken as a result of, or in reliance on, such use.

Download the SDN List                    Sanctions List Search: Rules for use                    Visit The OFAC Website

Download the Consolidated Non-SDN List                                                    Program Code Key

## Details:

| | | | |
|---|---|---|---|
| **Type:** | Entity | **List:** | Non-SDN |
| **Entity Name:** | LUKOIL OAO | **Program:** | UKRAINE-EO13662 |
| | | **Remarks:** | For more information on directives, please visit the following link: http://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx#directives. |

## Identifications:

| Type | ID# | Country | Issue Date | Expire Date |
|---|---|---|---|---|
| Government Gazette Number | 00044434 | | | |
| Tax ID No. | 7708004767 | | | |
| Registration ID | 1027700035769 | | | |
| Email Address | info@lukoil.ru | | | |
| Website | www.lukoil.ru | | | |
| Executive Order 13662 Directive Determination Subject to Directive 4 - | | | | |
| Secondary sanctions risk: | Ukraine-/Russia-Related Sanctions Regulations, 31 CFR 589.201 and/or 589.209 | | | |

## Aliases:

| Type | Category | Name |
|---|---|---|
| a.k.a. | strong | LUKOIL OIL COMPANY |
| a.k.a. | strong | LUKOIL |
| a.k.a. | strong | NK LUKOIL OAO |
| a.k.a. | strong | NEFTYANAYA KOMPANIYA LUKOIL OOO |

## Addresses:

| Address | City | State/Province | Postal Code | Country |
|---|---|---|---|---|
| 11 Sretenski boulevard | Moscow | | 101000 | Russia |

Back

# EXHIBIT 14

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VALARIS PLC, *et al.*,[1] | ) Case No. 20-34114 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

**SUPPLEMENTAL DECLARATION OF BRAD RINGLEB IN FURTHER
SUPPORT OF THE DEBTORS' APPLICATION FOR ENTRY OF AN ORDER
AUTHORIZING THE RETENTION AND EMPLOYMENT OF KPMG LLP
TO PROVIDE AUDIT, TAX COMPLIANCE AND TAX CONSULTING
SERVICES AS OF THE PETITION DATE**

I, Brad Ringleb, being duly sworn, deposes and says:

1.  I am a Certified Public Accountant and a partner of KPMG LLP, a professional services firm ("**KPMG**"). KPMG is the United States member firm of KPMG International. I submit this supplemental declaration (this "**Supplemental Declaration**") on behalf of KPMG in further support of the application [Docket No. 211] (the "**Application**")[2] of the above-captioned debtors and debtors in possession (the "**Debtors**"), for entry of an order, pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), authorizing the Debtor to retain and employ KPMG to

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.stretto.com/Valaris. The location of Debtor Ensco Incorporated's principal place of business and the Debtors' service address in these chapter 11 cases is 5847 San Felipe Street, Suite 3300, Houston, Texas 77057.

[2]  Capitalized terms used herein but not otherwise defined shall have those meanings set forth in the Application.

provide accounting advisory, tax consulting, transfer pricing, and tax compliance services to the Debtor, *nunc pro tunc*, to the Petition Date. This Supplemental Declaration supplements my declaration that was filed with the Court on September 15, 2020 [Docket No. 211-1] (the "**Initial Declaration**") and includes additional disclosures. I have personal knowledge of the matters set forth herein.

2.      As set forth in the Application, which was granted by this Court on October 9, 2020 [Docket No. 331], KPMG committed to file a supplemental declaration pursuant to Bankruptcy Rule 2014 to the extent it discovered new information that was relevant to the Application and merited disclosure. *See* Initial Declaration, ¶¶ 15, 18. Accordingly, in connection with KPMG's retention by the Debtor, I submit this Supplemental Declaration to provide the additional disclosures set forth herein.

## SPECIFIC DISCLOSURES

3.      The KPMG International member firm located in Russia (KPMG Russia) has been asked to provide services to a third party, which services may be considered adverse to the Debtors or their estates. The proposed services consist of due diligence services in connection with the potential acquisition of assets from the Debtors' estates. The proposed client is for AMNGR/Ogier, and the principal asset sought to be acquired is a self-elevating floating drilling rig owned by Ensco Offshore International Company, one of the Debtors in this proceeding.

4.      KPMG Russia has not had any role in the engagements for the Debtors. However, in order to avoid the appearance of impropriety and to avoid any improper disclosure of confidences of the Debtor, the professionals and staff at KPMG Russia will not be involved in the services KPMG is providing to the Debtors in any way. KPMG has established an ethical wall between the professionals and staff providing services to the Debtors and the professionals and

staff at KPMG Russia.  In this regard, no KPMG personnel now or in the future providing services to the Debtors will discuss the work for the Debtors or any information pertaining to the services being provided to the Debtors with any professional or staff member at KPMG Russia.  In addition, no records, information, or files pertaining to the Debtors may be accessed, read, or reviewed by the professionals and staff at KPMG Russia.

5.      Based on the foregoing disclosures and the disclosures contained in my Initial Declaration, to the best of my knowledge, KPMG neither holds nor represents an interest adverse to the Debtor's estates in accordance with section 327 of the Bankruptcy Code.  If a connection arises that relates to services related to the Debtors or their estates, KPMG will make additional inquiries to determine the nature of the matter and the particular services provided by the KPMG Entity and include such information in a supplemental disclosure to the Court.

6.      This declaration is provided in accordance with sections 327 and 328 of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2014-1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of November, 2020.

Brad Ringleb
Digitally signed by Brad Ringleb
Date: 2020.11.11 16:40:28 -06'00'

Brad Ringleb
KPMG LLP
811 Main Street, Suite 4500
Houston, TX 77002

# **EXHIBIT 15**

From: Elizabeth Darby <Elizabeth.Darby@valaris.com>
Sent: Thursday, August 4, 2022 2:12:35 PM
To: Sebastian Miralles <smiralles@tempestcapital.com>; CCO <CCO@valaris.com>
Subject: Re: EXTERNAL: Violations of OFAC Sanctions in Sale of Ensco 101 to entites owned by the Russian
Federation

[EXTERNAL]
Mr. Miralles, thank you for your follow up.  We responded through the EthicsPoint site where you first raised your
concerns.  The investigation of the issue you raised to the hotline has been completed. Due to the confidential nature of
any investigation, the findings must remain confidential and cannot be shared.

Thank you.

 **VALARIS**    Elizabeth Darby | Chief Compliance Officer
5847 San Felipe | Suite 3300 | Houston, TX  77057
+1 713 979 4843 p | +1 713 725 5712 m |
Elizabeth.Darby@valaris.com

From: Sebastian Miralles <smiralles@tempestcapital.com>
Date: Monday, August 1, 2022 at 3:07 PM
To: Elizabeth Darby <Elizabeth.Darby@valaris.com>, CCO <CCO@valaris.com>
Subject: RE: EXTERNAL: Violations of OFAC Sanctions in Sale of Ensco 101 to entites owned by the Russian
Federation

⏱ Some people who received this message don't often get email from smiralles@tempestcapital.com. Learn why this is important
Dear Elizabeth,

I trust this email finds you well. Is there any update on this matter? Your office never contacted me regarding the
incidents.

Best regards,

Sebastián

From: Elizabeth Darby <Elizabeth.Darby@valaris.com>
Sent: Thursday, April 28, 2022 6:32 AM
To: Sebastian Miralles <smiralles@tempestcapital.com>; CCO <CCO@valaris.com>
Subject: Re: EXTERNAL: Violations of OFAC Sanctions in Sale of Ensco 101 to entites owned by the Russian
Federation

[EXTERNAL]
Mr. Miralles, thank you for raising this concern.  We take all allegations seriously and treat them with the utmost
confidentiality. We will investigate this matter consistent with our policies and procedures. As we investigate this matter,
we may reach out to you for additional information or clarification.

Regards,

 **VALARIS**   Elizabeth Darby | Acting General Counsel & Chief Compliance Officer
5847 San Felipe | Suite 3300 | Houston, TX 77057
+1 713 979 4843 p | +1 713 725 5712 m |
Elizabeth.Darby@valaris.com

---

From: Sebastian Miralles <smiralles@tempestcapital.com>
Date: Wednesday, April 27, 2022 at 6:12 PM
To: CCO <CCO@valaris.com>
Subject: EXTERNAL: Violations of OFAC Sanctions in Sale of Ensco 101 to entites owned by the Russian Federation

[] Some people who received this message don't often get email from smiralles@tempestcapital.com. Learn why this is important

This message is from an external sender. Unless you recognize the sender, do not click links or open attachments.

Confidential

Dear Valaris Compliance,

Through the following I would like to bring to your attention the violation of OFAC Sanctions 31 CFR Part 589 under OFAC Directive 4 Under Executive Order 13662 (sale of artic drilling equipment to the Russian Federation) by your firm. This occurred in the sale of ENSCO 101 to Arktikmorneftegazrazvedka AO a fully owned unit of is Zarubezhneft Joint Stock Company. The sale occurred some time in 2021 after notifying the Texas Southern District Bankruptcy Court, as documented by the Memorandum of Understanding presented by attorneys representing the Valaris. Further information showing the transfer of the rig did occur and the rig was delivered to the Russian Navy.

This was a harsh weather jackup for artic drilling, sold to an entity whose name translates to the Artic Oil and Gas Drilling Company. The purchasing entity is ultimately controlled by a Evgeny Murov, a Specially Designated Individual. The contract contemplates the use of the rig by Yukos which is also a Specially Designated entity. The rig is currently listed as docked at Kmolz Shipyard, the Naval Military Base of Kronstadt in St Petersburg, which in turn is a SDN as per OFAC.

This is particularly alarming in the current environment. I trust you will investigate impartially and take appropriate action.

Best regards,

Sebastián



SEBASTIÁN MIRALLES, CF
A MANAGING PARTNER

PaseodelaReforma296Piso41
CP06600,México,CDMX
T.+52(55)71004570 M.+525
518776252 smiralles@temp
estcapital.com www.tempes
tcapital.com

Este mensaje y sus anexos pueden contener información confidencial o legalmente protegida y no puede ser utilizada ni divulgada por personas diferentes a su destinatario. Si por error recibe este mensaje, por favor avise inmediatamente a su remitente y destruya el correo y sus adjuntos. Cualquier uso, divulgación, copia, distribución, impresión o acto derivado del conocimiento total o parcial de este mensaje sin autorización de Tempest Capital SC y/o cualquiera de sus afiliadas o subsidiarias será sancionado de acuerdo con las normas legales vigentes. El presente correo electrónico sólo refleja la opinión de su remitente y no representa necesariamente la opinión oficial de Tempest Capital SC y/o de sus afiliadas y/o subsidiarias.
This email and any attachments may be confidential, privileged or otherwise exempt from disclosure under applicable law. No confidentiality or privilege is waived or lost by any transmission errors. This communication is intended solely for the intended recipient, and if you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose, or otherwise act upon any part of this email communication or its attachments. Tempest Capital SC, may seek applicable legal relief in case of any use, disclosure, copying, distribution, printing or action arising from the total or partial knowledge of this message without the authorization of Tempest Capital SC. and/or its affiliates or subsidiaries. This email only reflects the opinion of the sender and does not necessarily represents the official views of Tempest Capital SC. and/or its affiliates or subsidiaries.

This message is intended solely for the use of the individual or organization to whom it is addressed. It may contain privileged or confidential information. If you have received this message in error, please notify the originator immediately. If you are not the intended recipient, you should not use, copy, alter or disclose the contents of this message.

Este mensaje y sus anexos pueden contener información confidencial o legalmente protegida y no puede ser utilizada ni divulgada por personas diferentes a su destinatario. Si por error recibe este mensaje, por favor avise inmediatamente a su remitente y destruya el correo y sus adjuntos. Cualquier uso, divulgación, copia, distribución, impresión o acto derivado del conocimiento total o parcial de este mensaje sin autorización de Tempest Capital SC y/o cualquiera de sus afiliadas o subsidiarias será sancionado de acuerdo con las normas legales vigentes. El presente correo electrónico sólo refleja la opinión de su remitente y no representa necesariamente la opinión oficial de Tempest Capital SC y/o de sus afiliadas y/o subsidiarias.
This email and any attachments may be confidential, privileged or otherwise exempt from disclosure under applicable law. No confidentiality or privilege is waived or lost by any transmission errors. This communication is intended solely for the intended recipient, and if you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose, or otherwise act upon any part of this email communication or its attachments. Tempest Capital SC, may seek applicable legal relief in case of any use, disclosure, copying, distribution, printing or action arising from the total or partial knowledge of this message without the authorization of Tempest Capital SC. and/or its affiliates or subsidiaries. This email only reflects the opinion of the sender and does not necessarily represents the official views of Tempest Capital SC. and/or its affiliates or subsidiaries.

# EXHIBIT 16

**DETALLES DE LA DENUNCIA**

**Fecha de envío de la denuncia**
4/22/2022

**Compañía denunciada/Información sobre la agencia**
Ciudad/Estado/Código postal: USA )

**Please identify the person(s) engaged in this behavior:**
Derek Sangster - President and Director of ENSCO Offshore
Matthew Cavenaugh - Co-Counsel Debtors
Anup Sathy - Co-Counsel Debtors

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
This was authorized signed by Derek Sangster who lists himself as President and Director of ENSCO Offshore.
The filing was presented by Matthew Cavenaugh and Anup Sathy who are Valaris' Counsel for its bankruptcy procedure.

Given the value of the rig, this sale was presumably authorized by CEO Tom Burke, CFO Jonathan Baksht, and General Counsel Michael T McGuinty.

**Is management aware of this problem?**
Yes

**What is the general nature of this matter?**
Violation of OFAC sanctions 31 CFR Part 589 by selling artic drilling equipment to Arktikmorneftegazrazvedka AO - AMNGR AO. AMNG

**Where did this incident or violation occur?**
Cross-border. Authorized in the USA, rig was in the UK. and was subsequently moved to St. Petersburg, Russia.

**Please provide the specific or approximate time this incident occurred:**
Transfer of the asset occurred approximately on June 22, 2021

**How long do you think this problem has been going on?**
More than a year

**How did you become aware of this violation?**
I observed it

**If other, how?**
This incident is 100% confirmed. It was disclosed by Valaris management in court filings Case 10-34114 Document 874

**Please identify any persons who have attempted to conceal this problem and the steps they took to conceal it:**
Valaris Management, and Valaris bankruptcy council presented the sale of ENSCO 101 an Artic Drilling Harsh Weather Jackup. It was listed as a De Minimis Asset sale (Document 874). In the sales documents the name of the purchasing party, Arktikmorneftegazrazvedka AO - AMNGR AO. AMNG, is only mentioned once, and at no time is there a reference to an OFAC waiver.

In Clause 4.2.2 the intended users is Zarubezhneft, and Lukoil. Zarubezhneft is beneficially owned by the Russian Federation and is specialized in Artic Oil Exploration (literally its name is Artic Oil Exploration Company).

**Detalles**
To whom it may concern,

I would like to report a gross violation of OFAC Sanctions pursuant to 31 CFR Part 589, Ukraine/Russia trading with the enemy sanctions. The violation pertains to the sale by Valaris Ltd (Previously Valaris Plc) of Ensco 101 – Harsh Weather Jack-up to Arktikmorneftegazrazvedka AO - AMNGR AO. AMNGR is a fully owned joint-stock company of the Government of the Russian Federation. It appears to be linked to the Russian Navy, having its headquarters in Murmansk within a former naval command building. CEO Mikhail Aleksandrovich Popov appears to be a Politically Exposed Person. http://www.amngr.ru/kontakty/.

The parent entity is Zarubezhneft Joint Stock Company https://www.zarubezhneft.ru/en/about_company/corporate_governance/110/.
The Chairman of the Board, Gen. Eugeniy A Murov is an active Director of the FSB. https://www.zarubezhneft.ru/en/about_company/corporate_governance/110/. He oversaw the Federal Guard Service (FSO) – the agency in charge of protecting Vladimir Putin, amongst others. Not your typical cia executive to say the least. https://ecfr.eu/article/commentary_why_the_departure_of_putins_chief_bodyguard_actually_7032/, https://en.wikipedia.org/wiki/Yevgeny_Murov

The sale contract specifically states that the Jack-up is to be used by Lukoil, which is a Specially Designated Entity as per OFAC (See Page 25 attached) & Zarubezhneft. Ensco 101 was renamed the Nevskaya. It's last known position as per its naval tracking beacon showed it anchored WITHIN Kronstadt Naval Military base St Petersburg. https://www.marinetraffic.com/en/ais/details/ships/shipid:752981/mmsi:273293870/imo:8764779/vessel:ENSCO_101

Furthermore, Valaris is leasing oil rigs to Lukoil for oil exploration in the Gulf of Mexico. I believe it is fair to say Valaris has willingly circumvented OFAC sanctions while having its main offices in Houston and placing itself under the bankruptcy jurisdiction of the United States. Valaris itself is a US publicly traded entity, domiciled in Bermuda (previously in the UK) which is undergoing bankruptcy in the United States Bankruptcy Court of the Southern District Texas, and whose main office is in Houston, Texas. It is thus under the umbrella

of US jurisdiction, and recognizes it is subject to OFAC provisions.

Best regards,

**Cargar archivos**
1. Asset Sale Nevskaya.pdf
   Court Docket Document 874 requesting permission for sale of ENSCO-101 to Russia Federation

2. Russian Use.png
   Zoom in on specific clauses for Yukoil and Russian Federation use

3. Murov Eugeniy.pdf
   Chairman of the Board of Purchasing Party

4. Yevgeny Murov - Wikipedia.pdf
   Politically exposed person Yevgeny Murov. In charge of security for Vladimir Putin

5. NEVSKAYA.pdf
   Harbor documents showing the change in name to Nevskaya.

6. eo13662_directive4_20171031.pdf
   OFAC guidance on artic drilling equipment

7. eo13662_directive4_20171031.pdf
   OFAC Directive on prohibition of sale of artic drilling equipment

8. Latest Position.png
   Screenshot location of Ensco 101 in Russian military harbor in Kronstdat

9. Exhibit C -Ukraine-related Designations _ U.S. Department of the Treasury - Evgeny Murov.pdf
   Evgeny Murov, Chairman of the ultimate beneficiary, designated by the US Department of the Treasury for sanctions.

10. Exhibit E - Marinetraffic Location Ensco 101 2022-04-26.png
    EIS transponder for ENSCO 101 / Nevskaya showing its last location as Kronstadt Naval Base

11. Exhibit E - Marinetraffic Location Ensco 101 2022-04-26.png
    EIS transponder for ENSCO 101 / Nevskaya showing its last location as Kronstadt Naval Base

12. 2022-04-27.png
    Photo evidence of ENSCO 101 / Nevskaya manuvering in St. Petersburg harbour after the sale.

13. Exhibit F -Ukraine-related Designations _ U.S. Department of the Treasury - Kmolz Shipyard.pdf
    Desgination to SDN by US Treasury of Kmolz Shipyard. Site where Ensco 101 is photographed docking.

    aka. FEDERAL STATE UNITARY ENTERPRISE KRONSHTADTSKYY MORSKOY FACTORY MINOBORONY ROSSII (a.k.a. FEDERAL STATE UNITARY ENTERPRISE KRONSTADT MARINE PLANT OF THE MINISTRY OF DEFENSE OF THE RUSSIAN FEDERATION; a.k.a. JOINT STOCK COMPANY KRONSTADT MARINE PLANT; a.k.a. KRONSTADT MARINE PLANT)

14. Letter to Valaris Board on Violation of OFAC Sanctions - Merged.pdf

---

**Notas de seguimiento**
No se encuentran notas adicionales para esta denuncia.

---

**Preguntas/Comentarios de seguimiento**
4/26/2022 3:48 PM posted by Organization
Dear Reporter,

Thank you for your report. We take all allegations seriously and treat them with the utmost confidentiality. We will review this report and investigate the matter consistent with our policies and procedures. If you would like to submit additional information you may do so through this hotline. As we review your report, we may reach out to you for additional information or clarification.

Thank you
7/28/2022 6:44 AM posted by Organization
The investigation of the issue you raised to the hotline has been completed. Due to the confidential nature of any investigation, the findings must remain confidential and cannot be shared. Thank you.

---

**Transcripciones de charla**
No existen transcripciones de charla para este incidente



You are now in an EthicsPoint Secure Area **| File a Report**

You are currently in the confidential and secure reporting structure of EthicsPoint. Below are the choices available to you. Please select the type of report you would like to make.

| | |
|---|---|
| Compliance Matters | Details |
| Financial Matters | Details |
| Health, Safety & Environment Matters | Details |
| Human Resource Matters | Details |

Copyright © 2000-2022 NAVEX Global, Inc. All Rights Reserved.
Privacy Statement | Acceptable Use Policy | Contact NAVEX

# EXHIBIT 17

# Press Release

## LUKOIL STARTS EXPLORATION DRILLING AT BLOCK 12 IN MEXICO

Monday, August 16, 2021

LUKOIL started drilling its first exploration well at Block 12 located in the southern area of the Gulf of Mexico.

The *Yoti West-1Exp* well will be drilled by *Valaris 8505* semisubmersible rig, which was transported to Block 12 after its successful work at Block 10 (the *Sayulita-1EXP* well). The exploration will focus on turbidite deposits of Upper and Lower Miocene. Water depth at the drilling site is 207 meters.

Drilling of the *Yoti West-1Exp* will provide geological and geophysical data needed to make a decision on further exploration of Block 12.



## INFORMATION

LUKOIL Upstream Mexico (part of LUKOIL Group) acquired licence for exploration and production of hydrocarbons at Block 12 in 2017 following the Shallow Water Bidding Round 2.1. The block is located 50 km off the coast, in the Gulf of Mexico (State of Tabasco, Mexico). Its surface area amounts to 521 square meters, with water depth varying from 150 to 400 m. The Block 12 joint venture is formed by Eni (40%) and LUKOIL Upstream Mexico (operator, 60%). The parties' minimum obligations for the early stages of exploration are to drill one well.

Press release in PDF

 

## CONTACT INFORMATION

Press Centre PJSC "LUKOIL"                                              https://www.lukoil.com

 media@lukoil.com

https://www.facebook.com/Lukoil.en

📞 +7 (495) 627-16-77

http://twitter.com/lukoilengl

## YOU MAY BE INTERESTED _____

### 07/26/2022 - LUKOIL AND ROSATOM TO DEVELOP COOPERATION

 

Vadim Vorobyov, President of PJSC LUKOIL, and Alexey Likhachev, Director General of ROSATOM, signed a protocol of strategic session on organising cooperation. The protocol aims to develop coordinated actions in the field of oil and gas machinery procurement, introduction of complex solutions for industrial automation and power supply, joint development of IT products.

  

### 07/14/2022 - LUKOIL RELEASES 2021 SUSTAINABILITY REPORT

PJSC LUKOIL Board of Directors approved Sustainability Report for 2021. The document was prepared in line with the international and industry reporting standards, such as GRI, SASB, UNCTAD and IPIECA, as well as the Bank of Russia's recommendations on disclosing information related to ESG factors and sustainable development

  

### 07/12/2022 - LUKOIL APPROVES PROGRAM FOR ENERGY SAVING AND ENERGY EFFICIENCY IMPROVEMENT



LUKOIL approved Energy Saving and Energy Efficiency Improvement Program for entities of the LUKOIL Group for 2023 and for the period of 2024-2025. The Program will help the Company to save about 9 million GJ of fuel and energy resources over the next three years.

  

FIND SIMILAR

*Status: This is the original version (as it was originally made).*

STATUTORY INSTRUMENTS

# 2019 No. 855

# The Russia (Sanctions) (EU Exit) Regulations 2019

PART 5

Trade

CHAPTER 4

Energy-related goods and related activities

**Interpretation of this Chapter**

**39.** For the purposes of this Chapter "Russia" includes Russia's exclusive economic zone and continental shelf (which terms are to be interpreted in accordance with the United Nations Convention on the Law of the Sea)(**1**).

**Export of energy-related goods**

**40.**—(1)  The export of energy-related goods for use in Russia is prohibited.

(2)  Paragraph (1) is subject to Part 7 (Exceptions and licences).

**Supply and delivery of energy-related goods**

**41.**—(1)  A person must not directly or indirectly supply or deliver energy-related goods for use in Russia from a third country to a place in Russia.

(2)  Paragraph (1) is subject to Part 7 (Exceptions and licences).

(3)  A person who contravenes the prohibition in paragraph (1) commits an offence, but it is a defence for a person charged with that offence to show that the person did not know and had no reasonable cause to suspect that—

(a)  the goods were destined (or ultimately destined) for Russia, or

(b)  the goods were for use in Russia.

(4)  In this regulation "third country" means a country that is not the United Kingdom, the Isle of Man or Russia.

**Making energy-related goods available**

**42.**—(1)  A person must not directly or indirectly make energy-related goods available for use in Russia.

(2)  Paragraph (1) is subject to Part 7 (Exceptions and licences).

---

(**1**)   Command 8941.

Document Generated: 2022-05-16

*Status: This is the original version (as it was originally made).*

(3)  A person who contravenes a prohibition in paragraph (1) commits an offence, but it is a defence for a person charged with that offence to show that the person did not know and had no reasonable cause to suspect that the goods were for use in Russia.

**Technical assistance relating to energy-related goods**

**43.**—(1)  A person must not directly or indirectly—

(a)  provide technical assistance relating to energy-related goods for use in Russia; or

(b)  provide, to a person connected with Russia, technical assistance relating to energy-related goods.

(2)  Paragraph (1) is subject to Part 7 (Exceptions and licences).

(3)  A person who contravenes a prohibition in paragraph (1) commits an offence, but—

(a)  it is a defence for a person charged with the offence in paragraph (1)(a) to show that the person did not know and had no reasonable cause to suspect that the goods were for use in Russia;

(b)  it is a defence for a person charged with the offence in paragraph (1)(b) ("P") to show that P did not know and had no reasonable cause to suspect that the person was connected with Russia.

**Financial services and funds relating to energy-related goods and energy-related technology**

**44.**—(1)  A person must not directly or indirectly provide, to a person connected with Russia, financial services in pursuance of or in connection with an arrangement whose object or effect is—

(a)  the export of energy-related goods,

(b)  the direct or indirect supply or delivery of energy-related goods,

(c)  directly or indirectly making energy-related goods available to a person, or

(d)  the direct or indirect provision of technical assistance relating to energy-related goods.

(2)  A person must not directly or indirectly make funds available to a person connected with Russia in pursuance of or in connection with an arrangement mentioned in paragraph (1).

(3)  A person must not directly or indirectly provide financial services or funds in pursuance of or in connection with an arrangement whose object or effect is—

(a)  the export to Russia of energy-related goods for use in Russia;

(b)  the direct or indirect supply or delivery of energy-related goods for use in Russia;

(c)  directly or indirectly making energy-related goods available for use in Russia;

(d)  the direct or indirect provision of technical assistance relating to energy-related goods to a person connected with Russia;

(e)  the direct or indirect provision of technical assistance relating to energy-related goods for use in Russia;

(4)  Paragraphs (1) to (3) are subject to Part 7 (Exceptions and licences).

(5)  A person who contravenes a prohibition in any of paragraphs (1) to (3) commits an offence, but—

(a)  it is a defence for a person charged with an offence of contravening a prohibition in paragraph (1) or (2) ("P") to show that P did not know and had no reasonable cause to suspect that the person was connected with Russia;

(b)  it is a defence for a person charged with an offence of contravening a prohibition in paragraph (3) to show that the person did not know and had no reasonable cause to suspect

Document Generated: 2022-05-16

*Status: This is the original version (as it was originally made).*

that the financial services or funds (as the case may be) were provided in pursuance of or in connection with an arrangement mentioned that paragraph.

**Brokering services: non-UK activity relating to energy-related goods and energy-related technology**

**45.**—(1)  A person ("P") must not directly or indirectly provide brokering services in relation to an arrangement ("arrangement A") whose object or effect is—

(a)  the direct or indirect supply or delivery of energy-related goods for use in Russia from a third country to a place in Russia;

(b)  directly or indirectly making energy-related goods available for use in Russia;

(c)  the direct or indirect provision, in a non-UK country, of technical assistance relating to energy-related goods—

  (i)  to a person connected with Russia, or

  (ii)  for use in Russia;

(d)  the direct or indirect provision, in a non-UK country, of financial services—

  (i)  to a person connected with Russia, where arrangement A, or any other arrangement in connection with which arrangement A is entered into, is an arrangement mentioned in regulation 44(1) , or

  (ii)  where arrangement A, or any other arrangement in connection with which arrangement A is entered into, is an arrangement mentioned in regulation 44(3);

(e)  directly or indirectly making funds available, in a non-UK country, to a person connected with Russia, where arrangement A, or any other arrangement in connection with which arrangement A is entered into, is an arrangement mentioned in regulation 44(1); or

(f)  the direct or indirect provision of funds from a non-UK country, where arrangement A, or any other arrangement in connection with which arrangement A is entered into, is an arrangement mentioned in regulation 44(3).

(2)  Paragraph (1) is subject to Part 7 (Exceptions and licences).

(3)  A person who contravenes a prohibition in paragraph (1) commits an offence, but it is a defence for a person charged with that offence to show that the person did not know and had no reasonable cause to suspect that the brokering services were provided in relation to an arrangement mentioned in that paragraph.

(4)  In this regulation—

"non-UK country" means a country that is not the United Kingdom;

"third country" means a country that is not the United Kingdom, the Isle of Man or Russia.

**Prohibition on providing other energy-related services**

**46.**—(1)  A person must not provide, directly or indirectly, relevant energy services.

(2)  Paragraph (1) is subject to Part 7 (Exceptions and licences).

(3)  A person who contravenes the prohibition in paragraph (1) commits an offence, but it is a defence for a person charged with that offence to show that the person did not know and had no reasonable cause to suspect that the person was providing relevant energy services.

(4)  In this regulation—

"relevant energy services" means specified services necessary for a relevant oil exploration or production project;

*Document Generated: 2022-05-16*

**Status:**  *This is the original version (as it was originally made).*

"relevant oil exploration or production project" means a project in Russia within any of the following descriptions—

(a)    oil exploration and production in waters deeper than 150 metres;

(b)    oil exploration and production in the offshore area north of the Arctic Circle; or

(c)    a project that has the potential to produce oil from resources located in shale formations by way of hydraulic fracturing, excluding exploration and production through shale formations to locate or extract oil from non-shale reservoirs;

"specified services" means any of the following—

(a)    drilling;

(b)    well testing;

(c)    logging and completion services;

(d)    supply of specialised floating vessels.

4

# **EXHIBIT 19**

Legal Services for the Period Ending December 31, 2020      Invoice Number:      1250007899
Valaris plc      Matter Number:      48301-31
Use, Sale or Lease of Property

### Description of Legal Services

| Date | Name | Hours | Description |
|---|---|---|---|
| 12/01/20 | Spencer A. Winters | 0.20 | Review and analyze issues re asset sale. |
| 12/03/20 | Nick Hafen | 0.30 | Correspond with Y. Salloum and Bracewell re letter of credit order. |
| 12/04/20 | Nick Hafen | 2.10 | Correspond with Y. Salloum, B. Elliott, JW, Wells Fargo and JP Morgan re letter of credit order (1.2); revise same (.9). |
| 12/05/20 | Nick Hafen | 0.10 | Revise letter of credit order. |
| 12/07/20 | Spencer A. Winters | 1.50 | Review and analyze issues re potential asset sale, operational issues and motions (.8); correspond and telephone conferences with working group re same, open items and deadlines (.7). |
| 12/09/20 | Jaimie Fedell | 1.20 | Correspond with Company re potential asset sale (.4); revise draft asset purchase agreement (.8). |
| 12/10/20 | Spencer A. Winters | 0.50 | Prepare for and telephone conference with Company re potential asset sale. |
| 12/16/20 | Jaimie Fedell | 1.30 | Conference with K&E team, Company re asset sale (.7); research precedent re sale motions (.6). |
| 12/16/20 | Ruth Mulvihill | 0.20 | Telephone conference and correspond with J. Fedell re motion to sell asset. |
| 12/17/20 | Ruth Mulvihill | 0.80 | Draft, revise motion re sale of rig. |
| 12/18/20 | Ruth Mulvihill | 5.60 | Review precedent private sale motions (1.9); draft, revise motion re sale of certain assets (3.6); telephone conference and correspond with J. Fedell re same (.1). |
| 12/20/20 | Jaimie Fedell | 1.00 | Correspond with Company, K&E team re lender consent to asset sale. |
| 12/21/20 | Lucas W. Brown | 0.50 | Correspond with A&M and JW re monthly operating report filing. |
| 12/21/20 | Ruth Mulvihill | 2.10 | Revise motion and declaration re sale of ENSCO 101 (1.5); review precedent declarations re same (.5); correspond with J. Fedell re same (.1). |
| 12/22/20 | Jaimie Fedell | 1.20 | Review, revise ENSCO 101 sale motion. |
| 12/22/20 | Ruth Mulvihill | 4.30 | Review local rules re sales of private property (.5); revise motion and correspond with K&E team, Company re same (3.8). |

Legal Services for the Period Ending December 31, 2020      Invoice Number:     1250007899
Valaris plc     Matter Number:     48301-31
Use, Sale or Lease of Property

| Date | Name | Hours | Description |
|------|------|-------|-------------|
| 12/23/20 | Jaimie Fedell | 1.70 | Conference with N. Schodek re ENSCO 101 sale motion (.2); review, revise same (.8); correspond with Company re same (.7). |
| 12/23/20 | Ruth Mulvihill | 0.40 | Correspond with Kramer, MoFo, Shearman and J. Fedell re ENSCO 101 sale motion. |
| 12/24/20 | Jaimie Fedell | 2.20 | Conferences with K&E team, Kramer re ENSCO 101 sale motion (1.5); correspond with Company, K&E team re same (.7). |
| 12/24/20 | Ruth Mulvihill | 0.90 | Correspond with J. Fedell, Kramer re sale motion (.1); revise same (.4); compile for filing (.2); correspond with J. Fedell, JW re same (.2). |
| 12/24/20 | Spencer A. Winters | 0.70 | Review and analyze issues re ENSCO 101 sale (.3); correspond and telephone conferences with Kramer, K&E team re same (.4). |
| 12/27/20 | Jaimie Fedell | 0.60 | Correspond with Company and Kramer re ENSCO 101 sale motion. |
| 12/28/20 | Jaimie Fedell | 0.70 | Coordinate filing of ENSCO 101 sale motion. |
| 12/28/20 | Ruth Mulvihill | 0.50 | Prepare sale motion for filing (.4); correspond with J. Fedell and JW re same (.1). |
| 12/29/20 | Ruth Mulvihill | 0.60 | Review U.S. Trustee comments to sale motion (.3); draft proposed responses re same (.3). |
| 12/30/20 | Ruth Mulvihill | 0.30 | Correspond with J. Fedell, Company re U.S. Trustee comments to ENSCO 101 sale motion. |

**Total**     **31.50**

# **EXHIBIT 20**

## Esgian Fair Market Value Report
### (As of December 2019)

This is a fairness market value report regarding Valaris rigs as provided in a Microsoft excel file  by Esgian. The values shown are as of December 2019. Esgian offers rigs analysis and valuation services and is widely recognized in the industry.

*Amounts shown below in US$ Millions*

| Rig name | Dec 19 - Max | Dec 19 - Min |
|---|---|---|
| Valaris 8500 | $60 | $51 |
| Valaris 8501 | 60 | 51 |
| Valaris 8502 | 65 | 56 |
| Valaris 8503 | 122 | 110 |
| Valaris 8504 | 116 | 105 |
| Valaris 8505 | 125 | 113 |
| Valaris 8506 | 90 | 79 |
| Valaris DPS-1 | 126 | 114 |
| Valaris DS-10 | 278 | 252 |
| Valaris DS-11 | 254 | 230 |
| Valaris DS-12 | 261 | 236 |
| Valaris DS-13 | 299 | 271 |
| Valaris DS-14 | 305 | 276 |
| Valaris DS-15 | 252 | 228 |
| Valaris DS-16 | 262 | 237 |
| Valaris DS-17 | 257 | 232 |
| Valaris DS-18 | 264 | 239 |
| Valaris DS-3 | 115 | 104 |
| Valaris DS-4 | 115 | 104 |
| Valaris DS-5 | 120 | 109 |
| Valaris DS-6 | 126 | 114 |
| Valaris DS-7 | 270 | 244 |
| Valaris DS-8 | 252 | 228 |
| Valaris DS-9 | 270 | 244 |
| Valaris JU-100 | 12 | 7 |
| Valaris JU-101 | 48 | 40 |
| Valaris JU-102 | 49 | 40 |
| Valaris JU-104 | 51 | 42 |
| Valaris JU-105 | 33 | 23 |
| Valaris JU-106 | 62 | 53 |
| Valaris JU-107 | 65 | 56 |
| Valaris JU-108 | 70 | 59 |
| Valaris JU-109 | 78 | 67 |
| Valaris JU-110 | 109 | 99 |
| Valaris JU-111 | 47 | 38 |

ENSCO 101

**Esgian Fair Market Value Report**
**(As of December 2019)**

| | | |
|---|---|---|
| Valaris JU-113 | 82 | 71 |
| Valaris JU-114 | 82 | 71 |
| Valaris JU-115 | 95 | 83 |
| Valaris JU-116 | 85 | 75 |
| Valaris JU-117 | 89 | 78 |
| Valaris JU-118 | 97 | 86 |
| Valaris JU-120 | 134 | 121 |
| Valaris JU-121 | 134 | 121 |
| Valaris JU-122 | 131 | 118 |
| Valaris JU-123 | 151 | 137 |
| Valaris JU-140 | 94 | 83 |
| Valaris JU-141 | 94 | 83 |
| Valaris JU-142 | 55 | 47 |
| Valaris JU-143 | 81 | 70 |
| Valaris JU-144 | 78 | 68 |
| Valaris JU-145 | 78 | 68 |
| Valaris JU-146 | 79 | 69 |
| Valaris JU-147 | 81 | 71 |
| Valaris JU-148 | 81 | 71 |
| Valaris JU-22 | 6 | 4 |
| Valaris JU-247 | 49 | 40 |
| Valaris JU-248 | 43 | 33 |
| Valaris JU-249 | 53 | 43 |
| Valaris JU-250 | 63 | 54 |
| Valaris JU-290 | 244 | 221 |
| Valaris JU-291 | 249 | 225 |
| Valaris JU-292 | 249 | 225 |
| Valaris JU-36 | 6 | 4 |
| Valaris JU-37 | 6 | 4 |
| Valaris JU-54 | 6 | 4 |
| Valaris JU-67 | 1 | 0.5 |
| Valaris JU-71 | 1.5 | 0.5 |
| Valaris JU-72 | 5 | 3 |
| Valaris JU-75 | 41 | 32 |
| Valaris JU-76 | 39 | 31 |
| Valaris JU-84 | 5 | 3 |
| Valaris JU-87 | 6 | 4 |
| Valaris JU-88 | 3 | 1 |
| Valaris JU-92 | 6 | 4 |
| Valaris MS-1 | 107 | 97 |

**Note 11 -**     **Contingencies**

*Indonesian Well-Control Event*

In July 2019, a well being drilled offshore Indonesia by one of our jackup rigs experienced a well-control event requiring the cessation of drilling activities. In February 2020, the rig resumed operations. Indonesian authorities initiated an investigation into the event and have contacted the customer, us and other parties involved in drilling the well for additional information. We cooperated with the Indonesian authorities. We cannot predict the scope or ultimate outcome of this investigation. If the Indonesian authorities determine that we violated local laws in connection with this matter, we could be subject to penalties including environmental or other liabilities, which may have a material adverse impact on us.

*ARO Newbuild Funding Obligations*

In connection with our 50/50 unconsolidated joint venture, we have a potential obligation to fund ARO for newbuild jackup rigs. ARO has plans to purchase 20 newbuild jackup rigs over an approximate 10-year period. The joint venture partners intend for the newbuild jackup rigs to be financed out of available cash from ARO's operations and/or funds available from third-party debt financing. ARO paid a 25% down payment from cash on hand for each of the two newbuilds ordered in January 2020 and is actively exploring financing options for remaining payments due upon delivery. In the event ARO has insufficient cash from operations or is unable to obtain third-party financing, each partner may periodically be required to make additional capital contributions to ARO, up to a maximum aggregate contribution of $1.25 billion from each partner to fund the newbuild program. Each partner's commitment shall be reduced by the actual cost of each newbuild rig, as delivered, on a proportionate basis.

*Letters of Credit*

In the ordinary course of business with customers and others, we have entered into letters of credit to guarantee our performance as it relates to our drilling contracts, contract bidding, customs duties, tax appeals and other obligations in various jurisdictions. Letters of credit outstanding as of June 30, 2022 (Successor) totaled $136.2 million and are issued under facilities provided by various banks and other financial institutions. Obligations under these letters of credit are not normally called, as we typically comply with the underlying performance requirement. As of June 30, 2022 (Successor), we had collateral deposits in the amount of $20.6 million with respect to these agreements.

*Other Matters*

In addition to the foregoing, we are named defendants or parties in certain other lawsuits, claims or proceedings incidental to our business and are involved from time to time as parties to governmental investigations or proceedings, including matters related to taxation, arising in the ordinary course of business. Although the outcome of such lawsuits or other proceedings cannot be predicted with certainty and the amount of any liability that could arise with respect to such lawsuits or other proceedings cannot be predicted accurately, we do not expect these matters to have a material adverse effect on our financial position, operating results and cash flows. We have increased our accrual with respect to certain matters as of June 30, 2022 by approximately $25.0 million to reflect a change in the projected value of these claims against us.

# EXHIBIT 22

# Stacked rigs provide operational leverage in an improving market

## Stacked Fleet Overview

- Stacked fleet includes 11 high-quality modern assets with a total build cost of ~$4.0B and significant useful lives remaining

- Rigs stacked in clusters to minimize holding costs, preserve cash in the near term and maximize option value on future cash flows

- Proven ability to win work for preservation stacked assets, with five long-term floater contracts awarded since mid-2021

- Three uncontracted high-specification drillships provide operational leverage in an improving market

- Additional exposure to drillship market from purchase options on two newbuilds[1]

## Asset Value

| Illustrative Asset Value of Stacked Fleet[1] | | | | Build Cost |
|---|---|---|---|---|
| Value per Floater (5 Rigs) | $100M | $200M | $300M | ~$600M |
| Value per Jackup (6 Rigs) | $25M | $50M | $75M | ~$150M |
| Total Asset Value | $650M | $1,300M | $1,950M | ~$4,000M |

### Recent Contract Awards for Stacked Assets

| Rig Name | Customer | Location | Total Contract Value[2] |
|---|---|---|---|
| DS-4 | PETROBRAS | Brazil | |
| DS-9 | ExxonMobil | Angola | |
| DS-16 | OXY Occidental | U.S. GOM | ~$950 million |
| DS-17 | equinor | Brazil | |
| DPS-1 | Woodside | Australia | |

 **VALARIS**

1 Valaris has the right, but not the obligation, to take delivery of either or both rigs on or before December 31, 2023. Purchase price of approx. $119M for DS-13 and $218M for DS-14.
2 Total contract value includes approx. $150 million expected from lump sum payments for mobilization fees, reactivation costs and capital upgrades that are excluded from contract backlog and average day rates.

24

# Equity trades at a significant discount to major peers and recent market transactions

**Equity Performance Since Valaris Listing** [1]



**Implied Steel Value per Ultra-Deepwater Equivalent Rig ($M)** [2,3,4]



**Recent Market Transactions for Drillships**

| Rig Name | Buyer | Seller | Price |
|----------|-------|--------|-------|
| Crete | Stena Drilling | SAMSUNG HEAVY INDUSTRIES | $295 million |
| Santorini | SAIPEM | SAMSUNG HEAVY INDUSTRIES | $280 million [5] |
| Cobalt Explorer | TÜRKİYE PETROLLERİ ANONİM ORTAKLIĞI | DSME | $230 million |

- Three recent market transactions for drillships have averaged ~$270 million (including an estimated $50 million of reactivation costs per rig) – nearly 2.0x the implied steel value Valaris is currently trading at for similar assets

Source: FactSet as of July 31, 2022; Fearnley Securities; Company filings
1 Equity performance since Valaris listing on May 3, 2021, except for Diamond, which relisted on March 29, 2022
2 Steel values calculated using market value of equity, book value of debt, underfunded pension liabilities, newbuild capital commitments and NPV of reactivation costs, less cash and NPV of backlog
3 Valaris steel value per UDW equivalent rig attributes $443M to ARO Drilling based on the principal value of the shareholder note receivable
4 Number of ultra-deepwater equivalent rigs per Fearnley Securities research report dated July 25, 2022; 5 Purchase price calculated as 2 x $15M lease payments, plus $200M purchase option price

 **VALARIS**

29

# **EXHIBIT 23**



www.valaris.com

**Press Release**

## Valaris Reports First Quarter 2022 Results

Continued Strong Operational Performance – 99% Revenue Efficiency in 1Q 2022
Four Floater Reactivation Projects in Progress for Contracts Expected to Commence in 2Q 2022
Drillship VALARIS DS-12 Awarded Contract Offshore West Africa
Jackups VALARIS 113 and 114 Sold for a Total of $125 Million

Hamilton, Bermuda, May 2, 2022 … Valaris Limited (NYSE: VAL) ("Valaris" or the "Company") today reported first quarter 2022 results.

President and Chief Executive Officer Anton Dibowitz said, "The heart of our business, and our primary focus every day, is on delivering safe, reliable and efficient operations to our customers. I would like to thank the Valaris team for continuing to deliver the strong performance that our customers have come to expect from us, achieving 99% revenue efficiency during the first quarter."

Dibowitz commented, "We are currently in the midst of a transitional period as we incur reactivation costs to put three drillships and one semisubmersible back to work on long-term contracts. I am proud of the progress that the entire Valaris team has made in executing these major projects concurrently, particularly considering the ongoing pandemic, personnel and global supply chain challenges. VALARIS DPS-1 recently returned to work, and we continue to expect that all four floaters will be on contract by the middle of the year with financial results expected to improve meaningfully as these reactivations are completed."

Dibowitz added, "Very recently, we were awarded a contract with a major operator offshore Angola and the Republic of Congo for drillship VALARIS DS-12. The operating rate for this contract, which is expected to take place during the first quarter 2023, is at a level not seen in the past seven years for drillship work offshore West Africa, providing further evidence of the improvement in floater day rates across geographies."

Dibowitz concluded, "We continue to take a rational approach to fleet management, including regularly assessing our fleet for retirement and divestiture candidates. In this regard, we recently sold two jackups, VALARIS 113 and 114, to ADES for a total of $125 million, a value which is highly accretive to our shareholders. Each of these rigs had been stacked for more than six years and would have required meaningful capital to reactivate."

**First Quarter Review**

Revenues increased to $318 million in the first quarter 2022 from $306 million in the fourth quarter 2021. Excluding reimbursable items, revenues increased to $291 million in the first quarter from $283 million in the fourth quarter primarily due to higher utilization for the jackup fleet and higher average day rates for the other segment, partially offset by lower utilization for the floater fleet.

Contract drilling expense increased to $331 million in the first quarter 2022 from $286 million in the fourth quarter 2021. Excluding reimbursable items, contract drilling expense increased to $305 million in the first quarter from $264 million in the fourth quarter, primarily due to higher rig reactivation costs, which increased to $62 million in the first quarter from $37 million in the fourth quarter, as we prepare four floaters for long-term contracts that are expected to commence in the second quarter. The remaining variance was due to higher personnel costs, higher repair and maintenance costs and higher mobilization costs.

Depreciation expense decreased to $23 million in the first quarter 2022 from $25 million in the fourth quarter 2021. General and administrative expense increased marginally to $19 million in the first quarter 2022 from $18 million in the fourth quarter 2021.

Other income decreased to $9 million in the first quarter 2022 from $21 million in the fourth quarter 2021. First quarter other income included a gain on sale of assets of $2 million related to the sale of jackup VALARIS 67 compared to a $21 million gain on sale of assets related to the sale of jackups VALARIS 22, 37 and 142 in the fourth quarter. The remaining variance is primarily due to lower reorganization-related professional fees in the first quarter as compared to the fourth quarter.

Tax benefit decreased to $1 million in the first quarter 2022 from $31 million in the fourth quarter 2021. The first quarter tax provision included $15 million of discrete tax benefit primarily related to a reduction in liabilities for unrecognized tax benefits associated with tax positions taken in prior years. The fourth quarter tax provision included $30 million of discrete tax benefit primarily related to a reduction in liabilities for unrecognized tax benefits associated with tax positions taken in prior years and deferred tax benefits associated with Swiss tax reform. Adjusted for discrete items, tax expense of $14 million in the first quarter compared to a tax benefit of $1 million in the fourth quarter. The increase in tax expense is primarily due to changes in the relative components of our earnings generated in tax jurisdictions with higher tax rates compared to the prior quarter, and to a reduction in deferred tax valuation allowances in the prior quarter.

Net loss was $40 million in the first quarter 2022 compared to net income of $28 million in the fourth quarter 2021. Adjusted EBITDA decreased to negative $31 million in the first quarter from $3 million in the fourth quarter. Adjusted EBITDAR decreased to $31 million in the first quarter from $40 million in the fourth quarter.

**Segment Review**

Floaters

Floater revenues decreased marginally to $100 million in the first quarter 2022 from $101 million in the fourth quarter 2021. Excluding reimbursable items, revenues decreased to $87 million in the first quarter from $93 million in the fourth quarter. The sequential quarter decline was primarily due to semisubmersible VALARIS DPS-5 being out of service for most of the first quarter while undergoing a five-year special survey prior to starting the first of several new contracts. This was partially offset by higher utilization and average day rates for the drillship fleet.

Contract drilling expense increased to $148 million in the first quarter 2022 from $114 million in the fourth quarter 2021. Excluding reimbursable items, contract drilling expense increased to $135 million in the first quarter from $106 million in the fourth quarter. The sequential quarter increase was primarily due to higher rig reactivation costs, which increased to $61 million in the first quarter from $34 million in the fourth quarter, as we prepared drillships VALARIS DS-4, DS-9 and DS-16 as well as semisubmersible VALARIS DPS-1 for new long-term contracts. Included within first quarter reactivation costs is approximately $4 million related to minor damage arising from an incident involving VALARIS DS-16, which broke free from its moorings during gale force winds. We also incurred repair and maintenance costs in the first quarter on semisubmersible VALARIS DPS-5 while the rig was in the shipyard undergoing a five-year special survey.

Jackups

Jackup revenues increased to $181 million in the first quarter 2022 from $172 million in the fourth quarter 2021. Excluding reimbursable items, revenues increased to $170 million in the first quarter from $160 million in the fourth quarter. The sequential quarter increase was primarily due to higher utilization on VALARIS 249, 117, 144 and Norway, each of which commenced new contracts either in the first quarter or late in the fourth quarter. This was partially offset by idle time between contracts for VALARIS Viking and 107.

Contract drilling expense increased to $139 million in the first quarter 2022 from $128 million in the fourth quarter 2021. Excluding reimbursable items, contract drilling expense increased to $129 million in the first quarter from $117 million in the fourth quarter. The sequential quarter increase was primarily due to higher costs resulting from more operating days across the jackup fleet in the first quarter and higher mobilization costs primarily related to VALARIS 144.

ARO Drilling

Revenues increased to $111 million in the first quarter 2022 from $105 million in the fourth quarter 2021 primarily due to higher utilization and the addition of VALARIS 140 to the leased rig fleet late in the first quarter. Contract drilling expense decreased to $84 million in the first quarter from $89 million in the fourth quarter. Operating income was $5 million in the first quarter compared to an operating loss of $6 million in the fourth quarter. EBITDA was $22 million in the first quarter compared to $11 million in the fourth quarter.

Other

Revenues increased to $38 million in the first quarter 2022 from $33 million in the fourth quarter 2021 primarily due to higher day rates for managed rigs Mad Dog and Thunder Horse, which were each awarded two-year contract extensions, effective from late January. Contract drilling expense increased marginally to $16 million in the first quarter from $15 million in the fourth quarter. Operating income increased to $22 million in the first quarter from $16 million in the fourth quarter. EBITDA increased to $23 million in the first quarter from $17 million in the fourth quarter.

| | First Quarter | | | | | | | | | | | | | | | | | |
| | Floaters | | | Jackups | | | ARO | | | Other | | | Reconciling Items | | | Consolidated Total | | |
| (in millions of $, except %) | Q1 2022 | Q4 2021 | Chg | Q1 2022 | Q4 2021 | Chg | Q1 2022 | Q4 2021 | Chg | Q1 2022 | Q4 2021 | Chg | Q1 2022 | Q4 2021 | | Q1 2022 | Q4 2021 | Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | 99.7 | 100.5 | (1)% | 180.7 | 172.3 | 5 % | 111.3 | 105.4 | 6 % | 38.0 | 32.7 | 16 % | (111.3) | (105.4) | | 318.4 | 305.5 | 4 % |
| Operating expenses | | | | | | | | | | | | | | | | | | |
| Contract drilling | 147.6 | 113.8 | 30 % | 139.2 | 128.0 | 9 % | 84.2 | 88.9 | (5)% | 15.5 | 15.4 | 1 % | (55.2) | (60.6) | | 331.3 | 285.5 | 16 % |
| Depreciation | 12.2 | 11.7 | 4 % | 9.1 | 12.1 | (25)% | 16.5 | 17.7 | (7)% | 0.9 | 1.1 | (18)% | (16.2) | (17.5) | | 22.5 | 25.1 | (10)% |
| General and admin. | — | — | — % | — | — | — % | 5.2 | 5.1 | 2 % | — | — | — % | 13.6 | 13.2 | | 18.8 | 18.3 | 3 % |
| Equity in earnings (losses) of ARO | — | — | — % | — | — | — % | — | — | — % | — | — | — % | 4.3 | (1.3) | | 4.3 | (1.3) | nm |
| Operating income (loss) | (60.1) | (25.0) | 140 % | 32.4 | 32.2 | 1 % | 5.4 | (6.3) | nm | 21.6 | 16.2 | 33 % | (49.2) | (41.8) | | (49.9) | (24.7) | 102 % |
| | | | | | | | | | | | | | | | | | | |
| Net income (loss) | (60.0) | (25.4) | 136 % | 34.7 | 52.8 | (34)% | 1.4 | (10.0) | nm | 21.6 | 16.2 | 33 % | (37.5) | (5.9) | | (39.8) | 27.7 | nm |
| Adjusted EBITDA | (48.7) | (12.9) | 278 % | 43.0 | 44.4 | (3)% | 21.9 | 11.4 | 92 % | 22.6 | 17.3 | 31 % | (69.7) | (57.5) | | (30.9) | 2.7 | nm |
| Adjusted EBITDAR | 12.2 | 20.9 | (42)% | 43.6 | 47.7 | (9)% | 21.9 | 11.4 | 92 % | 22.6 | 17.4 | 30 % | (69.7) | (57.5) | | 30.6 | 39.9 | (23)% |

**Fresh Start Accounting**

Valaris emerged from Chapter 11 bankruptcy protection on April 30, 2021 (the "Effective Date"). Upon emergence, Valaris applied fresh start accounting which resulted in Valaris becoming a new reporting entity for accounting and financial reporting. Accordingly, our financial statements and notes after the Effective Date are not comparable to our financial statements and notes prior to that date. As required by GAAP, results for the second quarter must be presented separately for the predecessor period from April 1, 2021, through April 30, 2021 (the "Predecessor" period) and the successor period from May 1, 2021, through June 30, 2021 (the "Successor" period). However, the Company has combined certain results of the Predecessor and Successor periods ("Combined" results) as non-GAAP measures to compare the combined second quarter with other quarters since we believe it provides the most meaningful basis to analyze our results. The Predecessor and Successor results for the second quarter are more fully discussed in our quarterly report on Form 10-Q for the period ended June 30, 2021 filed with the SEC on August 3, 2021.

As previously announced, Valaris will hold its first quarter 2022 earnings conference call at 9:00 a.m. CT (10:00 a.m. ET) on Tuesday, May 3, 2022. An updated investor presentation will be available on the Valaris website after the call.

**About Valaris Limited**

Valaris Limited (NYSE: VAL) is the industry leader in offshore drilling services across all water depths and geographies. Operating a high-quality rig fleet of ultra-deepwater drillships, versatile semisubmersibles, and modern shallow-water jackups, Valaris has experience operating in nearly every major offshore basin. Valaris maintains an unwavering commitment to safety, operational excellence, and customer satisfaction, with a focus on technology and innovation. Valaris Limited is a Bermuda exempted company. To learn more, visit the Valaris website at www.valaris.com.

**Forward-Looking Statements**

*Statements contained in this press release that are not historical facts are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include words or phrases such as "anticipate," "believe," "estimate," "expect," "intend," "likely," "plan," "project," "could," "may," "might," "should," "will" and similar words and specifically include statements regarding expected financial performance; expected utilization, day rates, revenues, operating expenses, rig commitments and availability, cash flows, contract status, terms and duration, contract backlog, capital expenditures, insurance, financing and funding; the effect, impact, potential duration and other implications of the ongoing COVID-19 pandemic; impact of our emergence from bankruptcy; the offshore drilling market, including supply and demand, customer drilling programs, stacking of rigs, effects of new rigs on the market and effect of the volatility of commodity prices; expected work commitments, awards and contracts; letters of intent; scheduled delivery dates for rigs; performance of our joint venture with Saudi Aramco; the timing of delivery, mobilization, contract commencement, availability, relocation or other movement of rigs; future rig reactivations; expected divestitures of assets; general market, business and industry conditions, trends and outlook; general political conditions, including political tensions, conflicts and war (such as the ongoing conflict in Ukraine); future operations; increasing regulatory complexity; the outcome of tax disputes; assessments and settlements; and expense management. The forward-looking statements contained in this press release are subject to numerous risks, uncertainties and assumptions that may cause actual results to vary materially from those indicated, including the COVID-19 outbreak and global pandemic and the related public health measures implemented by governments worldwide, which may, among other things, impact our ability to staff rigs and rotate crews; cancellation, suspension, renegotiation or termination of drilling contracts and programs, including drilling contracts which grant the customer termination right if FID is not received with respect to projects for which the drilling rig is contracted; potential additional asset impairments; failure to satisfy our debt obligations; our ability to obtain financing, service our debt, fund capital expenditures and pursue other business opportunities; adequacy of sources of liquidity for us and our customers; the effects of our emergence from bankruptcy on the Company's business, relationships, comparability of our financial results and ability to access financing sources; actions by regulatory authorities, or other third parties; actions by our security holders; commodity price fluctuations and volatility, customer demand, new rig supply, downtime and other risks associated with offshore rig operations; severe weather or hurricanes; changes in worldwide rig supply and demand, competition and technology; consumer preferences for alternative fuels; increased scrutiny of our Environmental, Social and Governance ("ESG") practices and reporting responsibilities; changes in customer strategy; future levels of offshore drilling activity; governmental action, civil unrest and political and economic uncertainties; terrorism, piracy and military action; risks inherent to shipyard rig reactivation, upgrade, repair, maintenance or enhancement; our ability to enter into, and the terms of, future drilling contracts; suitability of rigs for future contracts; the cancellation of letters of intent or letters of award or any failure to execute definitive contracts following announcements of letters of intent, letters of award or other expected work commitments; the outcome of litigation, legal proceedings, investigations or other claims or contract disputes; governmental regulatory, legislative and permitting requirements affecting drilling operations; our ability to attract and retain skilled personnel on commercially reasonable terms; environmental or other liabilities, risks or losses; debt restrictions that may limit our liquidity and flexibility; and cybersecurity risks and threats. In addition to the numerous factors described above, you should also carefully read and consider "Item 1A. Risk Factors" in Part I and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II of our most recent annual report on Form 10-K, which is available on the SEC's website at www.sec.gov or on the Investor Relations section of our website at www.valaris.com. Each forward-looking statement speaks only as of the date of the particular statement, and we undertake no obligation to update or revise any forward-looking statements, except as required by law.*

| Investor & Media Contact: | Tim Richardson |
| --- | --- |
| | Director - Investor Relations |
| | +1-713-979-4619 |

# EXHIBIT 24

**Bondholder Recovery Plan**

| Claim Equity Interest[1] | Projected Recovery Under the Fourth Amended Plan | Claim Amount | Total Project Recovery | Shares Received |
|---|---|---|---|---|
| Pride Bond Claims | 27.20% | $439,296,780.92 | $119,488,724.41 | 2,541,980 |
| Ensco International Bond Claims | 19.10% | $114,229,893.60 | $21,817,909.68 | 447,040 |
| Jersey Bond Claims | 31.40% | $863,607,717.29 | $271,172,823.23 | 5,830,854 |
| Valaris Bond Claims | 15.80% | $3,123,087,570.34 | $493,447,836.11 | 10,630,256 |
| Legacy Rowan Bond Claims | 21.20% | $2,178,878,109.04 | $461,922,159.12 | 9,409,770 |
| Rights Offering Participants | | | | 14,062,500 |
| Backstop Parties | | | | 10,462,500 |
| **Total Recovery** | | **$6,719,100,071.19** | **$1,367,849,452.55** | **53,384,900** |
| *Amount of recovery received in Cash* | | | | *$193,915,501.55* |
| *Amount of recovery received purely in Equity* | | | | *$1,173,933,951.00* |

Out of the 75,000,000 shares issued by restructured Valaris, 53,384,900 pertained to bondholders at $21.99 par value on relisting opening price in 05/03/2021. However, common stock was trading at 5.5%[2] par value; an implied ~99.75%.

| | Price Paid for Debt (as cents on the dollar) | | | | |
|---|---|---|---|---|---|
| | 0.01 | 0.025 | 0.04 | 0.055 | 0.07 |
| Profit @ relisting for Pride Bond Claims | $55,339,159 | $54,500,687 | $53,662,215 | $52,823,742 | $51,985,270 |
| Profit @ relisting for Ensco International Bond Claims | $9,732,106 | $9,584,649 | $9,437,193 | $9,289,737 | $9,142,281 |
| Profit @ relisting for Jersey Bond Claims | $126,938,275 | $125,014,967 | $123,091,660 | $121,168,353 | $119,245,046 |
| Profit @ relisting for Valaris Bond Claims | $231,421,736 | $227,915,346 | $224,408,956 | $220,902,566 | $217,396,176 |
| Profit @ relisting for Legacy Rowan Bond Claims | $204,851,634 | $201,747,821 | $198,644,009 | $195,540,196 | $192,436,383 |

Valaris closing price as of 08/05/2022: $48.10

| | Price Paid for Debt (as cents on the dollar) | | | | |
|---|---|---|---|---|---|
| | 0.01 | 0.025 | 0.04 | 0.055 | 0.07 |
| Current Profit for Pride Bond Claims | $121,710,257 | $120,871,784 | $120,033,312 | $119,194,840 | $118,356,368 |
| Current Profit for Ensco International Bond Claims | $21,404,320 | $21,256,864 | $21,109,408 | $20,961,951 | $20,814,495 |
| Current Profit for Jersey Bond Claims | $279,181,873 | $277,258,565 | $275,335,258 | $273,411,951 | $271,488,644 |
| Current Profit for Valaris Bond Claims | $508,977,720 | $505,471,330 | $501,964,940 | $498,458,550 | $494,952,161 |
| Current Profit for Legacy Rowan Bond Claims | $450,540,729 | $447,436,916 | $444,333,103 | $441,229,291 | $438,125,478 |

IRR: 1,735.4%; MoM: 39.8x

---

[1] Term Sheet From RSA https://cases.stretto.com/public/X088/10396/PLEADINGS/1039602242180000000024.pdf

[2] Approximate from Note Price Paid (pg. 7) https://cases.stretto.com/public/X088/10396/PLEADINGS/1039612042080000000151.pdf

# EXHIBIT 25

## Markets
# Vast DOJ Probe Looks at Almost 30 Short-Selling Firms and Allies

- FBI said to show up at home of Citron's Left in early 2021
- Subpoenas to some firms since have sought info on dozens more

By Katia Porzecanski and Tom Schoenberg
February 4, 2022 at 10:34 AM CST

The Justice Department is collecting a trove of information on dozens of investment firms and researchers engaged in short selling as part of a sweeping U.S. hunt for potential trading abuses, according to people with knowledge of the matter.

The Federal Bureau of Investigation seized computers from the home of prominent short seller Andrew Left, the founder of Citron Research, in early 2021, some of the people said. In more recent months, the Justice Department subpoenaed certain market participants seeking communications, calendars and other records relating to almost 30 investment and research firms, as well as three dozen individuals associated with them, the people said, asking not to be identified discussing confidential inquiries.

Many on that roster -- a veritable who's-who of the activist short-selling realm -- said they haven't been contacted directly by the government, leaving some exasperated about being left in the dark. Reached for comment, Left also said he's frustrated.



The Department of Justice building in Washington, D.C. *Photographer: Stefani Reynolds/Bloomberg*

"It's very tough to defend yourself when you haven't been accused of anything," Left said. "I'm cooperating and I have full faith in the system and the First Amendment," he added, referencing protections on free speech.

The long list of names underscores the breadth of the Justice Department investigation first described by Bloomberg in December and shows how authorities are trying to map out alliances and understand how short sellers handle research and arrange bets that stocks will fall. It remains unclear which, if any, of the names mentioned in subpoenas might be targets of the inquiry or merely have ties to other people or entities of interest.

## SEC Scrutiny

The Securities and Exchange Commission also has sent some requests for information, people with knowledge of those inquiries said. Spokespeople for the Justice Department and SEC declined to comment. No one has been accused of wrongdoing, and in many cases, the opening of a probe doesn't lead to anyone facing charges.

Prominent firms and their leaders mentioned in the Justice Department's requests to some market participants include Melvin Capital Management and founder Gabe Plotkin; Orso Partners and Nate Koppikar; Sophos Capital Management and Jim Carruthers; as well as Kerrisdale Capital Management. The list also includes well-known researchers such as Nate Anderson and his Hindenburg Research, as well as Fraser Perring and his Viceroy Research.

Representatives for most of those firms -- Melvin, Orso, Sophos and Hindenburg -- declined to comment or didn't respond to messages seeking comment.

"We haven't been contacted by DOJ, SEC or any governmental authorities about any investigations," Kerrisdale's chief investment officer, Sahm Adrangi, wrote in an email. "We literally haven't spoken to anyone at the government in many years."

Viceroy's Perring said his firm also hasn't received requests for information.

"We will always cooperate with any such investigations and are happy to assist regulators in carrying out their duties," he said. "All our reports are based on information that is publicly available, sourced from records that anyone at any given time could research or find. Our most recent contact with the DOJ was in assisting an investigation into the fraud at a company that we had researched."

**Firms in the Dark**

Bloomberg had noted in December that Anson Funds, Marcus Aurelius Value, Muddy Waters Capital and Citron are part of the probe.

Other firms mentioned in requests include Atom Investors, Bonitas Research, Connective Capital Management, Falcon Research, GeoInvesting, Gotham City Research, GrizzlyRock Capital, J Capital Research, Oasis Management, Park West Asset Management, QKM, Sabrepoint Capital Management, Silverado Capital, Spruce Point Capital Management, Valiant Capital Management and White Diamond Research.

Representatives for many of those firms -- among them Falcon, GrizzlyRock, J Capital, Oasis, Valiant and White Diamond -- said they hadn't been contacted by investigators. "It's hard for us to comment on something we don't know anything about," said Taylor Hall, a representative for Oasis.

Valiant "has a long-standing policy of cooperating with any inquiries it receives from regulators and other government bodies," but is not aware of being involved in the short-selling probe, chief compliance officer Michaela Beckman said in an email. "Compliance with securities regulations has always been a point of significant emphasis at the firm since inception and we have not been subject to any regulatory action regarding insider trading or short-selling in our 13-year history."

"Ethics are a key part of my work, and I wouldn't do anything unethical or untruthful," said White Diamond's Adam Gefvert. "I may write negative things about a company but I wouldn't embellish anything. Everything is backed by proof."

Not all of the firms enter into public battles with companies. Atom invests in short-selling hedge funds. And GrizzlyRock isn't an activist short seller, founder Kyle Mowery noted, adding that he's glad the Justice Department is looking into that space.

Representatives for the rest declined to comment or didn't respond to messages.

### Pressure on DOJ

Short selling often involves borrowing and selling shares, in a bet that they can be bought back cheaper later to lock in a profit. Investors may also use derivatives such as put contracts.

The Justice Department and financial regulators have faced a growing number of calls in recent years to dig into short sellers and their research partners. Corporate executives including the world's richest person, Tesla Inc.'s Elon Musk, have decried short sellers, accusing them of maligning businesses for profit.

The Justice Department's probe is being run by the fraud section with federal prosecutors in Los Angeles and there's no public signal that authorities have drawn any conclusions. As Bloomberg previously reported, they've been examining trading in dozens of stocks, as well as relationships between funds and researchers, looking for signs that they manipulated markets or broke other laws to profit.

### Tough Times for Shorts

---

### Matt Levine's Money Stuff is what's missing from your inbox.Matt Levine's Money Stuff is what's missing from your inbox.Matt Levine's Money Stuff is what's missing from your inbox.

We know you're busy. Let Bloomberg Opinion's Matt Levine unpack all the Wall Street drama for you.We know you're busy. Let Bloomberg Opinion's Matt Levine unpack all the Wall Street drama for you.We know you're busy. Let Bloomberg Opinion's Matt Levine unpack all the Wall Street drama for you.

    Sign up to this newsletter

---

The U.S. probe adds to a treacherous period for short sellers. Some bearish funds threw in the towel as government stimulus drove equity markets, a situation exacerbated during the pandemic. The

pressure intensified during 2021's meme-stock frenzy, when retail investors banded together to bid up shares of popular short targets, inflicting losses on hedge funds and other traders. By late January of last year, Citron vowed to give up short-selling research and focus on long bets.

Read more: Short Sellers Face End of an Era as Rookies Rule Wall Street

Some of the loudest short-selling critics include executives at companies that were later found to have engaged in malfeasance. But legions of small investors have also expressed outrage over stock slumps, especially during last year's wild trading. Amid the complaints, members of Congress started demanding more government scrutiny.

Researchers make money in a variety of ways beyond placing their own bets. Some sell insights to subscribers, or make arrangements to give clients, such as hedge funds, ideas in exchange for a cut of the profits. Paying customers often get to see research alleging problems at publicly traded companies before publication.

One area of focus is how investors set up their bets that stocks will decline. Investigators have been looking, for example, for signs that money managers might try to engineer startling stock drops to induce selling by market makers or other investors, or engage in other abuses, such as insider trading, people familiar with the matter have said.

— *With assistance by Matt Robinson*

Terms of Service Do Not Sell My Info (California)  Trademarks Privacy Policy
©2022 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Help